**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DOUGLAS W. PETERS, Individually and on Behalf of All Others Similarly Situated,<br><br>                            Plaintiff,<br><br>        v.<br><br>BRASKEM S.A., CARLOS JOSÉ FADIGAS DE SOUZA FILHO, MARCELA APARECIDA DREHMER ANDRADE, and MÁRIO AUGUSTO DA SILVA,<br><br>                            Defendants. | No. 1:15-cv-05132<br><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Douglas W. Peters ("Plaintiff"), by and through the undersigned attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes, without limitation: (a) a review and analysis of regulatory filings made by Braskem S.A. ("Braskem" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by Braskem; and (c) a review of other publicly available information concerning Braskem. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

<u>**SUMMARY OF THE ACTION AND OVERVIEW**</u>

1.      This is a federal securities class action on behalf of all persons or entities who purchased or otherwise acquired Braskem American Depositary Shares ("ADRs") between June June 10, 2011 and March 11, 2015, inclusive (the "Class Period"). Plaintiff seeks to pursue

remedies against Braskem and certain of its officers named as Defendants herein for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Braskem is a Brazilian petrochemical company that is the largest petrochemicals producer in Latin America. Braskem is also the largest producer of thermoplastic resins in the Americas. Braskem's largest shareholders are Petróleo Brasileiro S.A. – Petrobras ("Petrobras"); the Brazilian Development Bank ("BNDES"), the main financing agent for development in Brazil; and Odebrecht S.A. ("Odebrecht"), Brazil's largest infrastructure company.

3.      Braskem buys naphtha, which accounts for half of its production costs and is the main ingredient for making petrochemicals in Brazil, from Petrobras under long-term agreements.  Petrobras provides approximately 70% of Braskem's naphtha needs, and the remaining 30% is imported.

4.      Petrobras has been involved in a massive scheme to funnel billions of dollars in kickbacks to executives at Petrobras. The multibillion-dollar laundering and corruption scandal, dubbed "Car Wash," spread to Petrobras after investigators uncovered ties between Petrobras's former head of refining, Paulo Roberto Costa ("Costa"), and a black-market money dealer, Albert Youssef ("Youssef"). As several of Petrobras's senior executives have now testified, Petrobras and its executives' participation in this long-running scheme caused the Company to overstate by billions of dollars the value of its refineries, oil rigs, and other assets.

5.      Odebrecht itself is one of 16 builders being investigated by federal police and prosecutors for participating in the alleged cartel to overcharge Petrobras for contracts.

6.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational, and compliance policies.  During the

Class Period, Braskem filed reports, forms, and other documents with the SEC that contained false and misleading statements regarding the effectiveness of Braskem's internal controls and procedures.

7. Further, during the Class Period, the Company's Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO"), acting on behalf of Braskem, signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). Those certifications contained false and misleading representations that Braskem had disclosed all "deficiencies and material weaknesses in the design or operation of internal control over financial reporting." These statements and the other similar statements during the Class Period were false. In reality, Braskem paid bribes to buy cheaper raw material from Petrobras between 2006 and 2012.

8. These facts began to emerge on March 11, 2015, when a report from a São Paulo newspaper, *Folha de S. Paolo*, implicated Braskem in the corruption scandal surrounding Petrobras.  According to testimony made by former Petrobras executive Costa and self-confessed money launderer Youssef, Braskem paid at least $5 million annually to Petrobras between 2006 and 2012. The payments were made to acquire crude derivative contracts, like propylene and naphtha, at cheaper prices.

