UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

IN RE BRASKEM S.A. SECURITIES LITIGATION

------------------------------------------------------------------X

     15 Civ. 5132 (PAE)

     OPINION & ORDER

------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/8/15
```

DOUGLAS W. PETERS, *individually and on behalf of all others similarly situated,*

               Plaintiff,

         -v-

BRASKEM S.A., et al.,

               Defendants.

------------------------------------------------------------------X

     15 Civ. 5132 (PAE)

CARMINE VITOLO, *individually and on behalf of all others similarly situated,*

               Plaintiff,

         -v-

BRASKEM S.A., et al.,

               Defendants.

     15 Civ. 5183 (PAE)

------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

In July 2015, the above two putative class actions were filed, under the federal securities laws, on behalf of purchasers of certain Braskem S.A. ("Braskem") securities between June 1, 2010 and March 11, 2015. Plaintiffs in each case claim that Braskem and the individual defendants (all directors and officers of Braskem) made false and misleading statements about,

and/or failed to disclose, *inter alia*, Braskem's payment of millions of dollars in annual bribes to

enable it to buy raw materials at reduced prices. As a result, plaintiffs allege, Braskem's costs

were artificially low, and its shares traded at artificially inflated prices. But, on March 11, 2015,

when the media exposed the alleged corruption scheme, Braskem shares fell more than 20%,

harming plaintiffs.

Pending before the Court are two sets of motions. One, unopposed, is to consolidate

these actions. The other consists of motions from two investors, each seeking appointment as

lead plaintiff and appointment of their respective attorneys as lead counsel. These movants are:

(1) the Boilermaker-Blacksmith National Pension Trust ("BBNPT"), a pension plan; and

(2) Ricardo DeSouza, an individual.

For the reasons that follow, the Court (1) consolidates these two actions, (2) appoints

BBNPT as lead plaintiff, and (3) appoints as lead counsel BBNPT's attorney, Cohen Milstein

Sellers & Toll PLLC.

## I.      Background[1]

Braskem is a Brazilian petrochemical company. Peters Am. Compl. ¶ 2; Vitolo Compl.

¶¶ 2, 14. It is the largest petrochemical producer in Latin America and the largest producer of

thermoplastic resins in the Americas. Peters Am. Compl. ¶ 2; Vitolo Compl. ¶ 2. Braskem's

American Depository Shares ("ADRs") are listed on the New York Stock Exchange under the

ticker symbol "BAK."[2] Peters Am. Compl. ¶ 12; Vitolo Compl., p. 36. Braskem's three largest

---

[1] The following facts are drawn from Peters's Complaint ("Peters Compl.") (15 Civ. 5132, Dkt. 1), Peters's Amended Complaint ("Peters Am. Compl.") (15 Civ. 5132, Dkt. 13), Vitolo's Complaint ("Vitolo Compl.") (15 Civ. 5183, Dkt. 1), and the parties' submissions on the lead-plaintiff motions, as cited herein. The Court takes these facts as true solely for the purpose of resolving these motions.

[2] As the Second Circuit has explained:

shareholders are (1) Petróleo Brasiliero S.A. – Petrobras ("Petrobras"), an integrated oil and gas company; (2) the Brazilian Development Bank, the primary financing agent for development in Brazil; and (3) Odebrecht S.A. ("Odebrecht"), Brazil's largest infrastructure company.  Peters Am. Compl. ¶ 2; Vitolo Compl. ¶¶ 3, 40.

In Brazil, the "main ingredient" for producing petrochemicals is naphtha, which accounts for half of Braskem's production costs.  Peters Am. Compl. ¶ 3; Vitolo Compl. ¶ 40.  Braskem buys 70% of its naphtha from Petrobras under long-term contracts; Braskem imports the remaining 30% of naphtha.  Peters Am. Compl. ¶ 3.

