**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | X | |
| IN RE BRASKEM, S.A., | : | |
| SECURITIES LITIGATION | : | Civil Action No. 15-CV-5132-PAE |
| | : | |
| | X | |

**CONSOLIDATED CLASS ACTION COMPLAINT**

Lead Plaintiff, the Boilermaker-Blacksmith National Pension Trust ("Lead Plaintiff"), hereby brings this Complaint for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and t(a) and SEC Rule 10b-5 promulgated thereunder, codified at 17 C.F.R. § 240.10b-5, against Braskem S.A. ("Braskem" or the "Company"); Bernardo Afonso de Almeida Gradin ("Gradin"); Carlos José Fadigas de Souza Filho ("Fadigas"); Marcela Aparecida Drehmer Andrade ("Drehmer") and Mario Augusto da Silva ("da Silva"); and Odebrecht S.A. ("Odebrecht").   Lead Plaintiff's allegations against Defendants (defined below) in this Consolidated Class Action Complaint (the "Complaint") are based on personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of their counsel, which included, among other things:   (i) review and analysis of Braskem's public filings with the U.S. Securities and Exchange Commission ("SEC") and certain international financial agencies; (ii) review and analysis of industry and Braskem analyst reports and other publicly-available materials concerning Braskem's business practices and revenue recognition policies; (iii) review and analysis of documents uncovered by the Brazilian government's investigation into Braskem, Petróleo Brasileiro S.A. – Petrobras ("Petrobras") and Odebrecht; and (iv) review and analysis of other publicly-available information concerning Braskem.   Lead Plaintiff believes that substantial additional evidentiary support will exist for their allegations after a reasonable opportunity for discovery.   On behalf of itself and the class they seek to represent, Lead Plaintiff alleges as follows:

I.      **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of Lead Plaintiff and a proposed class of purchasers of Braskem Ordinary Participation Certificates ("CPOs") in the form of

American Depository Shares ("ADS") during the period from June 1, 2010 to March 11, 2015, inclusive (the "Class Period").  Lead Plaintiff seeks to pursue remedies against Braskem and certain of its officers named as Defendants herein for violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

2.      Braskem is a Brazilian petrochemical company that is the largest petrochemicals producer in Latin America. Braskem is also the largest producer of thermoplastic resins in the Americas.  Braskem's largest shareholders are Odebrecht, Brazil's largest infrastructure company, and Petrobras, a quasi-government-owned energy company and the largest in the Southern Hemisphere, who, together, during the Class Period owned approximately 74% of Braskem's outstanding share capital and completely controlled Braskem's voting rights with approximately 97% of the Company's voting share capital.  Petrobras and Odebrecht are popularly understood to be Braskem's owners.[1]  Braskem's third largest shareholder is the Brazilian Development Bank ("BNDES"), the main financing agent for development in Brazil. Among the Company's internal divisions, Braskem has three major production units: the Basic Petrochemicals Unit, the Polyolefins Unit, and the Vinyls Unit.

3.      Braskem's Basic Petrochemicals Unit buys naphtha both domestically and from sources abroad, and transforms the naphtha into materials that are then used by Braskem's other production units.  Braskem purchases its domestic naphtha from Petrobras under long-term agreements. Petrobras is Brazil's only domestic naphtha supplier.  During the Class Period, naphtha accounted, directly and indirectly, for approximately half of Braskem's consolidated cost of sales and services rendered.  Petrobras provides approximately 70% of Braskem's naphtha needs, and Braskem imports the remaining 30%.

---

[1] *See, e.g.*, *Brazil: Braskem + Petrobras naphtha supply agreement on hold, O Estado de Sao Paulo*, Feb. 9, 2015, 2015 WLNR 4008647.

4.    Both prior to and during the Class Period, Braskem and Odebrecht, for the benefit of Braskem, caused the payment of bribes to politicians in the Partido Progressista, Brazil's Progressive Party, and to Petrobras, particularly Petrobras' former head of refining and director of supply, Paulo Roberto Costa ("Costa") as part of a price-fixing scheme to fix the price of naphtha that Braskem purchased from Petrobras.  The bribes resulted in Braskem receiving contracts for the purchase of naphtha from Petrobras for prices materially lower than the prevailing market rate.

5.    As a result, throughout the Class Period, Braskem and the Individual Defendants made materially false and misleading statements and omissions regarding the Company's business, operational, and compliance policies. During the Class Period, Braskem filed reports, forms, and other documents with the SEC that contained false and misleading statements and omissions regarding the effectiveness of Braskem's internal controls and procedures.  Those reports also falsely stated that the price at which Braskem purchased naphtha from Petrobras was dependent on market factors like the market price of naphtha, the *real*/U.S. dollar exchange rate, the volatility of the prices of these products in the international markets, and the level of paraffinicity of the naphtha that is delivered.

6.    However, Braskem's public statements, particularly its annual reports, filed with the SEC on Form 20-F, did not disclose that Braskem had paid up to  USD $5 million a year in bribes to the Progressive Party and Petrobras in exchange for favorable naphtha prices.  This bribery scheme took place both before and throughout the majority of the Class Period, from 2006 to 2014, and was part of an effort on behalf of Braskem, and its largest shareholder, Odebrecht, to secure raw materials at below-market prices to increase profitability for Braskem—a company which Odebrecht and Petrobras collectively controlled, including the

employment of 90% of Braskem's Board Members as well as the appointment, without challenge, of the Individual Defendants as CEO and CFO during the Class Period.

7.     Defendants paid these bribes, caused these bribes to be paid and/or knew or should have known that these bribes were paid to secure more favorable pricing of naphtha, the raw material critical to Braskem's petrochemical production business and a material sold exclusively in the domestic market by Petrobras.

8.     This bribery scheme was critical to Braskem's purported profitability, because, according to sworn testimony by a Petrobras executive, without the bribe-induced lower prices of naphtha, Braskem's profit margin would have been substantially compromised.    Thus, throughout the Class Period, the Company, the Individual Defendants and Odebrecht orchestrated a scheme to inflate the Company's share prices through a series of materially false and misleading statements and omissions regarding the Company's finances, business and operational and compliance policies.

9.     In connection with Braskem's annual reports filed during the Class Period, the Company's CEO and CFO, the Individual Defendants, acting on behalf of Braskem, also signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). Those certifications contained false and misleading representations that Braskem had disclosed all "deficiencies and material weaknesses in the design or operation of internal control over financial reporting." These statements and the other similar statements during the Class Period were false. In reality, Braskem paid bribes to buy cheaper raw material from Petrobras between 2006 and 2014.

10.     Odebrecht, as the Company's single largest shareholder, who, throughout the Class Period owned 38% of Braskem's outstanding share capital alone (approximately and 74%

in conjunction with Petrobras)[2] as well as 50.1% of the voting share capital itself, had the power to direct and cause the direction of the Company and the terms of its naphtha contracts with Petrobras.

11.     By shareholder agreement, Petrobras and Odebrecht retained veto power over Braskem's corporate actions and collectively appointed ten out of eleven total Board Members for Braskem.   The shareholder agreement also confers on Odebrecht the power to single-handedly appoint Braskem's CEO and CFO every two to three years[3] and on Petrobras the power to single-handedly appoint Braskem's Investment and Portfolio Officer.   As a result, Braskem agreed to undertake certain actions only after Odebrecht and Petrobras reach a consensus with respect to those actions.   Odebrecht also holds the sole power to approve Braskem's business plan, which is based largely on the purchase and use of naphtha from Petrobras.   Braskem's Annual Report for 2014 states plainly that "Odebrecht will have the ability to determine the outcome of most corporate actions or decisions requiring the approval of our shareholders or our board of directors — in certain instances, with the consent of Petrobras."

12.     The facts surrounding Defendants' involvement in a long-running bribery scheme that directly benefited Braskem's bottom line began to emerge as the result of a broad investigation by Brazilian authorities into a massive scheme to funnel billions of dollars in kickbacks to executives at Petrobras. The multibillion-dollar laundering and corruption scandal, dubbed "Car Wash," spread to Petrobras after investigators uncovered ties between Petrobras's Costa, and a black-market money dealer, Albert Youssef ("Youssef").

---

[2] Odebrecht's total share capital described herein experienced *de minimis* fluctuations from 38.1% up to 38.4% year over year during the Class Period, but its direct and indirect voting share capital of 50.1% did not change during the Class Period.  *See* Braskem's Form 20-F for fiscal years 2010 - 2015.

[3] Braskem had Bylaws in place in 2010 that set tenures at two years.  When the Bylaws were readopted in 2012, this tenure was extended to three years.  *See* Braskem, S.A., Annual Report (Form 20-F) (Apr. 11, 2012) at Ex. 1.01 and Braskem, S.A., Report of Foreign Private Issuer (Form 6-K) (Mar. 1, 2012).