9. On this news, Braskem ADRs fell over 20%, or $1.80 per ADR, on March 11, 2015.

10. As a result of Defendants' wrongful acts and omissions, Braskem ADRs traded at artificially inflated prices during the Class Period, and Plaintiff and other Class members suffered significant losses and damages. Plaintiff and the Class collectively incurred significant losses on their investments in Braskem ADRs.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27(c) of the Exchange Act (15 U.S.C. §78aa(c)). Many of the acts complained of herein, including the dissemination of materially false and misleading statements and reports prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of Defendants occurred, at least in part, in this District.  Braskem ADRs are listed on the New York Stock Exchange ("NYSE") under the symbol "BAK." Braskem appointed The Bank of New York to act as the depositary for the ADRs. The depositary's corporate trust office is located at 101 Barclay Street, New York, New York 10286. The depositary's principal executive office is located at One Wall Street, New York, New York 10286. The deposit agreement and the ADRs are governed by New York law.

13.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

14.     Plaintiff Douglas W. Peters, as set forth in his certification, purchased Braskem ADRs during the Class Period and suffered damages as a result of the federal securities law

violations and false and/or misleading statements and/or material omissions alleged herein. Mr. Peters incorporates by reference his certification filed with his original complaint.

15.     Defendant Braskem is a Brazilian petrochemical company headquartered in Camacari, Brazil that is a subsidiary of Odebrecht S.A. The Company was formerly known as Copene Petroquímica do Nordeste S.A. and changed its name to Braskem S.A. in 2002. The Company is the largest petrochemical company in Latin America and one of the largest in the world.  Braskem is the largest thermoplastic resins producer in the Americas and a major global player in the polypropylene, polyethylene, PVC, and chemicals markets.  Braskem's ADRs are listed on the NYSE under the ticker symbol "BAK."  Braskem appointed The Bank of New York to act as the depositary for the ADRs. The depositary's corporate trust office is located at 101 Barclay Street, New York, New York 10286. The depositary's principal executive office is located at One Wall Street, New York, New York 10286. The deposit agreement and the ADRs are governed by New York law.

16.     Defendant Carlos José Fadigas de Souza Filho ("Filho") has served as CEO and a Member of the Executive Management of Braskem since December 7, 2010.  Previously, Filho acted as Vice President of the Company's International Business Unit until 2011, as well as the Company's CFO and Executive Vice President of Investor Relations from 2007 to 2010, and as Director of Investor Relations of the Company between December 14, 2006, and 2007.  Filho also served as CFO of Construtura Norberto Odebrecht S.A. from 2002 to 2006.

17.     Defendant Marcela Aparecida Drehmer Andrade ("Andrade") has served as a Member of the Board of Directors of Braskem since August 2013.  From 2010 to June 2013, Andrade was Braskem's Vice President Executive Officer, CFO, Planning and Investor Relations Director, and Member of the Executive Board.  She has been the CFO of Odebrecht

S.A. since July 2013.  Andrade has also served as Braskem's Finance Director from 2005 to

2010 and as Manager of the Structured Finance Department of the Company from 2002 to 2005.

18.     Defendant Mario Augusto da Silva ("da Silva") has served as Braskem's CFO,

Investor Relations Officer, and Member of the Executive Management since July 1, 2013.  He

has served as a CFO for Construtora Norberto Odebrecht, Odebrecht Oleo & Gas, and, more

recently, Odebrecht Infraestrutura - Latin America.  Defendant da Silva also has served in the

strategic planning department of Braskem from 2001 to 2005.

19.     Defendants Filho, Andrade, and da Silva are referred to herein as the "Individual

Defendants."  The Individual Defendants, because of their positions with the Company,

possessed the power and authority to control the contents of Braskem's reports to the SEC, press

releases, and presentations to securities analysts, money and portfolio managers, and institutional

investors, *i.e.*, the market.  The Individual Defendants made specific false and misleading

statements and/or reviewed and approved the Company's reports and press releases alleged

herein to be misleading prior to, or shortly after, their issuance and had the ability and

opportunity to prevent their issuance or cause them to be corrected.  Because of their positions

and access to material, non-public information available to them, the Individual Defendants

knew that the adverse facts specified herein had not been disclosed to, and were being concealed

from, the public, and that the positive representations which were being made were then

materially false and/or misleading.