Petrobras has been involved in a multibillion dollar laundering and corruption scandal, in which "billions of dollars in kickbacks" were "funneled" to executives at Petrobras.  *Id.* ¶ 4.  This "long-running scheme caused [Petrobras] to overstate by billions of dollars the value of its refineries, oil rigs, and other assets."  *Id.*  On September 7, 2014, the *New York Times* published

---

[I]n order for a foreign corporation to trade on the American stock exchange without listing its ordinary shares on the exchange, the foreign corporation must issue and deposit American Depositary Shares or ADSs with an American financial institution.  *See Kingdom 5–KR–41, Ltd. v. Star Cruises PLC*, Nos. 01 Civ. 2946 (DLC) *et al.*, 2004 WL 1944457, at *1 n.1 (S.D.N.Y. Aug. 31, 2004).  The depositary institution then issues American Depositary Receipts or ADRs to the beneficial owners of the ADSs, who are then free to sell the ADSs on American securities exchanges.  *Id.*  The listing of ADSs on an American exchange "makes trading an ADR simpler and more secure for American investors than trading in the underlying security in the foreign market."  *In re Nat'l Australia Bank Sec. Litig.*, No. 03 Civ. 6537 (BSJ), 2006 WL 3844465, at *1 n.3 (S.D.N.Y. Oct. 25, 2006) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (3d Cir. 2002)).

ADSs share several of the same characteristics as ordinary shares.  For example, "ADRs are tradeable in the same manner as any other registered American security, may be listed on any of the major exchanges in the United States or traded over the counter, and are subject to the [federal securities laws.]"  *Id.* at *1 n.3.

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 464 (2d Cir. 2010).

an article about this kickback scheme, which, as alleged, involved Petrobras and various Brazilian political figures, including three governors, the energy minister, and more than 30 legislators.  Vitolo Compl. ¶ 4.  According to former Petrobras executive Paulo Roberto Costa ("Costa"), who testified pursuant to a plea deal, the kickback scheme involved the billing of contracts for oil projects, and politicians benefited by receiving 3% of the value of the contract. *Id.*

Throughout the class period, plaintiffs allege, it had appeared, including from Braskem's public statements, that it was not engaged in such bribery and/or kickback schemes.  For instance, in a series of public filings, Braskem officers made statements about the company's business, operations, and prospects in annual reports filed on Form 20-F with the SEC.  Peters Am. Compl. ¶¶ 22–34; Vitolo Compl. ¶¶ 21–36.  These Forms 20-F acknowledged Braskem's reliance on Petrobras for raw materials, described the terms of Braskem's five-year supply contract with Petrobras, summarized risks that Braskem faced, and attested that the company had disclosed any fraud "that involves management" as well as "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize, and report financial information."  Peters Am. Compl. ¶ 33; Vitolo Compl. ¶ 22.  Plaintiffs, however, clam that these statements by Braskem and its executives were knowingly and materially false and/or misleading, insofar as they failed to reveal Braskem's participation in the corruption scandal involving Petrobras.  Peters Am. Compl. ¶ 35; Vitolo Compl. ¶ 37.

On March 11, 2015, the Brazilian newspaper *Folha de S. Paolo* published an article that implicated Braskem in that corruption scandal.  According to confidential testimony of former Petrobras executive Costa, and admitted money launderer Alberto Youssef, Braskem paid annual

bribes of at least $5 million per year to Petrobras, between 2006 and 2012, in order to buy crude derivatives such as naphtha at lower prices.  Peters Am. Compl. ¶ 37; Vitolo Compl. ¶ 38.

The day that this story was published, the price of shares of Braskem ADRs fell more than 20%, or $1.80 per ADR.  Peters Am. Compl. ¶ 39; Vitolo Compl. ¶ 39.  Trading that day was "unusually heavy."  Peters Am. Compl. ¶ 39; Vitolo Compl. ¶ 39.