13.     On March 11, 2015, a report from a São Paulo newspaper, *Folha de S. Paulo*, implicated Braskem in the "Car Wash" corruption scandal which, by this time not only included investigations of Petrobras, but also Odebrecht.   According to testimony made by Costa and Youssef, Braskem paid up to USD $5 million annually to Petrobras between 2006 and 2014. The payments were made by Braskem and Odebrecht staff to acquire raw materials for Braskem's petrochemical production, materials such as propylene and naphtha, at cheaper prices. Several politicians, executives at Petrobras and Odebrecht, and others have been arrested, are facing trial or are currently serving prison sentences for their roles in the illegal bribery scheme.   On June 19, 2015, Odebrecht's CEO, Marcelo Odebrecht, who was also the Chairman of Braskem's Board of Directors at the time, was arrested for his role in the scheme as was Alexandrino Alencar ("Alencar"), an executive consultant at Braskem and then later at Odebrecht.

14.     On this news, Braskem ADSs fell over 20%, or $1.80 per ADR, on March 11, 2015 and Lead Plaintiff and the Class were damaged as a result.

15.     On April 24, 2015, Braskem  filed its 2014 Annual Report with the SEC on Form 20-F which explained that,

> In the context of anti-corruption allegations against certain individuals and entities in Brazil, including Petrobras, we were mentioned in allegations of improper payments made in order to receive favorable treatment in connection with certain contracts that we are party to with Petrobras…Although we have certain procedures in place, we have implemented additional procedures and controls to monitor our compliance with applicable anti-corruption laws and as a result of the recent allegations against us, have engaged Brazilian and U.S. legal counsel to conduct a voluntary internal investigation of this matter.

Braskem, S.A., Annual Report (Form 20-F) (Apr. 24, 2015) at 12.

16.     Defendants' wrongful acts and omissions, including Odebrecht's participation in the alleged fraud and control of Braskem caused Braskem ADSs to trade at artificially inflated prices during the Class Period.  Indeed the revelation of this bribery scheme involving Braskem,

Petrobras, and Odebrecht came as part of a wave of intense investigation—including dozens of search warrants and arrests that led to sworn testimony in court by actors in the fraud who confirmed the bribery activity.   As explained more fully below, when the bribery scheme orchestrated by Petrobras was revealed to the market, the impact of the news put thousands out of work, sparked mass demonstration in the streets, and pushed Brazil's economy into recession. The revelation of Braskem's involvement in this bribery scandal caused the price of Braskem ADS traded in the U.S. to tumble. Lead Plaintiff and the Class collectively incurred significant losses and damages on their investments in Braskem ADSs once the truth of Defendants' misconduct was disclosed.

## II.   JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27(c) of the Exchange Act (15 U.S.C. § 78aa(c)). Many of the acts complained of herein, including the dissemination of materially false and misleading statements, omissions and reports prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of Defendants occurred, at least in part, in this District. Braskem ADSs are listed on the New York Stock Exchange ("NYSE") under the symbol "BAK." Braskem appointed The Bank of New York to act as the depositary for the ADSs. The depositary's corporate trust office is located at 101 Barclay Street, New York, New York 10286. The depositary's principal executive office is located at One Wall Street, New York, New York 10286. The deposit agreement and the ADSs are governed by New York law.

19.     Jurisdiction over Defendant Odebrecht is also proper because Odebrecht, as alleged herein, has engaged in conduct that has had a foreseeable substantial effect within the United States.   Moreover, Odebrecht operates in the U.S. through its wholly-owned subsidiary Odebrecht Construction, Inc., located at 201 Alhambra Circle, Suite 1000, Coral Gables, Florida 33134.   Odebrecht also sells bonds in New York through its wholly-owned special purpose entity Odebrecht Finance, Ltd.

20.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.   <u>PARTIES</u>

21.     During the Class Period, Lead Plaintiff purchased ADSs of Braskem, as set forth in his certification attached hereto and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22.     Defendant Braskem is a Brazilian petrochemical company headquartered in Camacari, Brazil that is a subsidiary of Odebrecht S.A. The Company was formerly known as Copene Petroquímica do Nordeste S.A. and changed its name to Braskem S.A. in 2002. The Company is the largest petrochemical company in Latin America and one of the largest in the world. Braskem is the largest thermoplastic resins producer in the Americas and a major global player in the polypropylene, polyethylene, PVC, and chemicals markets. Braskem's ADSs are listed on the NYSE under the ticker symbol "BAK." Braskem appointed The Bank of New York to act as the depositary for the ADSs. The depositary's corporate trust office is located at 101 Barclay Street, New York, New York 10286. The depositary's principal executive office is

located at One Wall Street, New York, New York 10286. The deposit agreement and the ADSs are governed by New York law.

23.     Defendant Gradin was the Chief Executive Officer ("CEO") of Braskem from July 2008 until December 2010. From 2004 through 2007, Gradin was the Vice President of Basic Supplies for Braskem, and from December 2002 through 2004, he was the Executive Vice President of Vinyl Products.  From 1987, through his tenure as Braskem's CEO, Gradin worked for Odebrecht, Braskem's "controlling shareholder" according to Braskem's own press release announcing Gradin's appointment as the new CEO on July 3, 2008.

24.     Defendant Fadigas has served as CEO and a Member of the Executive Management of Braskem since December 7, 2010 and was elected to the board of directors of Braskem as a nominee of Odebrecht. Previously, Fadigas acted as Vice President of the Company's International Business Unit until 2011, as well as the Company's CFO and Executive Vice President of Investor Relations from 2007 to 2010, and as Director of Investor Relations of the Company between December 14, 2006, and 2007.  Fadigas also served as CFO of Construtura Norberto Odebrecht S.A. from 2002 to 2006.

25.     Defendant Drehmer has served as a Member of the Board of Directors of Braskem since August 2013 as a nominee of Odebrecht. From 2010 to June 2013, Drehmer was Braskem's Vice President Executive Officer, CFO, Planning and Investor Relations Director, and Member of the Executive Board. She has been the CFO of Odebrecht S.A. since July 2013. Drehmer has also served as Braskem's Finance Director from 2005 to 2010 and as Manager of the Structured Finance Department of the Company from 2002 to 2005.  Since 2002, Drehmer has worked Odebrecht affiliated entities.

26.     Defendant da Silva has served as Braskem's CFO, Investor Relations Officer, and Member of the Executive Management since July 1, 2013. Prior to his work with Braskem, Da Silva served as a CFO for Construtora Norberto Odebrecht, Odebrecht Oleo & Gas, and, more recently, Odebrecht Infraestrutura - Latin America. Defendant da Silva also has served in the strategic planning department of Braskem from 2001 to 2005.

27.     Defendants Gradin, Fadigas, Drehmer, and da Silva are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company and their participation in the fraudulent scheme as alleged herein, possessed the power and authority to control the contents of Braskem's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Articles 33 and 39 of the Company's Bylaws in effect in 2010 and readopted in 2012 state that:

> Article 33: The Executive Board will be responsible for: a) *carrying out all actions necessary for the functioning of the Company*, except those that, by law or by these bylaws, are assigned to other bodies; b) preparing the annual management report, the financial statements and the proposal for allocation of income for the fiscal year, all of which will be submitted to the Board of Directors and the General Meeting.
>
> * * *
>
> Article 39: The Executive Board is prohibited from: a) taking out loans with institutions that are not members of the official or private banking network, whether in Brazil or abroad, unless expressly authorized by the Board of Directors; b) *performing acts of any nature relating to business or operations that are not consistent with the Company's objectives*, such as the provision of guarantees on third-party liabilities, excepting those to fully controlled companies, or if expressly authorized by the Board of Directors.

*See* Braskem, S.A., Annual Report (Form 20-F) (Apr. 11, 2012) at Ex. 1.01 and Braskem, S.A., Report of Foreign Private Issuer (Form 6-K) (Mar. 1, 2012).

28.     The Individual Defendants made specific false and misleading statements and/or reviewed and approved the Company's reports and press releases alleged herein to be misleading

prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material, non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

29.     Each Individual Defendant's primary liability and controlling person liability arises from the following facts, among others: (a) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (b) the Individual Defendants, by virtue of their responsibilities and activities as senior officers of the Company, were privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (c) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) the Individual Defendants were aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Prior to and During the Class Period, Braskem, Odebrecht and Petrobras Paid Bribes to Politicians to Secure Favorable Pricing for Naphtha

30.     In approximately 2009, Braskem entered into a publicly-announced five-year

contract with Petrobras for the purchase of a regular quota of naphtha.[4]  According to Braskem, "naphtha, a crude oil derivative, is the principal raw material used by [Braskem's] Basic Petrochemical Unit and, indirectly, in [Braskem's] other business units."  During the Class Period, naphtha accounted for ***approximately half*** of Braskem's cost of sales and services rendered, as follows:

| Naphtha as a Percentage of Cost of Braskem Sales and Services Rendered | |
|---|---|
| Year | Percent |
| 2010 | 55.8% |
| 2011 | 48.6% |
| 2012 | 49.3% |
| 2013 | 48.9% |
| 2014 | 48.3% |

31.     The interim pricing for naphtha purchased under this contract, however, would be the result of bribes paid by Braskem to Petrobras, unbeknownst to investors. In fact, several years prior, since 2006, Braskem had been paying bribes – up to USD $5 million a year[5] – to politicians to manipulate the price Braskem paid for naphtha to purchase it at a cheaper price that was not actually supported by the market.[6]

32.     That same year in 2009 when Braskem entered into the five-year naphtha purchase contract with Petrobras, Braskem also negotiated the acquisition of Quattor, a competing petrochemical firm that was at the time was 40% owned by Petrobras.[7] Prior to Quattor's merger with Braskem, Quattor had struggled unsuccessfully to reach its own

---

[4] *Braskem, Petrobras extend naphtha supply contract by 6 months – report*, *See* News Latin Am., Mar. 22, 2014; *Brazil: Petrobras x Braskem naphtha supply contract lingers on*, Valor Economico, Oct. 29, 2015.