20.     Each Individual Defendant's primary liability and controlling person liability

arises from the following facts, among others: (a) the Individual Defendants were high-level

executives at the Company during the Class Period and members of the Company's management

team or had control thereof; (b) the Individual Defendants, by virtue of their responsibilities and

activities as senior officers of the Company, were privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (c) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) the Individual Defendants were aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

21.     Braskem and the Individual Defendants are collectively referred to herein as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Materially False and Misleading
Statements Issued During the Class Period**

22.     On June 10, 2011, the Company filed its annual report for the year ended December 31, 2010 on a Form 20-F with the SEC (the "2010 20-F").  The 2010 20-F was signed by Filho, the Company's then- and current CEO, and Andrade, the Company's then-CFO.  The Form 20-F stated the Company's financial results and financial position. In addition, the Form 20-F contained signed certifications pursuant to SOX by Filho.  The SOX certifications stated that the financial information contained in the 2010 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.   Specifically, the certifications represented that the 2010 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."   The certifications also stated that Filho had disclosed "[a]ll significant

7

deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting." Filho's statements were attributable to the Company.

23.     In addition, the 2010 20-F stated that the Company's certifying officers "[d]isclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting."

24.     Each of the statements set forth above was materially false and misleading because Braskem's internal controls were grossly ineffective during the Class Period. In the wake of the testimony from Costa and Youssef, the statements regarding the adequacy and effectiveness of the Company's internal controls during the Class Period were materially false and misleading, because Braskem engaged in a scheme where the Company paid bribes, called "under-the-table payments," to buy cheaper raw material from Petrobras between 2006 and 2012.

25.     On April 10, 2012, the Company filed its annual report for the year ended December 31, 2011 on a Form 20-F with the SEC (the "2011 20-F"). The 2011 20-F was signed by Filho, the Company's then- and current CEO, and Andrade, the Company's then-CFO.  The Form 20-F stated the Company's financial results and financial position.  In addition, the Form 20-F contained signed certifications pursuant to SOX by Filho.  The SOX certifications stated that the financial information contained in the 2011 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.  Specifically, the certifications represented that the 2011 20-F did "not contain any untrue statement of a material

fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  The certifications also stated that Filho had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting." Filho's statements were attributable to the Company.

26.   In addition, the 2011 20-F stated that the Company's certifying officers "[d]isclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting."

27.   Each of the statements set forth above was materially false and misleading because Braskem's internal controls were grossly ineffective during the Class Period. In the wake of the testimony from Costa and Youssef, the statements regarding the adequacy and effectiveness of the Company's internal controls during the Class Period were materially false and misleading, because Braskem engaged in a scheme where the Company paid bribes, called "under-the-table payments," to buy cheaper raw material from Petrobras between 2006 and 2012.

28.   On April 8, 2013, the Company filed its annual report for the year ended December 31, 2012 on a Form 20-F with the SEC (the "2012 20-F"). The 2012 20-F was signed by Filho, the Company's then- and current CEO, and Andrade, the Company's then-CFO.  The Form 20-F stated the Company's financial results and financial position. In addition, the Form 20-F contained signed certifications pursuant to SOX by Filho.  The SOX certifications stated

9

that the financial information contained in the 2012 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.   Specifically, the certifications represented that the 2012 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."   The certifications also stated that Filho had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting." Filho's statements were attributable to the Company.

29.    In addition, the 2012 20-F stated that the Company's certifying officers "[d]isclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting."

30.    Each of the statements set forth above was materially false and misleading because Braskem's internal controls were grossly ineffective during the Class Period. In the wake of the testimony from Costa and Youssef, the statements regarding the adequacy and effectiveness of the Company's internal controls during the Class Period were materially false and misleading, because Braskem engaged in a scheme where the Company paid bribes, called "under-the-table payments," to buy cheaper raw material from Petrobras between 2006 and 2012.