On July 1, 2015, Peters filed a Complaint, *see* 15 Civ. 5132, Dkt. 1, and published a notice of this action on *BusinessWire*, *see* 15 Civ. 5132, Dkt. 23, Ex. 1, a "widely circulated national business-oriented wire service," 15 U.S.C. § 78u–4(a)(3)(A)(i).[3]  On July 2, 2015, Vitolo filed a Complaint, as well.  15 Civ. 5183, Dkt. 1.[4]  The class period as defined in the Complaints is from June 1, 2010 to March 11, 2015.  Plaintiffs allege that, throughout the class period, Braskem and the individual defendants (officers and directors) made false and misleading statements, and failed to disclose material adverse facts about Braskem's business, operations, and prospects.  Peters Am. Compl. ¶ 6.  "Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company was engaged in the payment of annual bribes to Petrobras; (2) that such payments were made to purchase crude derivatives at low prices; (3) that, as a result, the Company's crude derivatives costs were maintained at artificially low prices; [and] (4) that the Company lacked adequate internal controls."  Vitolo Compl. ¶ 7; *see also* Peters Am. Compl. ¶¶ 6–7.  Plaintiffs both allege violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and Rule 10b-5.  Peters Am. Compl. ¶ 11; Vitolo Compl. ¶ 9.

---

[3] *See, e.g.*, *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 288 F.R.D. 26, 32 (S.D.N.Y. 2012) (noting that *BusinessWire* is "a widely-circulated, national, business-orientated news reporting wire service").

[4] On August 3, 2015, Peters filed an Amended Complaint.  *See* 15 Civ. 5132, Dkt. 13.

## II.     Consolidation

### A.     Legal Standards

Federal Rule of Civil Procedure 42(a) provides that, "[i]f actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay."

Rule 42(a) "empowers a trial judge to consolidate actions for trial when there are common questions of law or fact," and where consolidation will avoid needless costs or delay. *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990); *see also Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999). "Typically, considerations of judicial economy favor consolidation, but 'the benefits of efficiency can never be purchased at the cost of fairness.'" *M & T Mortg. Corp. v. White*, No. 04 Civ. 4775 (WFK) (VVP), 2012 WL 715896, at *1 (E.D.N.Y. Feb. 14, 2012) (quoting *Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346, 350 (2d Cir. 1993)), *report and recommendation adopted*, No. 04 Civ. 4775 (WFK) (VVP), 2012 WL 954651 (E.D.N.Y. Mar. 5, 2012). Before a Court orders consolidation, it must consider several factors and determine, *inter alia*, whether the gains in efficiency and economy are outweighed by the "risks of prejudice and possible confusion." *Johnson*, 899 F.2d at 1284 (citation and internal quotation marks omitted).

In the securities context, the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, provides that consolidation should occur where multiple actions assert "substantially the same claim." *Id.* § 78u–4(a)(3)(B)(ii).