[5] The bribes that Braskem paid were in USD.  *See, e.g.*, David Friedlander, *Braskem pagou propina, dizem delatores*, Folha de S. Paulo, Mar. 11, 2015 (discussing Youssef's testimony).

[6] Julia Affonso, *Doleiro diz que Odebrecht 'pagava propinas parte lá fora, parte aqui em reais,'* Estadão, Oct. 22, 2015,     http://politica.estadao.com.br/blogs/fausto-macedo/doleiro-diz-que-odebrecht-pagava-propinas-parte-la-fora-parte-aqui-em-reais/ (Part 2 of video for Youssef's testimony).

[7] Fernanda de Biagio, *Unipar stockholder wants to suspend negotiations on Braskem, Quattor merger*, BNamericas, Dec. 14, 2009; Fernanda de Biagio, *Shareholders approve incorporation of Quattor by Breskem*, BNamericas, Dec. 28, 2010.

agreement with Petrobras regarding pricing and the purchase of naphtha, even though Braskem had already finalized a purchase agreement.[8]   Victor Mallmann, president of Quattor at the time of the 2009 Quattor-Braskem merger, reportedly opposed Petrobras' pricing methods and had requested that Petrobras adopt a fair model for naphtha sales.[9]   (Despite these complaints, Youssef later divulged to federal prosecutors in a sworn plea agreement that Quattor was, at the time, also paying bribes through Petrobras' cartel to secure pricing on raw materials.)[10] Braskem's acquisition of Quattor would result in Braskem's control of 100% of domestic polyethylene and polypropylene production.[11]

33.     Thus, despite the appearance of a new agreement in 2009 for naphtha sales between Petrobras and Braskem, Braskem had already been paying and continued to pay bribes to Petrobras in a price-fixing scheme.   Years later when the renowned money-launderer Youssef—referred to by media sources as an independent "black market central banker"—was called to testify under oath in proceedings before Judge Sergio Moro in October 2015 as part of the Car Wash prosecution, Youssef stated that his relationship with Braskem began in 2006 through the Progressive Party congressman Jose Janene ("Janene"). According to Youssef, Janene introduced him to Alencar (then an executive employee of Braskem) so that Youssef could facilitate payment of Braskem's bribes to the Progressive Party as part of the naphtha-pricing scheme.   Youssef stated that the bribes were from USD $2.5 million up to USD $5

---

[8] Fernanda de Biagio, *Naphtha contract with Petrobras remains unchanged, says Braskem*, BNamericas, Jan. 26, 2010.
[9] *Brazil: Frank Geyer and the reasons to divest Quattor and preserve Unipar*, Valor Economico, Jan. 28, 2010 (Not surprisingly, Mallmann was replaced in the merger by a confidant of Defendant Gradin.).
[10] *See* Cooperation agreement submitted before Judge Moro in April 24, 2015 by prosecutors in the Car Wash prosecution, Terms of Cooperation No. 16 (admissions by Youssef describing bribes paid by Braskem).
[11] *Id.*

million annually.  From the bribe money, Costa received 30%, and the remaining amount would be paid to the Progressive Party.[12]

34.     In his testimony before Judge Moro, Youssef stated that he had participated in meetings where Petrobras' Costa, Braskem/Odebrecht's Alencar, and Progressive Party's Janene had all participated. Costa stated that Braskem continued to pay bribes through the regular set-up facilitated by Janene (until his death in 2010) and Alencar until at least late 2011 or early 2012, and that the amounts were decided by the CEO of Braskem – in particular, the bribe amounts were set by Defendant Gradin and Gradin's successor CEO at Braskem.[13]  Youssef stated that during all the years he coordinated laundering money for the bribes, Alencar consistently indicated that he had to seek authorization from Braskem's CEO for the bribes.  Youssef testified that he received funds through off-shore accounts and at other times in cash at his office.[14]

35.     Youssef further testified that the bribery scheme was a consequence of the dynamics in domestic naphtha sales: Petrobras was the sole domestic supplier of the raw material that Braskem needed[15] and the price charged by Petrobras in the national market for naphtha was so high that Braskem would be precluded from manufacturing plastics, ethylene, and other products. Because of these high prices, Youssef stated, Petrobras and Braskem made an agreement about the price charged so that it would be beneficial for both companies.[16]

---

[12] Michael Smith, et al., *The Betrayal of Brazil*, Bloomberg Business, May 8, 2015 ("In Brazil's justice system, a judge formally charges a defendant, approves major steps in the investigation by police and prosecutors, hears the evidence, and then decides whether the defendant is guilty or innocent."). *See also* Affonso, *supra* note 6 (Parts 1 and 2 of video for Youssef's testimony).

[13] *See* Affonso, *supra* note 6 (Part 1 of the video for Youssef's testimony).  *See also* Cooperation agreement submitted before Judge Moro in April 24, 2015 by prosecutors in the Car Wash prosecution, Terms of Cooperation No. 30 (admissions by Youssef regarding bribes paid by Quattor).

[14] Affonso, *supra* note 6 (Part 2 of the video for Youssef's testimony).

[15] Fernanda de Biagio, *Petrochemical industry competitiveness harmed by raw material costs*, BNamericas, Oct. 21, 2010.

[16] Affonso, *supra* note 6 (Part 2 of the video for Youssef's testimony).

36.     Youssef's assistant confirmed Youssef's account in sworn testimony before Judge Moro.  When Rafael Angulo Lopes testified in court on August 31, 2015, he stated that his responsibilities as Youssef's assistant were to pay bills, deliver money, withdraw money for Youssef and for other people at Youssef's request, and to do these tasks in various locations. Lopes testified that he met Braskem's Alencar at Braskem offices in Sao Paulo so that Lopes could give Alencar bank account numbers and swift codes.  Lopes always delivered the documents in a sealed envelope, in person, and simultaneously collected from Alencar deposit slips showing deposits in offshore accounts. [17]  Lopes went on to explain that Alencar and Youssef had numerous regular meetings at Youssef's office, in hotels, at Braskem's offices, and in restaurants.  Lopes further stated that he met Alencar himself approximately ten to fifteen times between 2008 and 2013 to exchange swift codes for deposit slips that confirmed the transfer of bribery money.[18]  According to Lopes, these meetings took place while Alencar was an executive at Braskem and later when Alencar was an executive at Odebrecht.[19]

37.     When Costa also testified in October 2015 before Judge Moro, he described the same bribery scheme as Youssef and Lopes as well as the direct involvement of Braskem's executives.  Costa testified that, in 2009, he had coordinated bribes with Braskem, that

---

[17] During Youssef's testimony before Judge Moro, when presented with documents produced by Lopes, Youssef confirmed that he recognized the swift codes and deposit receipts as part of their regular scheme.  *Id.* (Part 1 of video for Youssef's testimony).  When later asked if Lopes worked for him, Youssef confirms that Lopes did and also went on to describe the same process of exchanging swift codes and deposit slips in sealed envelopes.  *Id.* (Part 2 of video for Youssef's testimony).

[18] Alencar was an executive at Braskem until 2007 when he began working for Odebrecht until his arrest in 2015. Redação, *Delator cita doleiro da Suíça em propina de US$ 5 milhões da Braskem*, Estadao, Jun. 23, 2015.

[19] *See* NúcleoMultimídia Estadão, *Depoimento de Rafael Ângulo à Justiça Federal*, YouTube (Sep. 2, 2015), https://www.youtube.com/watch?v=fS5caTIbYBk (August 31, 2015 testimony by Costa before Judge Moro, posted by *O Estado de S. Paulo*, Sao Paulo's daily newspaper).

Defendant Gradin was aware of this arrangement, and that these payments extended throughout Costa's tenure at Petrobras and even afterward to 2014.[20]

38.     The bribes Braskem paid were fixed at a certain amount annually, approximately USD $5 million, during meetings Costa had with Janene and Alencar, and then Braskem paid the agreed-to amounts on a monthly basis, Costa said.[21]  Just as Costa had described, Youssef confirmed in his testimony before Judge Moro, too, that the amount of the bribes were agreed to on a yearly basis, but that Youssef would go to Alencar to talk about the payment scheme and make sure the interval payments were made.[22]  Likewise, Costa also stated that he "had a few conversations and [Braskem's CEOs] knew what was happening."   Costa said these conversations were first with former Braskem CEO Jose Carlos Grubisich, and then "after that, with [Defendant] Bernardo Gradin and then [Defendant] Carlos Fadigas. All of them knew what was happening."[23]

39.     Indeed, according to Costa, the "CEOs of Braskem, knew about the arrangements" to pay bribes for altered naphtha prices.  Costa stated that, at the heart of the bribery scheme to alter pricing was an effort to keep the price of naphtha at a measure below the international Amsterdam-Rotterdam-Antwerp ("ARA") price.[24]  Costa testified that Defendant Gradin himself asked Costa to maintain the naphtha prices for Braskem below 95% of the ARA—the price used for all Braskem's international purchases—and that Costa submitted a

---

[20] David Friedlander, *Costa diz que tratou de propinas com Gradin, ex-presidente da Braskem*, Folha de S. Paulo, Jul. 24, 2015; Cleide Carvalho, *Odebrecht monitorou negócios entre Petrobras e Braskem*, O Globo, Oct. 21, 2015; Affonso, *supra* note 6 (Part 1 of video for Costa's testimony).