31.    On April 14, 2014, the Company filed its annual report for the year ended December 31, 2013 on a Form 20-F with the SEC (the "2013 20-F").   Under the section titled

"*Risks Relating to Our Company and the Petrochemical Industry*," Braskem discusses its reliance on the stable price of naptha and its dependence on Petrobras for its naptha supply. Similar risk language was stated by the Company in previous 20-Fs filed with the SEC. The 2013 20-F stated, in pertinent part, as follows:

> Naphtha, a crude oil derivative, is the principal raw material used by our Basic Petrochemicals Unit and, indirectly, in our other business units. Naphtha accounted, directly and indirectly, for approximately 48.9% of our consolidated cost of sales and services rendered in 2013.
>
> We purchase naphtha for use by our Basic Petrochemical Unit from Petróleo Brasileiro S.A.—Petrobras, or Petrobras, at prices based on a variety of factors, including the Amsterdam-Rotterdam-Antwerp market prices of naphtha and a variety of other petrochemical derivatives, the volatility of the prices of these products in the international markets, the real/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.
>
> \* \* \*
>
> *We do not hedge against changes in the price of naphtha, so we are exposed to fluctuations in the price of our primary raw material.*
>
> We currently do not hedge our exposure to fluctuations in U.S. dollar or *real* prices of naphtha. Although we attempt to pass on increases in naphtha prices through higher prices for our products, in periods of high volatility in the U.S. dollar price of naphtha or in the *real*/U.S. dollar exchange rate, there is usually a lag between the time that the U.S. dollar price of naphtha increases or the *real* depreciates against the U.S. dollar and the time that we may effectively pass on those increased costs in *reals* to our customers in Brazil. As a result, if the U.S. dollar price of naphtha increases precipitously, or if the *real* depreciates against the U.S. dollar, as has occurred in recent years, we may not immediately be able to pass on all of the corresponding increases in our naphtha costs to our customers in Brazil, which would likely reduce our gross margin and net income.
>
> *We depend on Petrobras to supply us with a substantial portion of our naphtha, ethane and propane requirements.*
>
> Petrobras is the only Brazilian supplier of naphtha and has historically supplied approximately 70% of the naphtha consumed by our Basic Petrochemicals Unit. Petrobras produces most of the naphtha it sells to us and imports the balance. Petrobras currently is also the only Brazilian supplier of ethane and propane and has historically supplied all of the ethane and propane consumed by our subsidiary Rio Polímeros S.A., or RioPol, which operates the petrochemical

complex located in Duque de Caxias in the State of Rio de Janeiro, or the Rio de Janeiro Complex.

Our production volume and net sales revenue would likely decrease and our overall financial performance would likely be negatively affected in the event of the following:

- significant damage to Petrobras' refineries or to the port facilities through which Petrobras imports naphtha, or to any of the pipelines connecting our plants to Petrobras' facilities, whether as a consequence of an accident, natural disaster, fire or otherwise; or

- any termination by Petrobras of the naphtha, ethane or propane supply contracts with our company, which provide that Petrobras may terminate the contracts for certain reasons described in "Item 4. Information on the Company—Basic Petrochemicals Unit—Raw Materials of Our Basic Petrochemicals Unit."

In addition, although regulatory changes have ended Petrobras' monopoly in the Brazilian naphtha market and have allowed us to import naphtha, any reversal in the continuing deregulation of the oil and gas industry in Brazil could increase our production costs.

32.     These statements were false and misleading because the Company failed to disclose the true factors concerning the price of naphtha purchased from Petrobras. In reality, Braskem paid annual bribes, initially set at $5 million, to buy crude derivatives such as naphtha and propylene at low prices from 2006 to 2012. Similar statements were made in previous 20-F filings with the SEC.