### B.    Analysis

In this case, all parties seek consolidation, and consolidation is clearly merited.  *See* 15 Civ. 5132, Dkt. 18 and 21; and 15 Civ. 5183, Dkt. 6 and 9.  Both Complaints sue Braskem under the Exchange Act "on behalf of all persons or entities" who acquired Braskem ADRs between June 1, 2010 and March 11, 2015.[5]  Both center on the same alleged facts: Braskem's false and misleading statements about the adequacy of its internal controls, and its failure to disclose the facts that it allegedly paid annual bribes to Petrobras, resulting in artificially low reported costs. The defendants in the two suits are also common:  They include Braskem executives such as Carlos José Fadigas de Souza Filho, Braskem's CEO since December 2010; Marcela Aparecida Drehmer Andrade, Braskem's CFO between 2010 and June 2013, and a director since August 2013; and Mário Augusto da Silva, Braskem's CFO since July 1, 2013.  Peters Am. Compl. ¶¶ 16–18; Vitolo Compl. ¶¶ 15–16, 18.  Although the Vitolo Complaint names one other

---

[5] In Peters's original Complaint, the start date of the class period was June 1, 2010—the same start date as in Vitolo's.  Peters Compl. ¶ 1; Vitolo Compl. ¶ 1.  However, in his Amended Complaint, Peters changed the start date of the class period to June 10, 2011.  Peters Am. Compl. ¶ 1.  This difference is insignificant and does not bespeak material differences in the Complaints' substantive allegations.  Importantly, the proposed class periods end on the same date—the date where the truth allegedly emerged.  And courts routinely consolidate securities class actions despite minor differences in class periods where, as here, it is clear that there are common questions of law and fact.  *See, e.g.*, *Kaplan v. Gelfond*, 240 F.R.D. 88, 92 (S.D.N.Y. 2007), *reconsideration granted in part on other grounds sub nom. In re IMAX Sec. Litig.*, No. 06 Civ. 6128 (NRB), 2009 WL 1905033 (S.D.N.Y. June 29, 2009); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co.*, 229 F.R.D. 395, 402 (S.D.N.Y. 2004); *Skwortz v. Crayfish Co.*, Nos. 00 Civ. 6766 (DAB) *et al.*, 2001 WL 1160745, at *2 n.3 (S.D.N.Y. Sept. 28, 2001), *reconsideration granted in part on other grounds sub nom. In re Crayfish Co. Sec. Litig.*, No. 00 Civ. 6766 (DAB), 2002 WL 1268013 (S.D.N.Y. June 6, 2002); *Olsen v. N.Y. Cmty. Bancorp, Inc.*, 233 F.R.D. 101, 104–05 (E.D.N.Y. 2005); *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 293 (E.D.N.Y. 1998).

For purposes of this opinion only, the Court treats the class period as June 1, 2010 to March 11, 2015.  It is for plaintiffs, in a consolidated amended complaint, to identify what they believe the proper class period to be.

defendant (the Braskem CEO between July 2008 and December 2010, *see* Vitolo Compl. ¶ 17), the lawsuits are, overwhelmingly, similar.

Courts routinely consolidate securities class actions arising from the same allegedly actionable statements. *See, e.g.*, *Simmons v. Spencer*, No. 13 Civ. 8216 (RWS), 2014 WL 1678987, at *2 (S.D.N.Y. Apr. 25, 2014); *In re Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338, 344 (S.D.N.Y. 2009); *Blackmoss Invs., Inc. v. ACA Capital Holdings, Inc.*, 252 F.R.D. 188, 190 (S.D.N.Y. 2008).  All relevant factors support consolidation here.  Accordingly, the Court consolidates these actions.

## III.   Selecting the Lead Plaintiff: The PSLRA Requirements

Motions for appointment of lead plaintiff and approval of lead counsel in putative class actions brought under the securities laws are governed by the Private Securities Litigation Reform Act ("PSLRA").  *In re Millennial Media, Inc. Sec. Litig.*, No. 14 Civ. 7923 (PAE), 2015 WL 566460, at *4 (S.D.N.Y. Feb. 10, 2015); *Bo Young Cha v. Kinross Gold Corp.*, No. 12 Civ. 1203 (PAE), 2012 WL 2025850, at *2 (S.D.N.Y. May 31, 2012).  The PSLRA directs the court to appoint as lead plaintiff the party or parties "most capable of adequately representing the interests of class members."  15 U.S.C. § 78u–4(a)(3)(B)(i).  Under the PSLRA, there is a rebuttable presumption that the most adequate plaintiff is the person or group of persons that: (1) has either "filed a complaint or made a motion in response to a notice," *id.* § 78u–4(a)(3)(B)(iii)(I)(aa); (2) in the determination of the Court, has the "largest financial interest in the relief sought by the class," *id.* § 78u–4(a)(3)(B)(iii)(I)(bb); and (3) satisfies all the requirements of Federal Rule of Civil Procedure 23, which governs class actions, *see id.* § 78u–4(a)(3)(B)(iii)(I)(cc).