[21] Affonso, *supra* note 6 (Part 2 of video for Costa's testimony).

[22] *Id.* (Part 1 of video for Youssef's testimony).

[23] *Id.* (Part 2 of video for Costa's testimony).  Costa's testimony is in Portuguese and has been translated by Lead Plaintiff into English.

[24] Braskem buys naphtha from all sellers other than Petrobras (*e.g.* all Braskem's international purchases) based on the ARA price for naphtha.  *See* Braskem, S.A., Annual Report (Form 20-F) (Apr. 24, 2015)  at 26, 58.

request to Petrobras' technical committee that coordinated the sale of naphtha and asked for the committee to pay "special attention" to Braskem's request.[25]

40.     Costa stated that he made this request based on the "financial advantages" afforded him by Braskem's in the bribery scheme.  Costa further testified that Braskem's CEOs continued to participate directly in price negotiations on a regular basis.[26]

41.     The bribes that Braskem paid to price-fix its supply of naphtha were part of a larger business culture of political patronage that was rampant in the energy and petrochemicals industry.   Indeed, the same individuals who coordinated Braskem's bribes paid to the Progressive Party from 2006 to 2014—Costa, Janene, and Youssef, with the knowledge and direct participation of Defendants Gradin and Fadigas and Braskem's executive consultant Alencar—are the *same* members of Petrobras' Car Wash scheme, a sixteen-company cartel, described below, run by Petrobras.  The cartel, as described by Petrobras' Costa, was part of industry culture where executives understood that they could not achieve their professional and financial positions without the paid support of politicians as well as collusion of other company executives in the cartel.  As such, the cartel organized the payment of bribes in the hundreds of millions of dollars as part of scheme in which Petrobras awarded construction contracts at inflated prices to businesses in the cartel.  Similar to the practices described below, Petrobras and Odebrecht—key members of the Car Wash cartel—used the business practices to inflate the profitability and stock price of their subsidiary, Braskem.

---

[25] Affonso, *supra* note 6 (Part 2 of video for Costa's testimony).
[26] *Id.*

**B.**    **The Bribes Paid by Braskem, Odebrecht and Petrobras to Fix Naphtha Prices Were Part of Regular Practices in the Petrochemical Industries that Also Gave Rise to the Car Wash Scandal**

42.    Petrobras is majority-owned by the Brazilian government, based in Rio De Janeiro, Brazil and throughout the Class Period was the second largest shareholder of Braskem. From May 14, 2004 through April 2012, Paulo Roberto Costa served as Petrobras' Chief Downstream Officer and Director of Supply and reported directly to Petrobras' CEO.  Under Petrobras' corporate structure, the Downstream Officer is responsible for overseeing refining, logistics, petrochemical production activities, and marketing and trade.  During his time at Petrobras, according to his testimony in front of Brazilian federal court Judge Sergio Moro, Costa, and others, controlled a scheme in which companies paid kickbacks and bribes to Petrobras and in exchange, Petrobras considered these companies' contract bids at inflated prices that were up to 20% higher than Petrobras' own cost limits.[27]  The cartel was called the "VIP Club" by its members.[28]

43.    In addition, as part of the VIP Club, subcontractors who had previously competed for Petrobras' work began secretly collaborating through a cartel managed by Petrobras and dependent on bribes that the subcontractors paid to politicians and Petrobras.

44.    In return, companies in the cartel would be awarded Petrobras projects or contracts at an inflated price that could not be achieved on the open market.[29]  Petrobras used the money contributed by the cartel to then bribe politicians so that they would vote in line with the ruling party.[30]

---

[27]  Sabrina Valle and Juan Pablo Spinetto, *Brazil Fixated as 'Human Bomb' Revelations Rock Elections*, Bloomberg Business, Oct. 20, 2014.

[28] Sabrina Valle, *Petrobras's $100 Million Man Tops Graft Haul in Scandal*, Bloomberg Business, Dec. 2, 2014.

[29] David Segal, *Petrobras Oil Scandal Leaves Brazilians Lamenting a Lost Dream*, New York Times, Aug. 7, 2015.

[30] Valle and Spinetto, *supra* note 27.

45.     As part of this scheme of political patronage, Petrobras' Costa aligned himself with congressman Janene of the Progressive Party, who was an integral part of the Car Wash operation until his death in 2010.[31]  The bribery scheme was motivated in part by the fact that, in Brazil, senior management at state-controlled companies like Petrobras are often nominated by political parties, which, according to Costa, created this culture of political patronage.[32]

46.     Among the sixteen companies that federal prosecutors identified in open court as part of Petrobras' cartel was Odebrecht, the only Braskem shareholder larger than Petrobras itself and that enjoyed a voting majority in Braskem.[33]

47.     Additional testimony by Costa before Judge Moro revealed that Costa's position as Chief Supply Officer at Petrobras (from May 2004 until April 2012) was at the behest of the Brazil's Progressive Party. Costa explained in this testimony that nobody at Petrobras becomes a Director, CEO or Vice President, without a political sponsor from the government.  Costa stated that, in early 2004, congressman Janene and congressman Pedro Correa from the Progressive Party sought him out to see if he had any interest in becoming Director of Supply at Petrobras, a position he resumed four months after the Progressive Party's nomination. Costa testified that Janene explained to him that Costa would have to assist Janene's political party in return.  Costa summed up corporate culture: any high-ranking employee at Petrobras must have a political patron to be in a powerful position.[34]

48.     As part of Petrobras' bribery scheme, and also Braskem's bribery scheme, Youssef facilitated bribes by laundering money through companies owned by him and including

[31] Fabio Serapião, *Operação Lava Jato: Fala o denunciante*, CartaCapital, May 25, 2015.
[32] Robson Bonin and Malu Gaspar, *Petrobras takes a fall*, Veja International, Apr. 1, 2014.
[33] Smith, et al., *supra* note 12.
[34] *See* NúcleoMultimídia Estadão, *Interrogatório de Paulo Roberto Costa na Justiça Federal – Part 1*, YouTube (Apr. 28, 2015), https://www.youtube.com/watch?v=007KrjeTtn8 (April 28, 2015 testimony by Costa before Judge Moro, posted by O Estado de S. Paulo, Sao Paulo's daily newspaper).

his gas station business.[35]   (The same building once housed a carwash.  For this reason, the federal government's later investigation into the massive bribery scheme is called "Lava Jato," Portuguese for "car wash.").[36]  Youssef later testified in court that he worked with and eventually took over the role of Costa's political patron, Janene, after Janene's death in 2010.[37]

49.     As part of the Car Wash investigation, Brazil's Federal Audits Court known as the Tribunal de Contas da União (the "TCU") investigated irregularities identified in Petrobras' activities.  The TCU found that Petrobras had a "corporate strategy" of restricting competition in the bidding process and that, by way of example, contractors on one particular project were hired at values of up to 19% above the initial estimate by the state-owned company.[38]  In another example uncovered by the TCU, Petrobras' Costa facilitated the 2006 acquisition of a U.S. refinery for $1 billion—over *twenty times* more than the price a Belgian firm had paid just two years prior at a price of less than $50 million.[39]  Costa later admitted to personally collecting USD $1.5 million to close the over-priced deal.[40]

50.     The impact of this overarching scandal orchestrated by the two companies that have a 97% stake in voting shares of Braskem cannot be overstated.  When Youssef prepared to testify after his arrest about the Petrobras cartel that included Odebrecht, he reportedly told his lawyers, "'Guys, if I speak, the republic is going to fall.'"  Hyperbole aside, Youssef's warning was apt: when the scandal broke, one million Brazilians took to the streets in protest.  Numerous arrests of high-ranking executives followed.

---

[35] Francisco Marcelino and Sabrina Valle, *The Talented Mr. Youssef, Brazil's Black-Market Central Banker*, Bloomberg Business, Jan. 13, 2015.

[36] Segal, *supra* note 29.

[37] Marcelino and Valle, *supra* note 35.

[38] *Auditoria do TCU culpa Gabrielli e executivos por dano em refinaria da Petrobras*, Portal Noar, Aug. 25, 2015.

[39] Diego Iraheta, *Petrobras's Billion-Dollar Scandal: Behind The Chaos In Brazil's Biggest Company*, The World Post, Feb. 6, 2015.

[40] Nicolas Bourcier, *Petrobras, le scandale qui éclabousse le Brésil*, Le Monde, Jan. 29, 2015.