33.     Furthermore, the 2013 20-F was signed by Filho, the Company's then- and current CEO, and da Silva, the Company's then-CFO. The Form 20-F stated the Company's financial results and financial position. In addition, the 2013 Form 20-F contained signed certifications pursuant to SOX by Filho. The SOX certifications stated that the financial information contained in the 2013 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the 2013 20-F did "not contain any untrue statement of a material fact or omit to state a

12

material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications also stated that Filho had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."  Filho's statements were attributable to the Company.

34.    In addition, the 2013 20-F stated that the Company's certifying officers "[d]isclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting."

35.    Each of the statements set forth above was materially false and misleading because Braskem's internal controls were grossly ineffective during the Class Period.  In the wake of the testimony from Costa and Youssef, the statements regarding the adequacy and effectiveness of the Company's internal controls during the Class Period were materially false and misleading, because Braskem engaged in a scheme where the Company paid bribes, called "under-the-table payments," to buy cheaper raw material from Petrobras between 2006 and 2012.

## The Truth Finally Emerges

36.    On March 11, 2015, Brazil's Office of the Comptroller General ("CGU") announced that it had opened a case against ten additional construction firms with ties to Petrobras.

37.     On that same day, a report from a local newspaper, *Folha de S. Paolo*, implicated Braskem in the corruption scandal surrounding Petrobras.  The report stated that Braskem paid bribes to Petrobras executives and Progressive Party ("PP") party members in order to receive lower prices on naphtha and propylene products from 2006 through 2012. According to the release of testimony from Costa and Youssef, Costa received $5 million annually from Braskem in exchange for assistance.

38.     In addition, it was reported that Alexandrino de Alencar, former Braskem Vice President of Institutional Relations, sought out politicians for the bribes and carried out the bribery.  Former President and CEO of Braskem, Jose Carlos Grubisich, was said to have ratified the bribery personally.

39.     On this news, shares of Braskem fell over 20%, or $1.80 per share, on March 11, 2015.

40.     On April 24, 2015, Braskem filed a Form 6-K with the SEC announcing that it had hired law firms to investigate the bribery allegations.  The 6-K stated the following, in pertinent part:

> In early March 2015, declarations made by defendants in lawsuits filed against third parties were made public, in which Braskem and two of its former executive officers were cited in allegations of supposed improper payments between 2006 and 2012 to benefit the Company in raw-material supply agreements entered into with Petrobras. As of April 24, 2015, to the knowledge of the management, Braskem has not received any notification of the filing of any proceeding or investigation by Brazilian or U.S. authorities.
>
> In light of such facts, the Company's Management and Board of Directors approved in April the internal plan for investigation into the allegations ("Investigation") to be carried out by law firms experienced in similar cases in the United States and in Brazil. The law firms will work under the coordination of an ad hoc committee formed by members of its Board of Directors, specially created for this purpose.
>
> In addition, the following measures have already been taken:

i)   Voluntary announcement about the Investigation and periodical updates sent to regulatory agencies of capital markets in Brazil (Securities and Exchange Commission of Brazil - CVM) and the United States (Securities and Exchange Commission – SEC, and the Department of Justice - DOJ);

ii)   Publication of two Material Fact notices and one Notice to the Market to clarify the news reports and to keep shareholders and the market informed of actions taken by the Company;

iii)  Updating the Audit Board and external auditors about the progress of the Investigation and of the actions already taken.

Braskem and its subsidiaries are subject to a series of anticorruption and anti-bribery laws in the countries where they operate. To reduce the likelihood of infringement of such laws, a series of procedures and controls were implemented and are continuously being improved.

On the other hand, if any of the allegations proves to be true, the Company may be subject to material penalties envisaged in law. At this moment, the Company Management believes that it is not possible to estimate the duration or outcome of the Investigation and, consequently, whether it will have any impact on future financial statements.

The Management is committed to taking all the necessary measures to clarify the facts and will keep the market informed of any progress on this matter.

## CLASS ACTION ALLEGATIONS

41.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities who purchased or otherwise acquired Braskem ADRs from June 10, 2011 to March 11, 2015, inclusive.