### A.   Notice

All putative lead plaintiffs satisfy the first requirement, as each has either filed a complaint or submitted a timely motion for lead plaintiff status. *See* 15 U.S.C. § 78–u4(a)(3)(B)(iii)(I); *City of Monroe Emps. Ret. Sys. v. Hartford Fin. Servs. Group, Inc.*, 269 F.R.D. 291, 293 (S.D.N.Y. 2010).[6]

### B.   Financial Interest

In determining who has the largest financial stake in the litigation, courts in this Circuit have traditionally applied a four-factor test, first set forth in *Lax v. First Merchants Acceptance Corp.*, No. 97 Civ. 2715 (DHC), 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997). These "*Lax*" factors include:

> (1) the total number of shares purchased during the class period;
> (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period);
> (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and
> (4) the approximate losses suffered.

*City of Monroe*, 269 F.R.D. at 293.

Of these factors, courts have consistently held that the fourth, the magnitude of the loss suffered, is most significant. *See, e.g.*, *Kaplan v. Gelfond*, 240 F.R.D. 88, 93 (S.D.N.Y. 2007) ("Although courts have differed on how much weight to assign to each of the *Lax* factors, we, as have other courts, shall place the most emphasis on the last of the four factors: the approximate loss suffered by the movant."), *reconsidered on other grounds*, *In re IMAX Sec. Litig.*, No. 06

---

[6] Because Peters published a notice of his action on July 1, 2015 (*see* 15 Civ. 5132, Dkt. 23, Ex. 1), the deadline to file a motion for appointment as lead plaintiff was August 31, 2015.  15 U.S.C. § 78u–4(a)3(A)(i)(II).

Civ. 6128 (NRB), 2009 WL 1905033 (S.D.N.Y. June 29, 2009); *Bo Young Cha*, 2012 WL 2025850, at *2; *Reimer v. Ambac Fin. Group Inc.*, No. 08 Civ. 411 (NRB), 2008 WL 2073931, at *3 (S.D.N.Y. May 9, 2008); *Bhojwani v. Pistiolis*, No. 06 Civ. 13761 (CM) (KNF), 2007 WL 2197836, at *6–7 (S.D.N.Y. July 31, 2007); *Strougo v. Brantley Capital Corp.*, 243 F.R.D. 100, 104–05 (S.D.N.Y. 2007); *see also Foley v. Transocean Ltd.*, 272 F.R.D. 126, 128 (S.D.N.Y. 2011) ("[I]n determining the largest financial interest, 'most courts simply determine which potential lead plaintiff has suffered the greatest total losses.'").

Here, the lead plaintiff candidates lost dramatically different amounts upon Braskem's stock-price drop on March 11, 2015.  Peters, a named plaintiff, lost about $360, *see* Peters Compl., Schedule A; Vitolo, the other named plaintiff, lost about $1,440, *see* Vitolo Compl., p. 36; DeSouza, a movant for lead plaintiff, lost $56,061, *see* 15 Civ. 5132, Dkt. 7, at 2; and BBNPT, the other movant for lead plaintiff, lost $1,408,952.77, *see* 15 Civ. 5132, Dkt. 22, at 1. BBNPT's losses are more than 25 times greater than any other lead plaintiff candidate's.

Under the PSLRA, Peters, Vitolo, and DeSouza's financial interests are far too small, relative to BBNPT's, for them to credibly bid for appointment.  *See* 15 U.S.C. §§ 77z–1(a)(3)(B)(iii); 78u–4(a)(3)(B)(iii).  And BBNPT is an institutional investor, the type of investor Congress prefers as lead plaintiff.  *See, e.g.*, H.R. Conf. Rep. No. 104-369, at *34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733 (1995) (stating that "increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions"); *Glauser v. EVCI Ctr. Colls. Holding Corp.*, 236 F.R.D. 184, 188 (S.D.N.Y. 2006) ("[T]he PSLRA was passed . . . to increase the likelihood that institutional investors would serve as lead plaintiffs in actions such as this one.") (citation

omitted); *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 99 (S.D.N.Y. 2005) ("[T]he PSLRA was designed to favor institutional investors.").