51.     Costa, the head of Petrobras, was arrested and placed in jail as was Odebrecht's CEO and chairman of Braskem, and dozens of other high-ranking executives were arrested.[41]  At least one member of the scheme, Nelma Kodama, has already received an 18-year prison sentence.  Not surprisingly, the national discovery of the bribery scandal destabilized the country's politics, pushed the economy into recession, and resulted in the unemployment of thousands.[42]

52.     As the Car Wash investigation unfolded and some members of the cartel began to testify, it became clear that corruption in the energy and petrochemicals industry was widespread and that many executives, unbeknownst to investors and the general public, paid bribes to meet their business goals and to inflate the profitability of the companies they ran.  As described below, it was revealed that Braskem, like other companies in the cartel part of the Car Wash operation, was not immune to these widespread practices and had also paid bribes to inflate its profitability.

**C.     The Truth is Revealed**

53.     On March 11, 2015, Brazil's Office of the Comptroller General ("CGU") announced that it had opened a case against ten additional construction firms with ties to Petrobras.

54.     On that same day, a report from a local newspaper, *Folha de S. Paulo*, implicated Braskem in the corruption scandal surrounding Petrobras. The report stated that Braskem paid bribes to Petrobras executives and Progressive Party ("PP") party members in order to receive

---

[41] Dom Phillips, *'Operation Carwash' in Brazil causes normally staid business meeting to go off script*, The Washington Post, Nov. 17, 2014; Anna Flávia Rochas, *Brazilian police arrest Braskem board chairman*, Plasticsnews, Jun. 19, 2015; Caroline Stauffer, *Jailed Odebrecht CEO Criticizes Plea Deals in Brazil*, Reuters, Sept. 1, 2015.
[42] Segal, *supra* note 29.

lower prices on naphtha and propylene products from 2006 through 2012. According to the release of testimony from Costa and Youssef, Costa received UWD $5 million annually from Braskem in exchange for assistance.

55.     In addition, it was reported that Alencar, former Braskem Vice President of Institutional Relations, sought out politicians for the bribes and carried out the bribery. Former President and CEO of Braskem, Jose Carlos Grubisich, was said to have ratified the bribery personally.

56.     On this news, shares of Braskem fell over 20%, or $1.80 per share, on March 11, 2015.

57.     On April 24, 2015, Braskem filed a Form 6-K/A with the SEC announcing that it had hired law firms to investigate the bribery allegations. The 6-K/A stated the following, in pertinent part:

> In early March 2015, declarations made by defendants in lawsuits filed against third parties were made public, in which Braskem and two of its former executive officers were cited in allegations of supposed improper payments between 2006 and 2012 to benefit the Company in raw-material supply agreements entered into with Petrobras. As of April 24, 2015, to the knowledge of the management, Braskem has not received any notification of the filing of any proceeding or investigation by Brazilian or U.S. authorities.
>
> …
>
> In light of such facts, the Company's Management and Board of Directors approved in April the internal plan for investigation into the allegations ("Investigation") to be carried out by law firms experienced in similar cases in the United States and in Brazil. The law firms will work under the coordination of an ad hoc committee formed by members of its Board of Directors, specially created for this purpose.

Braskem, S.A., Report of Foreign Issuer (Form 6-K/A) (Apr. 24, 2015) at 77.

58.     The investigation in Brazil is ongoing but on June 19, 2015, as part of the Brazilian Government's investigation, Marcelo Odebrecht was arrested for fraud and corruption concerning his dealings with Braskem and Petrobras.

### D.    Odebrecht Controlled Braskem

59.    Defendant Odebrecht was, during the Class Period, Braskem's largest and most involved shareholder.   Designees and employees of Odebrecht constituted a majority of the members of Braskem's board of directors and each of the Individual Defendants were affiliated with or employed by Defendant Odebrecht.   Braskem's chairman of the board was Odebrecht's CEO, Marcelo Odebrecht, until his arrest on June 19, 2015 in connection with the bribery and kickback scheme alleged herein.    By virtue of a shareholder agreement, Odebrecht exercised substantial control over Braskem's business functions.   According to Braskem's 2014 Annual Report, filed on Form 20-F on April 24, 2015 ("2014 20-F"):

> Under a shareholders' agreement to which Odebrecht and Petrobras are parties, Braskem have agreed to undertake certain actions only after Odebrecht and Petrobras have reached a consensus with respect to those actions and Odebrecht will have the sole power to approve the business plan of our company… As a result, Odebrecht will have the ability to determine the outcome of most corporate actions or decisions requiring the approval of our shareholders or our board of directors — in certain instances, with the consent of Petrobras.

FY 2014 Form 20-F, at 8 (Apr. 24, 2015).

60.    The referenced shareholder agreement was originally executed by Braskem, Odebrecht and Petrobras at the beginning of the Class Period and was filed with the SEC on Form 6-K on April 5, 2010.   Under the Shareholder Agreement, Odebrecht was entitled to elect six out of the total eleven Braskem board members; while Petrobras elected four.[43]   Also under the Shareholder Agreement, Odebrecht alone was responsible for nominating Braskem's chief executive officer, while Petrobras and Odebrecht together caused ten (out of eleven) board members to ratify Odebrecht's nomination.   That elected CEO, during the Class Period an

---

[43] *See* Braskem, S.A., Report of Foreign Private Issuer (Form-6-K) (Apr. 5, 2010), Ex. 3.01 ("Shareholder Agreement") at 3.2.2. The election scheme described above is contingent on Petrobras owning more than 30% of voting capital, which Petrobras consistently held throughout the Class Period.

Odebrecht employee (Gradin and Fadigas), then selected a chief financial officer (Drehmer then da Silva) from a list of three potential candidates provided by Odebrecht.  The CEO was also responsible for selecting an Investment and Portfolio Officer chosen from a list of potential candidates provided by Petrobras.  In both instances, Odebrecht and Petrobras caused their Board Members to ratify the Odebrecht-appointed CEO's choices.

61.     In short, Braskem's CEO and CFO are hired by Odebrecht, while the Investment and Portfolio Officer is hired by Petrobras.  The CEO, CFO, and Investment and Portfolio Officer each serve for a period of three years.[44]  Not surprisingly, Odebrecht lists Braskem among its subsidiary businesses controlled by the President and CEO of Odebrecht SA.[45]

62.     By virtue of Defendant Odebrecht's influence and oversight of Braskem's business activities, its Board and its senior management, including the Individual Defendants, as well as its voting power over the decisions and actions of Braskem's senior management, Odebrecht controlled and culpably and directly participated in the securities violations complained of here.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

63.     Throughout the Class Period, Defendants made multiple false and misleading statements and omissions that failed to disclose the true nature of the Company's business and the bribes that its employees, and its controlling shareholders were paying in exchange for undervalued naphtha contracts with Petrobras.

---

[44] *See* Shareholder Agreement at 3.6-3.9.  This Shareholder Agreement is valid until 2045.  *See Credit Opinion: Braskem SA*, Moody's Investors Service, Aug. 20, 2015.

[45] *See, e.g.* Odebrecht, 2013/2014 Annual Report, 6-7 (2014), http://odebrecht.com/en/communication/publications/annual-reports.

64.     On June 1, 2010, the Company filed its annual report for the year-ended December 31, 2009 on a Form 20-F with the SEC (the "2009 20-F"). The 20-F was signed by Gradin and Drehmer, the Company's CEO and CFO at the time. The 2009 20-F stated the Company's financial results and financial position which were based in large part to its naphtha costs.

65.     In addition, the 2009 20-F contained certifications pursuant to SOX signed by Gradin and Drehmer. The SOX certifications stated that the financial information contained in the 2009 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the 2009 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." 2009 20-F at Exs. 12.01, 12.02. The certifications also stated that Drehmer had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting." *Id.* Drehmer's statements were attributable to the Company.

66.     Each of the statements set forth above was materially false and misleading because Braskem's internal controls were grossly ineffective during the Class Period. In the wake of the testimony from Costa, Youssef, and Lopes, the statements regarding the adequacy and effectiveness of the Company's internal controls during the Class Period were materially false and misleading, because Braskem engaged in a scheme where the Company paid bribes,

25

called "under-the-table payments," to buy cheaper raw material from Petrobras between 2006 and 2014. As described above, the Company concealed from investors: (1) the expenditure of funds paid for bribes, (2) Braskem's collusion in an improper bribery scheme; (3) inflation of Braskem's profitability because, without naphtha purchases that were artificially cheaper, Braskem's profits would have been substantially reduced; and (4) a lack of adequate internal controls.

67. The 2009 20-F also described the contracts that Braskem maintained with Petrobras for the purchase of naphtha and the factors that determined the price of naphtha under those contracts.

> The price of naphtha supplied by Petróleo Brasileiro S.A.—Petrobras, or Petrobras, has historically been linked to the Amsterdam-Rotterdam-Antwerp market price of naphtha and to the *real*/U.S. dollar exchange rate. Under a naphtha purchase agreement with Petrobras that we have operated under since March 2009, we have purchased naphtha from Petrobras at prices based on a variety of factors, including the market prices of naphtha and other petrochemical derivatives, the volatility of the prices of these products in the international markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.