42.    Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

43.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are

hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Braskem or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, which is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Braskem;

(c)     whether the price of Braskem ADRs was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

48.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

49.     During the Class Period, Plaintiff and the Class purchased Braskem ADRs at artificially inflated prices and were damaged thereby.  When the misrepresentations that had been made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, the price of the Company's ADRs significantly declined, causing investors' losses.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

50.     Braskem ADRs traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's ADRs, relying upon the integrity of the market price of Braskem shares and the market information relating to Braskem, and have been damaged thereby.

51.     During the Class Period, the artificial inflation of Braskem shares was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Braskem's business, operations, and financial prospects.  These material misstatements and/or omissions created an unrealistically positive assessment of

Braskem and its business and financial condition, thus causing the price of the Company's ADRs to be artificially inflated at all relevant times and, when truthful information was disclosed, negatively affected the value of the Company stock.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's ADRs at such artificially inflated prices and being damaged as a result.

52.    At all relevant times, the market for Braskem ADRs was an efficient market for the following reasons, among others:

(a)    Braskem stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Braskem filed periodic public reports with the SEC and/or the NYSE;

(c)    Braskem regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Braskem was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

53.    As a result of the foregoing, the market for Braskem ADRs promptly digested current information regarding Braskem from all publicly available sources and reflected such information in Braskem's ADR price. Under these circumstances, all purchasers of Braskem

ADRs during the Class Period suffered similar injury through their purchase of Braskem ADRs at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

54.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements, because at the time each of those forward-looking statements was made, the speaker had actual knowledge, or was reckless in not knowing, that the forward-looking statement was materially false or misleading and/or the forward-looking statement was authorized or approved by an executive officer of Braskem who knew, or was reckless in not knowing, that the statement was false when made.

## COUNT I

## Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.     During the Class Period, the Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Braskem ADRs at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Individual Defendants took the actions set forth herein.

57.     The Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADRs in an effort to maintain artificially high market prices for Braskem ADRs in violation of §10(b) of the Exchange Act and Rule 10b-5. The Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

58.     The Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mail, engaged and participated in a continuous course of conduct to conceal adverse material information about Braskem's business, operations, and financial performance and prospects, as specified herein.

59.     The Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Braskem's value, performance, and continued substantial growth. These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Braskem and its business, operations, and financial prospects in light of the circumstances under which they were made, not misleading. As set forth more particularly herein, Defendants further engaged in

transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADRs during the Class Period.  Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.   Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Braskem's financial condition from the investing public and supporting the artificially inflated price of its ADRs.  As demonstrated by Defendants' misstatements and/or omissions concerning the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

60.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Braskem ADRs was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's ADRs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the market in which the ADRs trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Defendants, but not disclosed in public statements by the Defendants during the Class Period, Plaintiff and the other members of the Class acquired Braskem ADRs during the Class Period at artificially high prices and were damaged thereby.

61.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff

and the other members of the Class and the marketplace known the truth regarding Braskem and its business and prospects, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Braskem ADRs, or, if they had acquired such ADRs during the Class Period, they would not have done so at the artificially inflated prices that they paid.

62.     By virtue of the foregoing, the Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's ADRs during the Class Period.

**COUNT II**

**Violations of §20(a) of the Exchange Act**
**Against the Individual Defendants**

64.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65.     The Individual Defendants acted as controlling persons of Braskem within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends is false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other

statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.     As set forth above, Braskem and the Individual Defendants violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.   As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure with Plaintiff serving as class representative;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 3, 2015

*/s/ Thomas L. Laughlin*
Thomas L. Laughlin (TL-8888)
Donald A. Broggi
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: 212-223-6444
Facsimile: 212-223-6334
tlaughlin@scott-scott.com
dbroggi@scott-scott.com

David R. Scott
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Telephone:  (860) 537-5537
Facsimile:  (860) 537-4432
david.scott@scott-scott.com

*Counsel for Plaintiff Douglas W. Peters*