Nor is this a case where it would serve the class's interests to appoint co-lead plaintiffs because, for instance, one investor suffered the greatest losses but another was the only investor to have held the relevant securities for the full class period. *See, e.g.*, *Millennial Media, Inc. Sec. Litig.*, 2015 WL 566460, at *5. Here, no lead plaintiff candidates held Braskem ADRs for the full class period.

In sum, as between the four lead plaintiff candidates, all considerations point to BBNPT, the sole institutional investor and the investor with, by far, the largest losses.

### C.     Rule 23 Requirements

The PSLRA's final requirement is that the proposed lead plaintiff satisfy Rule 23's requirements for class certification: numerosity, commonality, typicality, and adequacy.  At this early stage of litigation, however, "only the last two factors—typicality and adequacy—are pertinent."  *Bo Young Cha*, 2012 WL 2025850, at *6 (quoting *Constance Sczesny Trust v. KPMG LLP*, 223 F.R.D. 319, 324 (S.D.N.Y. 2004)).

Lead plaintiffs' claims are typical where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Sgalambo v. McKenzie*, 268 F.R.D. 170, 173–74 (S.D.N.Y. 2010) (citations omitted).  A lead plaintiff is adequate where it "does not have interests that are antagonistic to the class that he seeks to represent and has retained counsel that is capable and qualified to vigorously represent the interests of the class that he seeks to represent."  *Glauser*, 236 F.R.D. at 189 (citing *Dietrich v. Bauer*, 192 F.R.D. 119, 124 (S.D.N.Y. 2000)).  "The claims of [BBNPT] are typical of the class because their claims and injuries arise from the same conduct

from which the other class members' claims and injuries arise." *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 49–50 (S.D.N.Y. 1998) (citations omitted).

No party or movant has contested BBNPT's typicality. And no party or movant has claimed that BBNPT "will not fairly and adequately protect the interests of the class" or is subject to "unique defenses" that render BBNPT incapable of adequately representing the class. 15 U.S.C. § 78u–(4)(a)(3)(B)(iii)(II).

Because BBNPT has satisfied all of the PSLRA requirements as of this early stage, the Court appoints BBNPT lead plaintiff.

## IV. Appointing Lead Counsel

The most adequate plaintiff may retain counsel to represent the class, subject to the Court's approval. *Id.* § 78u–(4)(a)(3)(B)(v). BBNPT has selected the law firm of Cohen Milstein Sellers & Toll PLLC. Having reviewed the firm's submissions as to its pertinent background and experience, including its experience litigating securities class actions, the Court finds that this firm is qualified to serve as lead counsel. Accordingly, the Court appoints Cohen Milstein Sellers & Toll PLLC as lead counsel.

CONCLUSION

To summarize, these two cases (15 Civ. 5132 and 15 Civ. 5183) are now consolidated for all purposes, and shall proceed under the name, *In re Braskem Securities Litigation*, and under the case number, 15 Civ. 5132. BBNPT's motion seeking appointment as lead plaintiff is granted. DeSouza's motion to serve as lead plaintiff is denied. The Court appoints Cohen Milstein Sellers & Toll PLLC as lead counsel.

The Clerk of Court is directed to terminate the motions pending at 15 Civ. 5132, Dkt. 18 and 21; and 15 Civ. 5183, Dkt. 6 and 9.  In light of the consolidation, the Clerk of Court is also directed to close the Vitolo case, 15 Civ. 5183.

The Court directs the parties to meet and confer and, by **September 22, 2015**, to submit a joint letter to the Court with an efficient proposed schedule for next steps in this case—including proposed dates for the filing of (1) a consolidated amended complaint and (2) defendants' response.  If defendants anticipate that their response will take the form of a motion to dismiss, the parties shall include proposed dates for the opposition and reply briefs as well.


SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: September 8, 2015
       New York, New York