2009 20-F at 6.

68. The 2009 20-F also explained:

> Our contract with Petrobras provides for naphtha prices based on a variety of factors, including the market prices of naphtha and other basic petrochemical derivatives, the volatility of the prices of these products in the international markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.

2009 20-F at 98.

69. These statements were false and misleading because they omitted the material fact that the price at which Braskem purchased naphtha from Petrobras under its contract was based in large part on bribes and kickbacks paid to Petrobras and its political allies, that resulted in

below-market naphtha prices for Braskem.   In order to prevent these statements from being untrue and misleading investors, Defendants had a duty to disclose the illegal bribery scheme set forth herein.

70.     Then on June 10, 2011, the Company filed its annual report for the year ended December 31, 2010 on a Form 20-F with the SEC (the "2010 20-F"). The 2010 20-F was signed by Fadigas, the Company's then- and current CEO, and Drehmer, the Company's then-CFO. The Form 20-F stated the Company's financial results and financial position.

71.     In addition, the 2010 20-F contained signed certifications pursuant to SOX by Fadigas and Drehmer. The SOX certifications stated that the financial information contained in the 2010 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the 2010 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." 2010 20-F at Exs. 12.01, 12.02. The certifications also stated that Fadigas had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting." *Id.* Fadigas' statements were attributable to the Company.

72.     In addition, the 2010 20-F stated that the Company's certifying officers "[d]isclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is

reasonably likely to materially affect, the company's internal control over financial reporting." *Id.*

73.     Each of the statements set forth above was materially false and misleading because Braskem's internal controls were grossly ineffective during the Class Period. In the wake of the testimony from Costa, Youssef, and Lopes, the statements regarding the adequacy and effectiveness of the Company's internal controls during the Class Period were materially false and misleading, because Braskem engaged in a scheme where the Company paid bribes, called "under-the-table payments," to buy cheaper raw material from Petrobras between 2006 and 2014.  As described above, the Company concealed from investors: (1) the expenditure of funds paid for bribes, (2) Braskem's collusion in an improper bribery scheme; (3) inflation of Braskem's profitability because, without naphtha purchases that were artificially cheaper, Braskem's profits would have been substantially reduced; and (4) a lack of adequate internal controls.

74.     The 2010 20-F also continued to describe the contracts that Braskem maintained with Petrobras for the purchase of naphtha and the factors that determined the price of that naphtha under those contracts.

> We purchase naphtha for use by our Basic Petrochemical Unit and our Quattor Unit from Petróleo Brasileiro S.A.—Petrobras, or Petrobras, at prices based on a variety of factors, including the Amsterdam-Rotterdam-Antwerp market prices of naphtha and a variety of other petrochemical derivatives, the volatility of the prices of these products in the international markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.

2010 20-F at 5

75.     The 2010 20-F also explained:

> Our contracts with Petrobras provides for naphtha prices based on a variety of factors, including the market prices of naphtha and other basic petrochemical derivatives, the volatility of the prices of these products in the international

markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.

2010 20-F at 91

76.    These statements were false and misleading because they omitted the material fact that the price at which Braskem purchased naphtha from Petrobras under its contract was based in large part on bribes and kickbacks paid to Petrobras and its political allies, that resulted in below-market naphtha prices for Braskem.   In order to prevent these statements from being untrue and misleading investors, Defendants had a duty to disclose the illegal bribery scheme set forth herein.

77.    On April 10, 2012, the Company filed its annual report for the year ended December 31, 2011 on a Form 20-F with the SEC (the "2011 20-F"). The 2011 20-F was signed by Fadigas, the Company's then- and current CEO, and Drehmer, the Company's then-CFO. The Form 20-F stated the Company's financial results and financial position.

78.    In addition, the 2011 20-F contained signed certifications pursuant to SOX by Fadigas and Drehmer. The SOX certifications stated that the financial information contained in the 2011 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the 2011 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." 2011 20-F at Exs. 12.01, 12.02. The certifications also stated that Fadigas had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves

29

management or other employees who have a significant role in the company's internal control over financial reporting." *Id.* Fadigas' statements were attributable to the Company.

79.    In addition, the 2011 20-F stated that the Company's certifying officers "[d]isclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting." *Id.*

80.    Each of the statements set forth above was materially false and misleading because Braskem's internal controls were grossly ineffective during the Class Period. In the wake of the testimony from Costa, Youssef, and Lopes, the statements regarding the adequacy and effectiveness of the Company's internal controls during the Class Period were materially false and misleading, because Braskem engaged in a scheme where the Company paid bribes, called "under-the-table payments," to buy cheaper raw material from Petrobras between 2006 and 2012.   As described above, the Company concealed from investors: (1) the expenditure of funds paid for bribes, (2) Braskem's collusion in an improper bribery scheme; (3) inflation of Braskem's profitability because, without naphtha purchases that were artificially cheaper, Braskem's profits would have been substantially reduced; and (4) a lack of adequate internal controls.

81.    The 2011 20-F also continued to describe the contracts that Braskem maintained with Petrobras for the purchase of naphtha and the factors that determined the price of that naphtha under those contracts.

We purchase naphtha for use by our Basic Petrochemical Unit and our Quattor Unit from Petróleo Brasileiro S.A.—Petrobras, or Petrobras, at prices based on a variety of factors, including the Amsterdam-Rotterdam-Antwerp market prices of naphtha and a variety of other petrochemical derivatives, the volatility of the prices of these products in the international markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.

2011 20-F at 5

82.     The 2011 20-F also explained:

Our contracts with Petrobras provides for naphtha prices based on a variety of factors, including the market prices of naphtha and other basic petrochemical derivatives, the volatility of the prices of these products in the international markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.

2011 20-F at 87

83.     These statements were false and misleading because they omitted the material fact that the price at which Braskem purchased naphtha from Petrobras under its contract was based in large part on bribes and kickbacks paid to Petrobras and its political allies, that resulted in below-market naphtha prices for Braskem.   In order to prevent these statements from being untrue and misleading investors, Defendants had a duty to disclose the illegal bribery scheme set forth herein.

84.     On April 8, 2013, the Company filed its annual report for the year ended December 31, 2012 on a Form 20-F with the SEC (the "2012 20-F"). The 2012 20-F was signed by Fadigas, the Company's then- and current CEO, and Drehmer, the Company's then-CFO. The Form 20-F stated the Company's financial results and financial position.

85.     As in previous years, the 2012 Form 20-F contained signed certifications pursuant to SOX by Fadigas and Drehmer. The SOX certifications stated that the financial information contained in the 2012 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the 2012

20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." 2012 20-F at Exs. 12.01, 12.02. The certifications also stated that Fadigas had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting." *Id.* Fadigas' statements were attributable to the Company.

86.     In addition, the 2012 20-F stated that the Company's certifying officers "[d]isclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting." *Id.*

87.     Each of the statements set forth above was materially false and misleading because Braskem's internal controls were grossly ineffective during the Class Period. In the wake of the testimony from Costa, Youssef, and Lopes, the statements regarding the adequacy and effectiveness of the Company's internal controls during the Class Period were materially false and misleading, because Braskem engaged in a scheme where the Company paid bribes, called "under-the-table payments," to buy cheaper raw material from Petrobras between 2006 and 2012.  As described above, the Company concealed from investors: (1) the expenditure of funds paid for bribes, (2) Braskem's collusion in an improper bribery scheme; (3) inflation of

Braskem's profitability because, without naphtha purchases that were artificially cheaper, Braskem's profits would have been substantially reduced; and (4) a lack of adequate internal controls.

88.     The 2012 20-F, as in previous years, continued to describe the contracts that Braskem maintained with Petrobras for the purchase of naphtha and the factors that determined the price of that naphtha under those contracts.

> We purchase naphtha for use by our Basic Petrochemical Unit and our Quattor Unit from Petróleo Brasileiro S.A.—Petrobras, or Petrobras, at prices based on a variety of factors, including the Amsterdam-Rotterdam-Antwerp market prices of naphtha and a variety of other petrochemical derivatives, the volatility of the prices of these products in the international markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.

2012 20-F at 6

89.     The 2012 20-F also explained:

> Our contracts with Petrobras provides for naphtha prices based on a variety of factors, including the market prices of naphtha and other basic petrochemical derivatives, the volatility of the prices of these products in the international markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.

2012 20-F at 82

90.     These statements were false and misleading because they omitted the material fact that the price at which Braskem purchased naphtha from Petrobras under its contract was based in large part on bribes and kickbacks paid to Petrobras and its political allies, that resulted in below-market naphtha prices for Braskem.   In order to prevent these statements from being untrue and misleading investors, Defendants had a duty to disclose the illegal bribery scheme set forth herein.

91.     On April 14, 2014, the Company filed its annual report for the year ended December 31, 2013 on a Form 20-F with the SEC (the "2013 20-F").  Under the section titled

"*Risks Relating to Our Company and the Petrochemical Industry*," Braskem discussed its reliance on the stable price of naphtha and its dependence on Petrobras for its naphtha supply. As described above, similar risk language was stated by the Company in previous 20-Fs filed with the SEC. The 2013 20-F stated, in pertinent part, as follows:

> Naphtha, a crude oil derivative, is the principal raw material used by our Basic Petrochemicals Unit and, indirectly, in our other business units. Naphtha accounted, directly and indirectly, for approximately 48.9% of our consolidated cost of sales and services rendered in 2013.
>
> We purchase naphtha for use by our Basic Petrochemical Unit from Petróleo Brasileiro S.A.—Petrobras, or Petrobras, at prices based on a variety of factors, including the Amsterdam-Rotterdam-Antwerp market prices of naphtha and a variety of other petrochemical derivatives, the volatility of the prices of these products in the international markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.

2013 20-F at 5.  *See also* 2013 20-F at 61.

92.    These statements were false and misleading because the Company failed to disclose the true factors concerning the price of naphtha purchased from Petrobras. In reality, Braskem was paying annual bribes, set yearly and in amounts up to $5 million, to buy crude derivatives such as naphtha at low prices from 2006 to 2014.   In order to prevent these statements from being untrue and misleading investors, Defendants had a duty to disclose the illegal bribery scheme set forth herein.

93.    Furthermore, the 2013 20-F was signed by Fadigas, the Company's then (and current) CEO, and da Silva, the Company's then-CFO. The Form 20-F stated the Company's financial results and financial position.

94.    In addition, the 2013 Form 20-F contained signed certifications pursuant to SOX by Fadigas and da Silva. The SOX certifications stated that the financial information contained in the 2013 20-F was accurate and disclosed any material changes to the Company's internal

control over financial reporting. Specifically, the certifications represented that the 2013 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." 2013 20-F at Exs. 12.01, 12.02. The certifications also stated that Fadigas had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting." *Id.* Fadigas' statements were attributable to the Company.

95.    In addition, the 2013 20-F stated that the Company's certifying officers "[d]isclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting." *Id.*

96.    Each of the statements set forth above was materially false and misleading because Braskem's internal controls were grossly ineffective during the Class Period. In the wake of the testimony from Costa, Youssef, and Lopes, the statements regarding the adequacy and effectiveness of the Company's internal controls during the Class Period were materially false and misleading, because Braskem engaged in a scheme where the Company paid bribes, called "under-the-table payments," to buy cheaper raw material from Petrobras between 2006 and 2014.  As described above, the Company concealed from investors: (1) the expenditure of funds paid for bribes, (2) Braskem's collusion in an improper bribery scheme; (3) inflation of

Braskem's profitability because, without naphtha purchases that were artificially cheaper, Braskem's profits would have been substantially reduced; and (4) a lack of adequate internal controls.

## VI.   THE FACTS GIVE RISE TO A STRONG INFERENCE THAT THE DEFENDANTS ACTED WITH SCIENTER

### A.   The Individual Defendants and Odebrecht Each Knew or Recklessly Disregarded Braskem's Bribery and Compliance Issues And Failed to Disclose Those Facts

97.     The facts set forth above, viewed collectively, give rise to a strong inference that the Individual Defendants acted knowingly, or at least recklessly, when they concealed from the market the material negative information that they were involved in a long-standing bribery and corruption scandal with its two largest shareholders.

98.     As set forth herein, the Individual Defendants were involved in every step of the Company's contract approvals.  As set forth above:

(a)     Defendant Gradin personally requested from Costa that Petrobras set the price of naphtha lower than market prices;

(b)     Defendant Gradin and Defendant Fadigas were aware of the bribery scheme and continued to approve the annual bribery amounts;

(c)     Alencar personally facilitated the exchange of bribery funds by meeting with Youssef and Youssef's agent Lopes on numerous occasions when Alencar was an executive consultant at Braskem and Alencar continued these activities on behalf of Braskem as agent of Odebrecht;

(d)     Bribe amounts were never approved without the consent of Braskem's executives;

(e)     Defendants knew that disclosure of the bribes and kickbacks to investors would have had a materially negative impact on the Company; and

(f)     Petrobras consistently accepted Braskem's proposed price for naphtha that was below market prices, and Individual Defendants knew or recklessly disregarded the means that allowed Petrobras to sell naphtha below market.

99.     Furthermore, the following facts, among others set forth above, give rise to a strong inference that Odebrecht, knew or should have known, that Braskem was issuing false and

misleading statements and making material omissions from its public statements concerning the

Company business and compliance with U.S. and Brazilian anti-bribery laws, including:

(a)    Odebrecht executives, directors and senior management were involved in the bribes that were paid and received for Braskem's benefit;

(b)    Odebrecht (and Petrobras) maintained a culture of political patronage as part of the Car Wash cartel and sought, through its control of Braskem, to continue the culture of bribery and political patronage to maximize Braskem's apparent profitability;

(c)    Odebrecht exercised majority control over Braskem's voting share capital, and with Petrobras, almost complete control of the Company ;

(d)    Braskem could not perform most business actions without the consent of Odebrecht;

(e)    Odebrecht had complete control over Braskem's business plan;

(f)    All of the Individual Defendants who were involved in the kickback and bribery scheme were affiliated with or employed by Odebrecht and had the incentive to withhold the truth from investors;

(g)    Nearly all of the members of the board of directors were appointed as nominees of Odebrecht or Petrobras; and

(h)    By virtue of the position and influence, Odebrecht had access to all of the information concerning Braskem's naphtha contracts and recklessly disregarded the truth about the bribes being paid for Braskem's benefit.

100.    In any event, there is strong circumstantial evidence, as stated herein, that Odebrecht and the Individual Defendants knew or recklessly disregarded the truth about Braskem's involvement in the bribery scheme in disseminating the Company's public statements.

**B.    The Individual Defendants Had the Motive and Opportunity to Withhold Braskem's Bribery and Compliance Issues**

101.    In addition to the foregoing facts, all of which support a strong inference of scienter on the part of the Individual Defendants, the Individual Defendants also had the motive and opportunity to withhold the information concerning the Company's involvement in bribery

and corruption scandals from investors.  The Individual Defendants had motive and opportunity

for the following reasons:

    (a)    The petrochemical industry was dependent on a culture of political patronage and executive appointees were expected to carry out schemes on behalf of their political sponsors;

    (b)    Due to Odebrecht's involvement in the Car Wash cartel, Odebrecht had the motive to and did in fact appoint Board Members, CEOs and CFOs at Braskem that would facilitate and further the culture of political patronage that was part of the Car Wash cartel's activities in order to inflate the Company's profitability;

    (c)    Individual Defendants, as CEOs and CFOs, were appointed exclusively by the Company's largest shareholders pursuant to the Shareholder Agreement for a pre-determined two or three-year term and were controlled at the Company by those shareholders who were integral players in the bribery and kickback scheme, and were thus motivated to carry-out tasks on behalf of their parent companies;

    (d)    Because of Odebrecht's substantial ownership stake in the Company, Odebrecht had the opportunity and motive to, and did in fact, artificially inflate the Company's profitability and the Company's stock price for Odebrecht's own benefit, and Individual Defendants, as Odebrecht-appointed executives of the Company had the motive and did in fact carry-out tasks to artificially inflate the Company's profitability and the Company's stock price; and

    (e)    Individual Defendants, by the Company's Bylaws, were charged with (i) carrying out all actions necessary for the functioning of the Company, and (ii) performing acts of any nature relating to business or operations that are not consistent with the Company's objectives—objectives that were dictated by the Individual Defendants' employers Petrobras and Odebrecht, key players in the Car Wash cartel.

    102.    Odebrecht also has motive and opportunity for the following reasons:

    (a)    Odebrecht maintained a culture of political patronage as part of the Car Wash cartel and the culture at Petrobras, and Odebrecht sought, through its control of Braskem, to continue the culture of bribery and political patronage to maximize Braskem's apparent profitability;

    (b)    Because of Odebrecht's substantial ownership stake in the Company, Odebrecht had the ability and motive to, and did in fact, artificially inflate the Company's profitability and the Company's stock price for Odebrecht's own benefit;

    (c)    Odebrecht exercised almost complete control over Braskem's voting share capital and a super-majority control over the Company's outstanding shares; and

(d)     Braskem could not perform most business actions without the consent of Odebrecht.

## VII.     CLASS ACTION ALLEGATIONS

103.    Plaintiff brings this action individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons or entities who purchased or otherwise acquired Braskem ADSs from June 10, 2010 to March 11, 2015, inclusive.  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

104.    This action is properly maintainable as a class action.

105.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Braskem or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

106.    Lead Plaintiff's claims are typical of the claims of the members of the Class and Lead Plaintiff does not have any interests adverse to the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

107.    Lead Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

108.    There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. Among the questions of law and fact common to the Class are:

i.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

ii.  whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Braskem;

iii. whether the price of Braskem ADSs was artificially inflated during the Class Period; and

iv.  to what extent the members of the Class have sustained damages and the proper measure of damages.

109.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

110.    Lead Plaintiff anticipates that there will be no difficulty in the management of this litigation.

111.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

112.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**VIII.    LOSS CAUSATION**

113.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

114.    During the Class Period, Plaintiff and the Class purchased Braskem ADSs at artificially inflated prices and were damaged thereby. When the misrepresentations that had been made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, the price of the Company's ADSs significantly declined, causing investors' losses.

**IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

115.    At all relevant times, the market for Braskem's common stock was an efficient market for the following reasons, among others:

i.  Braskem ADS met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

ii.  As a regulated issuer, Braskem filed periodic public reports with the SEC and the NYSE;

iii.  Braskem regularly communicated with public investors via established market communications mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through the other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

41

iv. Braskem was followed by several securities analysts employed by major brokerage firms who wrote the reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

116. As a result of the foregoing, the market for Braskem ADSs promptly digested current information regarding Braskem from all publicly available sources and reflected such information in Braskem ADS stock price. Under these circumstances, all purchasers of Braskem ADS during the Class Period suffered similar injury through their purchase of Braskem common stock at artificially inflated prices and a presumption of reliance applies to Lead Plaintiff's claims.

## X.     APPLICABILITY OF PRESUMPTION OF RELIANCE (*AFFILIATED UTE* DOCTRINE)

117. Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because claims asserted herein against Defendants are predicated upon material omissions of fact that Defendants had a duty to disclose. Specifically, that Defendants failed to disclose the existence of a long-standing bribery scheme and that Braskem's naphtha purchase prices were the result of those bribes paid to Braskem's naphtha supplier and not the result of arms-length negotiations or market factors.

## XI.     NO SAFE HARBOR

118. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for purportedly those false forward-looking statements because at the time each of those purportedly forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Braskem who knew that those statements were false when made.

### FIRST CAUSE OF ACTION
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Company and the Individual Defendants

119.    Lead Plaintiff incorporates ¶¶ 1-118 by reference.

120.    Lead Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein. This claim is asserted against the Company, and Individual Defendants.

121.    During the Class Period, Braskem and the Individual Defendants and each of them, carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Braskem securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase Braskem securities at artificially inflated prices. In furtherance of this unlawful plan, scheme, and course of conduct, the Company and Individual Defendants, and each of them, took the actions set forth herein.

122.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the

purchasers of the Company's securities in an effort to maintain artificially high market prices for Braskem's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The Company and the Individual Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of Braskem, as alleged herein.

123.     In addition to the duties of full disclosure imposed on the Company and the Individual Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S- X (17 C.F.R. § 210.01, *et seq.*) and S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition, and performance so that the market prices of the Company's publicly- traded securities would be based on truthful, complete, and accurate information.

124.     Braskem and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the adequacy of Braskem's internal and financial controls as specified herein. These Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Braskem's value and performance and substantial growth, which included omitting to state material facts necessary in order to make the statements made about Braskem and its internal and financial controls, in light of the

circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in practices and a course of business which operated as a fraud and deceit upon the purchasers of Braskem's securities during the Class Period.

125. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

126. The Company and the Individual Defendants had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material omissions were made knowingly or recklessly and for the purpose and effect of concealing the state of Braskem's internal and financial controls from the investing public and supporting the artificially- inflated price of its stock. As demonstrated by their omissions concerning the Company's accounting, internal controls, and financial condition throughout the Class Period, the Individual Defendants, even if they did not have actual

knowledge of the omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking steps necessary to discover whether those omissions were false or misleading.

127.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Braskem securities was artificially inflated during the Class Period. In ignorance of the fact that the market price of Braskem shares was artificially inflated, and relying directly or indirectly on the omissions made by the Company and the Individual Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants but not disclosed to the public by these Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Braskem securities during the Class Period at artificially-inflated prices and were damaged thereby.

128.    At the time of said omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known of the true state of Braskem's internal and financial controls, which was not disclosed by the Company and the Individual Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired Braskem securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially-inflated prices which they paid.

129.    By virtue of the foregoing, Braskem and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

130.    As a direct and proximate result of the Company's and the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**SECOND CAUSE OF ACTION**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

131.    Lead Plaintiff incorporates ¶¶ 1-130 by reference.

132.    Lead Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. This claim is asserted against the Individual Defendants.

133.    The Individual Defendants were and acted as controlling persons of Braskem within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the dissemination of the various omissions which Lead Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the making of material omissions or cause affected statements to be corrected.

134.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

135.    As set forth above, Braskem and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### THIRD CAUSE OF ACTION
### Violations of Section 20(a) of the Exchange Act
### Against Odebrecht

136.    Lead Plaintiff incorporates ¶¶ 1-135 by reference.

137.    Lead Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. This claim is asserted against Odebrecht for the period November 5, 2010 through March 11, 2015.

138.    Odebrecht was and acted as a controlling person of Braskem within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of its controlling share of Braskem, as well as the actions of its employees, agents and nominees on behalf of Braskem as described above, and Odebrecht's control over Braskem's business plan and actions by virtue of the Shareholder Agreement, Odebrecht had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the dissemination of the various statements and omissions which Lead Plaintiff contends are false and misleading.

139.    In addition, Odebrecht, as a controlling shareholder with power over the business activities and decisions of Braskem and its day-to-day involvement in the operations of the

Company, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

140.     As set forth above, Braskem and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of its controlling position, Odebrecht is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Lead Plaintiff as a Class representative;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated: November 6, 2015

Respectfully submitted,

COHEN MILSTEIN SELLERS
& TOLL PLLC

/s/Christopher Lometti
Christopher Lometti
Kenneth M. Rehns (KR-9822)
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Steven J. Toll
Daniel S. Sommers
Genevieve Fontan
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

***Attorneys for Lead Plaintiff and the
Proposed Class***

## CERTIFICATION OF SECURITIES CLASS ACTION
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Mario Rodriguez, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Chief Investment Officer of the Boilermaker-Blacksmith National Pension Trust ("Boilermaker Pension Trust").

2. I have reviewed the First Amended Class Action Complaint (the "Complaint") filed in *Peters v. Braskem S.A., et al.*, Civ. No. 15-5132-PAE (S.D.N.Y.) and authorize the filing of this Certification and Lead Plaintiff Motion on behalf of Boilermaker Pension Trust.

3. Boilermaker Pension Trust is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4. During the Class Period (as defined in the Complaint), Boilermaker Pension Trust purchased and/or sold the securities that are the subject of the Complaint as set forth on the attached Schedule A.

5. Boilermaker Pension Trust did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6. Boilermaker Pension Trust has sought to serve or served as a representative party on behalf of a class in the following private action(s) arising under the Securities Act or the Exchange Act filed during the three-year period preceding the date of my signing this Certification:

*New Jersey Carpenters Vacation Fund, et al., v. The Royal Bank of Scotland Group PLC, et al.,* Civ. No. 08-5093-HB (S.D.N.Y.)

*New Jersey Carpenters Health Fund, et al., v. Residential Capital, LLC, et al.,* Civ. No. 08-8781-HB (S.D.N.Y.)

*City of Taylor General Employees Retirement System v. Magna International Inc. et al.,* Civ. No. 12-3553-NRB (S.D.N.Y.)

*In re Bear Stearns Mortgage Pass-Through Certificates Litigation,* Civ. No. 08-8093-LTS (S.D.N.Y.)

*Donio v. Linn Energy, LLC et al.,* Civ. No. 13-4875-CM (S.D.N.Y.)

*Mulligan v. Impax Laboratories, Inc., et al.,* Civ. No. 13-1037-EMC (N.D. Cal)

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3/ᴱᵀ day of August, 2015.

Mario Rodriguez
Chief Investment Officer

1

## SCHEDULE A

## TRANSACTIONS IN BRASKEM S.A. AMERICAN DEPOSITORY SHARES

| Trade Date | Transaction Type (Buy/Sell) | Share Quantity | Share Price ($) |
|---|---|---|---|
| 9/4/2013 | Purchase | 16,772 | 15.41 |
| 9/17/2013 | Purchase | 8,510 | 16.51 |
| 10/23/2013 | Purchase | 6,898 | 18.39 |
| 11/14/2013 | Purchase | 51,141 | 17.60 |
| 11/26/2013 | Purchase | 7,562 | 17.73 |
| 2/13/2014 | Sale | -4,234 | 15.40 |
| 2/26/2014 | Sale | -10,487 | 14.14 |
| 5/28/2014 | Sale | -15,487 | 12.98 |
| 6/10/2014 | Sale | -15,857 | 13.66 |
| 6/23/2014 | Sale | -6,400 | 13.48 |
| 7/18/2014 | Sale | -24,078 | 12.67 |
| 8/1/2014 | Sale | -14,340 | 12.32 |
| 11/3/2014 | Purchase | 50,820 | 14.44 |
| 11/11/2014 | Purchase | 7,090 | 14.52 |
| 11/21/2014 | Purchase | 67,645 | 15.35 |
| 12/9/2014 | Purchase | 33,311 | 14.34 |
| 2/18/2015 | Sale | -8,956 | 9.04 |

## CERTIFICATE OF SERVICE

I, Kenneth M. Rehns, hereby certify that, on November 6, 2015, I caused the foregoing

Consolidated Class Action Complaint document to be served on counsel of record through this

Court's Electronic Case Filing System.


_/s/  Kenneth M. Rehns_____
Kenneth M. Rehns