**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ──────────────────── X | |
| IN RE BRASKEM, S.A., | : |
| SECURITIES LITIGATION | :   Civil Action No. 15-CV-5132-PAE |
| | : |
| ──────────────────── X | |

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Lead Plaintiff, the Boilermaker-Blacksmith National Pension Trust ("Lead Plaintiff"), hereby brings this Second Amended Consolidated Complaint for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and t(a) and SEC Rule 10b-5 promulgated thereunder, codified at 17 C.F.R. § 240.10b-5, against Braskem S.A. ("Braskem" or the "Company"); Bernardo Afonso de Almeida Gradin ("Gradin"); Carlos José Fadigas de Souza Filho ("Fadigas"); and Odebrecht S.A. ("Odebrecht"). Lead Plaintiff's allegations against Defendants (defined below) in this Consolidated Class Action Complaint (the "Complaint") are based on personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of their counsel, which included, among other things: (i) review and analysis of Braskem's public filings with the U.S. Securities and Exchange Commission ("SEC") and certain international financial agencies; (ii) review and analysis of industry and Braskem analyst reports and other publicly-available materials concerning Braskem's business practices and revenue recognition policies; (iii) review and analysis of documents uncovered by the Brazilian government's investigation into Braskem, Petróleo Brasileiro S.A. – Petrobras ("Petrobras") and Odebrecht; and (iv) review and analysis of other publicly-available information concerning Braskem. Lead Plaintiff believes that substantial additional evidentiary support will exist for their allegations after a reasonable opportunity for discovery. On behalf of itself and the class they seek to represent, Lead Plaintiff alleges as follows:

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of Lead Plaintiff and a proposed class of purchasers of Braskem Ordinary Participation Certificates ("CPOs") in the form of

American Depository Shares ("ADS") during the period from July 15, 2010 to March 11, 2015, inclusive (the "Class Period"). Lead Plaintiff seeks to pursue remedies against Braskem and certain of its officers named as Defendants herein for violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

2.      Braskem is a Brazilian petrochemical company that is the largest petrochemicals producer in Latin America. Braskem is also the largest producer of thermoplastic resins in the Americas. Braskem's largest shareholders are Odebrecht, Brazil's largest infrastructure company, and Petrobras, a quasi-government-owned energy company and the largest in the Southern Hemisphere, who, together, during the Class Period owned approximately 74% of Braskem's outstanding share capital and completely controlled Braskem's voting rights with approximately 97% of the Company's voting share capital. Petrobras and Odebrecht are popularly understood to be Braskem's owners.[1] Braskem's third largest shareholder is the Brazilian Development Bank ("BNDES"), the main financing agent for development in Brazil. Among the Company's internal divisions, Braskem has three major production units: the Basic Petrochemicals Unit, the Polyolefins Unit, and the Vinyls Unit.

3.      Braskem's Basic Petrochemicals Unit buys naphtha both domestically and from sources abroad, and transforms the naphtha into materials that are then used by Braskem's other production units. Braskem purchases its domestic naphtha from Petrobras under long-term agreements. Petrobras is Brazil's only domestic naphtha supplier. During the Class Period, naphtha accounted, directly and indirectly, for approximately half of Braskem's consolidated cost of sales and services rendered. Petrobras provides approximately 70% of Braskem's naphtha needs, and Braskem imports the remaining 30%.

---

[1] *See, e.g.*, O Estado de Sao Paulo (Brazil): Braskem + Petrobras naphtha supply agreement on hold, 2015 WLNR 4008647, Feb. 9, 2015.

4.      Both prior to and during the Class Period, Braskem and Odebrecht, for the benefit of Braskem, caused the payment of bribes to politicians in the Partido Progressista, Brazil's Progressive Party, and to Petrobras, particularly Petrobras' former head of refining and director of supply, Paulo Roberto Costa ("Costa") as part of a price-fixing scheme to fix the price of naphtha that Braskem purchased from Petrobras. The bribes resulted in Braskem receiving contracts for the purchase of naphtha from Petrobras for prices materially lower than the prevailing market rate. Throughout the Class Period, however, Defendants concealed this bribery scheme from investors. Instead, Defendants touted Braskem's robust ethics standards and the Company's Code of Conduct, which included, among other policies, the requirement that Braskem deal ethically with suppliers of its raw materials.

5.      The facts surrounding Defendants' involvement in a long-running bribery scheme that directly benefited Braskem's bottom line began to emerge as the result of a broad investigation by Brazilian authorities into a massive scheme to funnel billions of dollars in kickbacks to executives at Petrobras. The multibillion-dollar laundering and corruption scandal, dubbed "Car Wash," spread to Petrobras after investigators uncovered ties between Petrobras's Costa, and a black-market money dealer, Albert Youssef ("Youssef").

6.      The Ministério Público Federal (the "MPF"), the Public Prosecutor's Office in Brazil, has been conducting an ongoing criminal and civil investigation into illegal activities in Brazil, dubbed by journalists as the Car Wash operation. The investigation, and its prosecution by the MPF, is currently presided over by the federal judge Sérgio Moro.

7.      On March 8, 2016, Judge Moro issued an order in which he sentenced Marcelo Odebrecht, Chief Executive Officer ("CEO") of Odebrecht, Braskem's parent company, to 19 years in prison for Marcelo Odebrecht's involvement in bribes paid to politicians as well as

Costa. Judge Moro found that "bribes were paid … in connection with contracts between Braskem and Petrobras." Judge Moro found that, "[t]he naphtha supply contract between Petrobras and Braskem involved the payment, according to the criminals who entered into plea deals, of a fixed amount of USD 5 million per year from 2006 to 2012, totaling USD 35 million."[2]

8.      Since Judge Moro's sentencing of Marcelo Odebrecht, additional developments related to Braskem's bribery scheme to purchase naphtha at a more favorable price have continued to emerge:

(a)     On February 8, 2016, Braskem received a formal subpoena from the SEC requesting information. At that time, and for an additional three months, Braskem failed to inform investors of its receipt of the SEC subpoena.[3]

(b)     On March 11, 2016, the MPF charged Marcelo Odebrecht—the former CEO of Odebrecht, Braskem's parent company—and others in a collective civil action seeking over R$ 7 billion (USD $2 billion) in damages for their participation in bribery schemes.[4]

(c)     In its March 11, 2016 complaint, the MPF stated that facts related to Braskem will be set forth in a separate action, indicating that the MPF will initiate separate

---

[2] *See* Translated Excerpts of March 8, 2010 Order by Judge Moro, Federal Court 13th Federal Judicial Section of Curitiba, State of Paraná Criminal Lawsuit No. 5036528-23.2015.4.04.7000/PR, at ¶ 848, *available at* http://politica.estadao.com.br/blogs/fausto-macedo/wp-content/uploads/sites/41/2016/03/sentencaOdebrecht.pdf. The Order is hereinafter referred to as the "March 8, 2016 Order." All sources cited herein that are in Portuguese have been translated by Lead Plaintiff.

[3] Braskem, S.A., Annual Report (Form 20-F), 40 (May 5, 2016); Stephen Dockery, *Braskem Discloses Petrobras-Related SEC Subpoena*, The Wall Street Journal, May 9, 2016, http://blogs.wsj.com/riskandcompliance/2016/05/09/braskem-discloses-petrobras-related-sec-subpoena/.

[4] Complaint at n.2, T.R.F.P.R.-13, *MPF v. Celso Araripe d'Oliveira, et al.*, Case No. AUTOS: 5006628-92.2015.4.04.7000, Relator: Deltan Marinazzo Dallagnol, 11.3.2016, Vara da Justica Federal [J.F.] (Braz.), *available at* http://www.mpf.mp.br/pr/sala-de-imprensa/docs/acao-de-improbidade-administrativa-odebrecht.

proceedings for damages based on, and which detail, activities directly at Braskem.[5]

(d)     Since his March 8, 2016 sentencing to 19 years in prison, Marcelo Odebrecht has agreed to testify in the Car Wash investigation, causing journalists to report that he has finally agreed to now "tell prosecutors what [he] know[s]."[6] This announcement came over six months after Marcelo Odebrecht's public statements and congressional testimony given prior to and on September 1, 2015 in which Marcelo Odebrecht both denied any wrongdoing and stated he did not intend to cooperate with prosecutors.[7]

(e)     On March 29, 2016, the Brazilian newspaper, *Valor Econômico*, reported that the U.S. Department of Justice ("DOJ") is investigating Braskem for violation of the Federal Corrupt Practices Act ("FCPA") on suspicion of corruption involving contracts for naphtha purchases. In particular, this news report stated that the federal police in Brazil informed Judge Moro—the judge presiding over the Car Wash prosecution—about the FCPA investigation of Braskem by the DOJ when the federal police attempted to seize a suspect's computers in February 2016. The federal police were unable to access all information sought because, they learned,

---

[5] *Id.*
[6] Marla Dickerson, *Odebrecht Says It Is Ready to Testify in Brazil's Petrobras Probe*, The Wall Street Journal, March 23, 2016, http://www.wsj.com/articles/odebrecht-says-it-is-ready-to-testify-in-brazils-petrobras-probe-1458776271 ("Brazilian construction giant Odebrecht SA on Wednesday confirmed that Mr. Odebrecht, its former chief executive, and other company employees are prepared to tell prosecutors what they know about a supplier cartel that siphoned billions from Brazil's state oil company and channeled it into the pockets of crooked politicians.").
[7] Will Connors, *Swiss Authorities Open Investigation Into Brazil's Odebrecht*, The Wall Street Journal, July 22, 2015, http://www.wsj.com/articles/swiss-authorities-open-investigation-into-brazils-odebrecht-1437605540; Caroline Stauffer, *Jailed Odebrecht CEO criticizes plea deals in Brazil*, Reuters, Sept. 1, 2015, *available at* http://www.reuters.com/article/us-brazil-corruption-odebrecht-idUSKCN0R14AU20150901.

certain relevant data had already been taken to the U.S. by a U.S. law firm involved in the DOJ investigation of Braskem.[8]

(f)      In response to this March 29, 2016 news, Braskem told journalists that information about these events was already known to the market because the Company had announced a year prior in April 2015 that its lawyers abroad were sharing information with the DOJ and the SEC pursuant to an internal investigation that the Company had, itself, voluntarily initiated. Indeed, when one particular publication reported on the breaking news on March 29, 2016 that the DOJ was now investigating Braskem, the Company sent that publication a formal response that:

> As is public knowledge from relevant fact released in April last year, Braskem took the initiative to open an independent inquiry to investigate the allegations. The process is being conducted by outside law firms hired by the company with the [DOJ] and [SEC]. Braskem offered access to information, data and files for the investigation to take place in a complete and profound way.[9]

(g)      Despite Braskem's statement describing its voluntary internal investigation begun in April 2015, as well as its comfort to investors on March 29, 2016 that the latest news was a result of this year-old voluntary investigation, the announcement of a U.S. government investigation caused the price of Braskem's stock to fall by

---

[8] *See* André Guilherme Vieira, et al., *EUA investigam Odebrecht e Braskem*, Valor Económico, March 29, 2016, http://www.valor.com.br/politica/4501426/eua-investigam-odebrecht-e-braskem.

[9] *EUA investigam Odebrecht e Braskem, afirma jornal*, Terra, March 29, 2016, http://noticias.terra.com.br/brasil/politica/lava-jato/eua-investigam-odebrecht-e-braskem-informa-valor, c1a7b4a790c9351ac4a6f6fea5d80f8blp5fi2lz.html (quoting a statement sent specifically to its publication after reporting on the news break in *Valor Económico* that the DOJ was investigating Braskem), ; *see also U.S. probes Brazil's Odebrecht, Braskem for corruption – Valor*, Reuters, March 29, 2016, http://www.reuters.com/article/brazil-corruption-usa-idUSL2N1710HV (summarizing a similar statement in response to the same news).

1.6% in Brazil and Braskem's ADSs in the U.S. to fall by 2.1% on the New York Stock Exchange.[10]

(h)     On March 31, 2016, *Valor Económico* reported that the MPF, for the first time, charged John Pizzolatti—a Progressive Party congressman—and several others with receiving $1.5 million in payments so that Braskem would "be favored in [the] naphtha purchase agreement with Petrobras."[11]

(i)     Similar to Braskem's response to the March 29 news that a U.S. government agency was investigating its activities, Braskem again on April 1, 2016 released the same statement to journalists and investors that it was "public knowledge from relevant fact released in April last year, [that] Braskem took the initiative to open an independent inquiry to investigate the allegations" and was sharing the information with the DOJ and SEC.[12]

(j)     Unbeknownst to investors and nearly two months prior, on February 8, 2016, Braskem had received a formal subpoena from the SEC requesting information. The SEC had served the subpoena on Braskem, despite Braskem's assertions to investors that it had already been conducting a voluntary investigation for a year, and had "offered access to information, data and files" to the SEC and DOJ "for the investigation to take place in a complete and profound way."[13]

---

[10] U.S. probes Brazil's Odebrecht, Braskem for corruption – Valor, Reuters, March 29, 2016.

[11] Letícia Casado and Carolina Oms, *Ex-deputado João Pizzolatti recebeu US$ 1,5 mi da Odebrecht, diz Janot,* Valor Económico, March 31, 2016, http://www.valor.com.br/politica/4506746/ex-deputado-joao-pizzolatti-recebeu-us-15-mi-da-odebrecht-diz-janot.

[12] U.S. probes Brazil's Odebrecht, Braskem for corruption – Valor, *supra* at n.10 ("Braskem on Tuesday said that its lawyers abroad were sharing information with the DOJ and the Securities and Exchange Commission about an internal investigation it opened last year.").

[13] *See supra* at nn. 9, 10.

    (k)      On May 5, 2016, Braskem finally announced to investors that it was "responding to requests for documents, including requests made in an SEC subpoena we received on February 8, 2016."[14]

    9.      Throughout the Class Period, Braskem and the Individual Defendants made materially false and misleading statements and omissions regarding the Company's business, operational, and compliance policies. During the Class Period, Braskem filed reports, forms, and other documents with the SEC that contained false and misleading statements and omissions regarding the effectiveness of Braskem's internal controls and procedures. Those reports also falsely stated that the price at which Braskem purchased naphtha from Petrobras was dependent on market factors like the market price of naphtha, the *real*/U.S. dollar exchange rate, the volatility of the prices of these products in the international markets, and the level of paraffinicity of the naphtha that is delivered.

    10.      However, Braskem's public statements, particularly its annual reports, filed with the SEC on Form 20-F, did not disclose that Braskem had paid up to USD $5 million a year in bribes to the Progressive Party and Petrobras in exchange for favorable naphtha prices. This bribery scheme took place both before and throughout the majority of the Class Period, from 2006 to at least 2012, and, by some reports, 2014, was part of an effort on behalf of Braskem, and its largest shareholder, Odebrecht, to secure raw materials at below-market prices to increase profitability for Braskem—a company which Odebrecht and Petrobras collectively controlled, including the employment of 90% of Braskem's Board Members as well as the appointment, without challenge, of the Individual Defendants as CEO and Chief Financial Officer ("CFO") during the Class Period.

---

[14] *See supra* at n.3.

11.    Defendants paid these bribes, caused these bribes to be paid and/or knew or should have known that these bribes were paid to secure more favorable pricing of naphtha, the raw material critical to Braskem's petrochemical production business and a material sold exclusively in the domestic market by Petrobras.

12.    This bribery scheme was critical to Braskem's purported profitability, because, according to sworn testimony by a Petrobras executive, without the bribe-induced lower prices of naphtha, Braskem's profit margin would have been substantially compromised. Thus, throughout the Class Period, the Company, the Individual Defendants and Odebrecht orchestrated a scheme to inflate the Company's share prices through a series of materially false and misleading statements and omissions regarding the Company's finances, business and operational and compliance policies.

13.    Odebrecht, as the Company's single largest shareholder, who, throughout the Class Period owned 38% of Braskem's outstanding share capital alone (approximately and 74% in conjunction with Petrobras) [15] as well as 50.1% of the voting share capital itself, had the power to direct and cause the direction of the Company and the terms of its naphtha contracts with Petrobras.

14.    By shareholder agreement, Petrobras and Odebrecht retained veto power over Braskem's corporate actions and collectively appointed ten out of eleven total Board Members for Braskem. The shareholder agreement also confers on Odebrecht the power to single-handedly

---

[15] Odebrecht's total share capital described herein experienced *de minimis* fluctuations from 38.1% up to 38.4% year over year during the Class Period, but its direct and indirect voting share capital of 50.1% did not change during the Class Period. *See* Braskem, S.A., Annual Reports (Form 20-F) (May 5, 2016; April 24, 2015; April 14, 2014; April 8, 2013; April 10, 2012; June 10, 2011). (Form 20-F's for fiscal years 2010 – 2015).

appoint Braskem's CEO and CFO every two to three years[16] and on Petrobras the power to single-handedly appoint Braskem's Investment and Portfolio Officer. As a result, Braskem agreed to undertake certain actions only after Odebrecht and Petrobras reach a consensus with respect to those actions. Odebrecht also holds the sole power to approve Braskem's business plan, which is based largely on the purchase and use of naphtha from Petrobras. Braskem's Annual Report for 2014 states plainly that "Odebrecht will have the ability to determine the outcome of most corporate actions or decisions requiring the approval of our shareholders or our board of directors—in certain instances, with the consent of Petrobras."[17]

15.     The payments were made by Braskem and Odebrecht staff to acquire raw materials for Braskem's petrochemical production, materials such as propylene and naphtha, at cheaper prices. Several politicians, executives at Petrobras and Odebrecht, and others have been arrested, are facing trial or are currently serving prison sentences for their roles in the illegal bribery scheme.

16.     On this news, Braskem ADSs fell over 20%, or $1.80 per ADR, on March 11, 2015 and Lead Plaintiff and the Class were damaged as a result.

17.     On April 24, 2015, Braskem filed its 2014 Annual Report with the SEC on Form 20-F which explained that,

> In the context of anti-corruption allegations against certain individuals and entities in Brazil, including Petrobras, we were mentioned in allegations of improper payments made in order to receive favorable treatment in connection with certain contracts that we are party to with Petrobras…Although we have certain procedures in place, we have implemented additional procedures and controls to monitor our compliance with applicable anti-corruption laws and as a result of the

---

[16] Braskem had Bylaws in place in 2010 that set tenures at two years. When the Bylaws were readopted in 2012, this tenure was extended to three years. *See* Braskem, S.A., Annual Report (Form 20-F) (Apr. 11, 2012) at Ex. 1.01 and Braskem, S.A., Report of Foreign Private Issuer (Form 6-K) (Mar. 1, 2012).

[17] Braskem, S.A., Annual Report (Form 20-F), 8 (Apr. 24, 2015) ("2014 Form 20-F").

recent allegations against us, have engaged Brazilian and U.S. legal counsel to conduct a voluntary internal investigation of this matter.

Braskem, S.A., Annual Report (Form 20-F), 12 (Apr. 24, 2015).

18.     Defendants' wrongful acts and omissions, including Odebrecht's participation in the alleged fraud and control of Braskem caused Braskem ADSs to trade at artificially inflated prices during the Class Period. Indeed the revelation of this bribery scheme involving Braskem, Petrobras, and Odebrecht came as part of a wave of intense investigation—including dozens of search warrants and arrests that led to sworn testimony in court by actors in the fraud who confirmed the bribery activity. As explained more fully below, when the bribery scheme orchestrated by Petrobras was revealed to the market, the impact of the news put thousands out of work, sparked mass demonstration in the streets, and pushed Brazil's economy into recession. The revelation of Braskem's involvement in this bribery scandal caused the price of Braskem ADS traded in the U.S. to tumble. Lead Plaintiff and the Class collectively incurred significant losses and damages on their investments in Braskem ADSs once the truth of Defendants' misconduct was disclosed.

## II.     JURISDICTION AND VENUE

19.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27(c) of the Exchange Act (15 U.S.C. § 78aa(c)). Many of the acts complained of herein, including the dissemination of materially false and misleading statements, omissions and reports prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of Defendants

occurred, at least in part, in this District. Braskem ADSs are listed on the New York Stock Exchange ("NYSE") under the symbol "BAK." Braskem appointed The Bank of New York to act as the depositary for the ADSs. The depositary's corporate trust office is located at 101 Barclay Street, New York, New York 10286. The depositary's principal executive office is located at One Wall Street, New York, New York 10286. The deposit agreement and the ADSs are governed by New York law.

21.     Jurisdiction over Defendant Odebrecht is also proper because Odebrecht, as alleged herein, has engaged in conduct that has had a foreseeable substantial effect within the United States. Moreover, Odebrecht operates in the U.S. through its wholly-owned subsidiary Odebrecht Construction, Inc., located at 201 Alhambra Circle, Suite 1000, Coral Gables, Florida 33134. Odebrecht also sells bonds in New York through its wholly-owned special purpose entity Odebrecht Finance, Ltd.

22.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

23.     During the Class Period, Lead Plaintiff Boilermaker-Blacksmith National Pension Trust purchased ADSs of Braskem, as set forth in his certification attached hereto and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

24.     Defendant Braskem S.A. is a Brazilian petrochemical company headquartered in Camacari, Brazil that is a subsidiary of Odebrecht S.A. The Company was formerly known as Copene Petroquímica do Nordeste S.A. and changed its name to Braskem S.A. in 2002. The

Company is the largest petrochemical company in Latin America and one of the largest in the world. Braskem is the largest thermoplastic resins producer in the Americas and a major global player in the polypropylene, polyethylene, PVC, and chemicals markets. Braskem's ADSs are listed on the NYSE under the ticker symbol "BAK." Braskem appointed The Bank of New York to act as the depositary for the ADSs. The depositary's corporate trust office is located at 101 Barclay Street, New York, New York 10286. The depositary's principal executive office is located at One Wall Street, New York, New York 10286. The deposit agreement and the ADSs are governed by New York law.

25.     Defendant Bernardo Afonso de Almeida Gradin was the Chief Executive Officer ("CEO") of Braskem from July 2008 until December 2010. From 2004 through 2007, Gradin was the Vice President of Basic Supplies for Braskem, and from December 2002 through 2004, he was the Executive Vice President of Vinyl Products. From 1987, through his tenure as Braskem's CEO, Gradin worked for Odebrecht, Braskem's "controlling shareholder" according to Braskem's own press release announcing Gradin's appointment as the new CEO on July 3, 2008.

26.     Defendant Carlos José Fadigas de Souza Filho has served as CEO and a Member of the Executive Management of Braskem since December 7, 2010 and was elected to the board of directors of Braskem as a nominee of Odebrecht. Previously, Fadigas acted as Vice President of the Company's International Business Unit until 2011, as well as the Company's CFO and Executive Vice President of Investor Relations from 2007 to 2010, and as Director of Investor Relations of the Company between December 14, 2006, and 2007. Fadigas also served as CFO of Construtura Norberto Odebrecht S.A. from 2002 to 2006.

27.     Defendants Gradin and Fadigas are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company and their participation in the fraudulent scheme as alleged herein, possessed the power and authority to control the contents of Braskem's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Articles 33 and 39 of the Company's Bylaws in effect in 2010 and readopted in 2012 state that:

> Article 33: The Executive Board will be responsible for: a) ***carrying out all actions necessary for the functioning of the Company***, except those that, by law or by these bylaws, are assigned to other bodies; b) preparing the annual management report, the financial statements and the proposal for allocation of income for the fiscal year, all of which will be submitted to the Board of Directors and the General Meeting.
>
>           * * *
>
> Article 39: The Executive Board is prohibited from: a) taking out loans with institutions that are not members of the official or private banking network, whether in Brazil or abroad, unless expressly authorized by the Board of Directors; b) ***performing acts of any nature relating to business or operations that are not consistent with the Company's objectives***, such as the provision of guarantees on third-party liabilities, excepting those to fully controlled companies, or if expressly authorized by the Board of Directors.

*See* Braskem, S.A., Annual Report (Form 20-F), Ex. 1.01 (Apr. 11, 2012) (emphasis added) and Braskem, S.A., Report of Foreign Private Issuer (Form 6-K) (Mar. 1, 2012) (emphasis added).

28.     Defendant Odebrecht S.A., or "Odebrecht," directly or through its wholly-owned subsidiary Odebrecht Serviços e Participações S.A., or OSP, owns 38.3% of Braskem's outstanding share capital, including 50.11% of Braskem's voting share capital. Designees of Odebrecht constitute a majority of the members of Braskem's board of directors. Each of the Individual Defendants were affiliated with or employed by Defendant Odebrecht. Moreover, Odebrecht's CEO, Marcelo Odebrecht, was the Chairman of the Board of Braskem until his arrest on June 19, 2015. As alleged herein, Odebrecht, as the largest single shareholder of

Braskem, participated in the fraudulent scheme on behalf of Braskem. According to Braskem's

2014 Annual Report, filed on Form 20-F on April 24, 2015:

> Under a shareholders' agreement to which Odebrecht and Petrobras are parties, Braskem have agreed to undertake certain actions only after Odebrecht and Petrobras have reached a consensus with respect to those actions and Odebrecht will have the sole power to approve the business plan of our company… As a result, Odebrecht will have the ability to determine the outcome of most corporate actions or decisions requiring the approval of our shareholders or our board of directors—in certain instances, with the consent of Petrobras.

Braskem 2014, Form 20-F, at 8 (filed April 2015).

29.     For example, Braskem filed a 6-K on April 5, 2010, disclosing a Shareholders'

Agreement entered into by Petrobras and Odebrecht, later filed as an exhibit to its FY 2009 20-F

on June 1, 2010. Braskem's subsequent 20-F's incorporate the 2009 20-F in reference to the

Shareholders' Agreement. Under the Shareholder Agreement, Odebrecht is entitled to elect six

out of the total eleven Braskem Board Members; while Petrobras elects four. Also under the

Shareholder Agreement, Odebrecht alone nominates Braskem's CEO. That elected CEO then

must choose a CFO from a list of three candidates provided by Odebrecht and the CEO must also

choose an Investment and Portfolio Officer from a list of three candidates provided by Petrobras.

Odebrecht must cause its Board Members to ratify the CEO's choices. In short, Braskem's CEO

and CFO are hired by Odebrecht. The CEO, CFO, and Investment and Portfolio Officer each

serve for a period of three years. Not surprisingly, Odebrecht lists Braskem among its subsidiary

businesses controlled by the President and CEO of Odebrecht SA. Odebrecht also regularly

published press releases related solely to Braskem on Odebrecht's website during the Class

Period.

30.     The Individual Defendants made specific false and misleading statements and/or

reviewed and approved the Company's reports and press releases alleged herein to be misleading

prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material, non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

31.     Each Individual Defendant's primary liability and controlling person liability arises from the following facts, among others: (a) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (b) the Individual Defendants, by virtue of their responsibilities and activities as senior officers of the Company, were privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (c) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) the Individual Defendants were aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

32.     Odebrecht's liability, as control person, arises from the following facts: (a) Odebrecht exercised control over Braskem and its executives because Odebrecht possessed a controlling share of Braskem, and maintained control over the actions of its employees, agents and nominees on behalf of Braskem, as well as over Braskem's business plan and actions by virtue of the Shareholder Agreement; (b) Odebrecht had the power to influence and control and

did influence and control, directly or indirectly, the decision-making of the Company, including the dissemination of the various statements and omissions which Lead Plaintiff contends are false and misleading.

IV.    **SUBSTANTIVE ALLEGATIONS**

    A.    **Prior to and During the Class Period, Braskem, Odebrecht and Petrobras Paid Bribes to Politicians to Secure Favorable Pricing for Naphtha**

33.    In approximately 2009, Braskem entered into a publicly-announced five-year contract with Petrobras for the purchase of a regular quota of naphtha (the "2009 Naphtha Contract"). [18] Prior to the 2009 Naphtha Contract, Braskem had been paying 100% of the international Amsterdam-Rotterdam-Antwerp ("ARA") rate plus USD $2 per ton. Yet, as described below, pursuant to the 2009 Naphtha Contract, Braskem paid, in practice, much less— in fact, merely 93% of ARA for naphtha. [19] According to Braskem, "naphtha, a crude oil derivative, is the principal raw material used by [Braskem's] Basic Petrochemical Unit and, indirectly, in [Braskem's] other business units." During the Class Period, naphtha accounted for approximately half of Braskem's cost of sales and services rendered, as follows:

| Naphtha as a Percentage of Cost of Braskem Sales and Services Rendered | |
|---|---|
| Year | Percent |
| 2010 | 55.8% |
| 2011 | 48.6% |
| 2012 | 49.3% |
| 2013 | 48.9% |
| 2014 | 48.3% |

34.    The interim pricing for naphtha purchased under this contract, however, would be the result of bribes paid by Braskem to Petrobras, unbeknownst to investors. In fact, several

---

[18] Braskem, *Petrobras extend naphtha supply contract by 6 months – report*, News Latin Am., Mar. 22, 2014; Brazil: *Petrobras x Braskem naphtha supply contract lingers on*, Valor Economico, Oct. 29, 2015.
[19] March 8, 2016 Order, at ¶¶ 705, 721.

years prior, since 2006, Braskem had been paying bribes—up to USD $5 million a year—to politicians to manipulate the price Braskem paid for naphtha to purchase it at a cheaper price that was not actually supported by the market.[20]

35.    Thus, despite the appearance of a new agreement in 2009 for naphtha sales between Petrobras and Braskem, Braskem had already been paying and continued to pay bribes to Petrobras in a price-fixing scheme. Years later when the renowned money-launderer Youssef—referred to by media sources as an independent "black market central banker"—was called to testify under oath in proceedings before Judge Moro in October 2015 as part of the Car Wash prosecution, Youssef stated that his relationship with Braskem began in 2006 through the Progressive Party congressman Jose Janene ("Janene"). According to Youssef, Janene introduced him to Alexandrino Alencar's ("Alencar") (then an executive employee of Braskem) so that Youssef could facilitate payment of Braskem's bribes to the Progressive Party as part of the naphtha-pricing scheme. From the bribe money, Costa received 30%, and the remaining amount would be paid to the Progressive Party.[21]

36.    In his testimony before Judge Moro, Youssef stated that he had participated in meetings where Petrobras' Costa, Braskem/Odebrecht's Alencar, and Progressive Party's Janene had all participated. Costa stated that Braskem continued to pay bribes through the regular set-up facilitated by Janene (until his death in 2010) and Alencar until at least late 2011 or early 2012, and that the amounts were decided by the CEO of Braskem—in particular, the bribe amounts

---

[20] Julia Affonso, *Doleiro diz que Odebrecht 'pagava propinas parte lá fora, parte aqui em reais,'* Estadão, Oct. 22, 2015,   http://politica.estadao.com.br/blogs/fausto-macedo/doleiro-diz-que-odebrecht-pagava-propinas-parte-la-fora-parte-aqui-em-reais/ (Part 2 of video for Youssef's testimony).
[21]    Michael   Smith,   et   al.,   *The   Betrayal   of   Brazil*,   Bloomberg   Business,   May   8,   2015, http://www.bloomberg.com/news/features/2015-05-08/brazil-s-massive-corruption-scandal-has-bitterness-replacing-hope ("In Brazil's justice system, a judge formally charges a defendant, approves major steps in the investigation by police and prosecutors, hears the evidence, and then decides whether the defendant is guilty or innocent."). *See also* Affonso, *supra* note 20 (Parts 1 and 2 of video for Youssef's testimony).

were set by Defendant Gradin and Gradin's successor CEO at Braskem.[22] Youssef stated that during all the years he coordinated laundering money for the bribes, Alencar consistently indicated that he had to seek authorization from Braskem's CEO for the bribes, and in particular Defendant Gradin and his successor. Youssef further testified that the money he received was for "kickbacks," that they were not political donations, and that he received funds through off-shore accounts and at other times in cash at his office.[23]

37.    Youssef further testified that the bribery scheme was a consequence of the dynamics in domestic naphtha sales: Petrobras was the sole domestic supplier of the raw material that Braskem needed[24] and the price charged by Petrobras in the national market for naphtha was so high that Braskem would be precluded from manufacturing plastics, ethylene, and other products. Because of these high prices, Youssef stated, Petrobras and Braskem made an agreement about the price charged so that it would be beneficial for both companies.[25]

38.    Youssef's assistant confirmed Youssef's account in sworn testimony before Judge Moro. When Rafael Angulo Lopes testified in court on August 31, 2015, he stated that his responsibilities as Youssef's assistant were to pay bills, deliver money, withdraw money for Youssef and for other people at Youssef's request, and to do these tasks in various locations. Lopes testified that he met Braskem's Alencar at Braskem offices in Sao Paulo so that Lopes

---

[22] *See* Affonso, *supra* note 20 (Part 1 of the video for Youssef's testimony). *See also* Cooperation agreement submitted before Judge Moro on April 24, 2015 by prosecutors in the Car Wash prosecution, Terms of Cooperation No. 30 (admissions by Youssef regarding bribes paid by Quattor).

[23] Affonso, *supra* note 20 (Part 2 of the video for Youssef's testimony). Indeed, the payments that Youssef facilitated were not political donations—by his own account, but also by public record. The Tribunal Superior Electoral ("TSE"), a government entity that tracks and discloses political donations, has no record of these payments. According to the TSE, Braskem registered R $440,000 (USD $116,000) in donations to the Progressive Party in 2010, R $100,000 (USD $26,500) in 2012, and R $380,000 (USD $100,500) in 2014—*di minimis* amounts compared to the millions that Braskem paid annually to the Progressive Party and Costa.  *See* Plaintiff Declaration, ECF No.. 59,Ex. 4.

[24] Fernanda de Biagio, *Petrochemical industry competitiveness harmed by raw material costs*, BNamericas, Oct. 21, 2010,   http://www.bnamericas.com/en/news/petrochemicals/Petrochemical_industry_competitiveness_harmed_by_ raw_material_costs.

[25] Affonso, *supra* note 20 (Part 2 of the video for Youssef's testimony).

could give Alencar bank account numbers and swift codes. Lopes always delivered the documents in a sealed envelope, in person, and simultaneously collected from Alencar deposit slips showing deposits in offshore accounts.[26] Lopes went on to explain that Alencar and Youssef had numerous regular meetings at Youssef's office, in hotels, at Braskem's offices, and in restaurants. Lopes further stated that he met Alencar himself approximately ten to fifteen times between 2008 and 2013 to exchange swift codes for deposit slips that confirmed the transfer of bribery money.[27] According to Lopes, these meetings took place while Alencar was an executive at Braskem and later when Alencar was an executive at Odebrecht.[28]

**B.** **Findings by an Internal Petrobras Investigation and Testimony by Petrobras Employees Confirm that Braskem Paid Bribes to Achieve a Lower Price for Naphtha**

39.     When Costa also testified in October 2015 before Judge Moro, he described the same bribery scheme as Youssef and Lopes as well as the direct involvement of Braskem's executives. Costa testified that, in 2009, he had coordinated bribes with Braskem, that Defendant Gradin was aware of this arrangement, and that these payments extended throughout Costa's tenure at Petrobras and even afterward to 2012.[29] Indeed, Costa stated that he had personally

---

[26] During Youssef's testimony before Judge Moro, when presented with documents produced by Lopes, Youssef confirmed that he recognized the swift codes and deposit receipts as part of their regular scheme. *Id.* (Part 1 of video for Youssef's testimony). When later asked if Lopes worked for him, Youssef confirms that Lopes did and also went on to describe the same process of exchanging swift codes and deposit slips in sealed envelopes. *Id.* (Part 2 of video for Youssef's testimony).

[27] Alencar was an executive at Braskem until 2007 when he began working for Odebrecht until his arrest in 2015. Redação, *Delator cita doleiro da Suíça em propina de US$ 5 milhões da Braskem*, Estadao, Jun. 23, 2015, http://politica.estadao.com.br/blogs/fausto-macedo/delator-cita-reunioes-com-executivo-da-odebrecht-para-negociar-propinas/.

[28] *See* NúcleoMultimídia Estadão, *Depoimento de Rafael Ângulo à Justiça Federal*, YouTube (Sep. 2, 2015), https://www.youtube.com/watch?v=fS5caTIbYBk (August 31, 2015 testimony by Costa before Judge Moro, posted by *O Estado de S. Paulo*, Sao Paulo's daily newspaper).

[29] David Friedlander, *Costa diz que tratou de propinas com Gradin, ex-presidente da Braskem*, Folha de S. Paulo, Jul. 24, 2015, http://www1.folha.uol.com.br/poder/2015/07/1660072-costa-diz-que-tratou-de-propinas-com-gradin-ex-presidente-da-braskem.shtml; Cleide Carvalho, *Odebrecht monitorou negócios entre Petrobras e Braskem*, O Globo, Oct. 21, 2015, http://oglobo.globo.com/brasil/odebrecht-monitorou-negocios-entre-petrobras-braskem-17834832; Affonso, supra note 20 (Part 1 of video for Costa's testimony).

spoken to Defendants Gradin and Fadigas about the bribes he received, and that Costa carried out

tasks, as asked. Costa stated:

> **Costa**: But other executives, in this instance, the presidents [sic] of Braskem, knew about the process because ***we'd some conversations*** and they knew what was happening.

> **Judge Moro**: Was this subject of payment of commissions, of kickbacks, ***mentioned in these conversations***?

> **Costa**: It was.

> **Judge Moro**: And who would these presidents be?

> **Costa**: The first one [I] had contact with was José Carlos Grubisich, then there was ***Bernardo Gradi[n] and then Carlos Fadigas***, all of them knew what was going on.

> ….

> **MPF:** …. Here you say that you were sought out by Bernardo Gradin, Braskem's president at the time, who allegedly requested from you, who presented a formula and so forth, arguing for a percentage under 95% of the ARA to be set.

> **Costa:** Yes, that's correct.

> **MPF:** Right. You also stated that based on this conversation you allegedly escalated the subject to the technical department requesting that special attention be paid to this proposal presented by Braskem, is that correct?

> **Costa:** Correct.

> **MPF:** Right. Next, you said you "recognize that this initiative of ***requesting that special attention be given to the Braskem proposal was related to the amounts you were going to receive as a benefit***, both personally and to the benefit of the Progressive Party," is this true?

> **Costa:** It is.

> **MPF:** That, in fact, Braskem's argument ***was given the green light in the terms suggested by Bernardo Gradin***, is this correct?

21

      **Costa:** Yes.[30]

40.     The bribes Braskem paid were fixed at a certain amount annually, approximately USD $5 million, during meetings Costa had with Janene and Alencar, and then Braskem paid the agreed-to amounts on a monthly basis, Costa said.[31] Just as Costa had described, Youssef confirmed in his testimony before Judge Moro, too, that the amount of the bribes were agreed to on a yearly basis, but that Youssef would go to Alencar to talk about the payment scheme and make sure the interval payments were made.[32]

41.     Indeed, according to Costa, the "CEOs of Braskem, knew about the arrangements" to pay bribes for altered naphtha prices. Costa stated that, at the heart of the bribery scheme to alter pricing was an effort to keep the price of naphtha at a measure below the ARA price.[33] Costa testified that Defendant Gradin himself asked Costa to maintain the naphtha prices for Braskem below 95% of the ARA—the standard ARA being the price reference used in Braskem's international purchases—and that Costa submitted a request to Petrobras' technical committee that coordinated the sale of naphtha and asked for the committee to pay "special attention" to Braskem's request. Costa stated that he made this request based on the "financial advantages" afforded him by Braskem in the bribery scheme.[34]

42.     Costa testified that negotiations for the price of naphtha, which would later be memorialized in the 2009 Naphtha Contract, were required to pass analysis by the technical department at Petrobras. Guilherme França, an employee in the technical department at Petrobras who worked on naphtha pricing and who also worked as an assistant to Costa, confirmed in his

---

[30] Affonso, *supra* note 20 (Part 2 of video for Costa's testimony) (emphasis added).
[31] *Id.*
[32] *Id.* (Part 1 of video for Youssef's testimony).
[33] Braskem buys naphtha from all sellers other than Petrobras (*e.g.* all Braskem's international purchases) based on the ARA price for naphtha. *See* Braskem, S.A., Annual Report (Form 20-F), 26, 58 (Apr. 24, 2015).
[34] Affonso, *supra* note 20 (Part 2 of video for Costa's testimony).

testimony that the pricing for naphtha was consciously manipulated to ensure a consistently lower price for Braskem. In fact, Petrobras and Braskem did not agree on a fixed price for naphtha in the 2009 Naptha Contract. Rather, executives from both companies agreed on a formula, which, in theory, could produce a range of pricing of the course of the contract's enforcement. According to França's testimony, the formula in the 2009 Naphtha Contract was an aggregate calculation of the average standard prices for a pre-determined group of raw materials. In essence, the price of naphtha was based on a calculation that took into account the current market prices of various raw materials commonly used in the petrochemical industry. The formula, however, was not objective: França testified that there was an "agreement between Mr. Paulo Roberto Costa and Bernardo Gradin," which resulted in the introduction of Marlim oil as one of the raw materials whose price reference was featured in the formula. The known effect of adding Marlim oil to the formula, according to França, was that the price resulting from the formula would consistently be lower and produce a more favorable price.[35]

43.    Indeed, the purpose of adding Marlim oil was that it created a formula certain to "tend to be at the minimum [of the pricing formula] if there was no other unusual deviation" of pricing in the market. However, this result was undesirable for Petrobras, and, in response, França "cancelled the entry of the Marlim oil prices to reach the value" for naphtha pricing that was higher, and closer to what it had been prior to the addition of the Marlim oil. Excluding the Marlim oil had the effect of raising the price resulting from the formula back to above 96% ARA. But, França testified, Costa "did not accept it." Instead, according to França, Costa "said that we needed to go with a lower value, that it had to be between 95% and 90%" ARA—not the 96% ARA or more that França's team had been pursuing. In fact, according to França, it was

---

[35] *See* Plaintiff Declaration, ECF No.. 59,Ex. 1 at 265 (Excerpt of MPF Closing Statements dated January 22, 2016) ("MPF Closing Statements").

Costa himself who "ended up defining the minimum as 92.5% which was the proposal received from the petrochemical [company, Braskem]."[36] França testified that Costa had "defined in a meeting that this was the proposal to be taken to the Board of Directors," and "that is what we did and the Director [Costa] took this proposal to a board meeting on March 12 of 2009."[37]

44.     Costa was no stranger to how the formula worked or how it could be manipulated to produce a consistent price, despite the illusion of the 92.5% - 105% ARA spread of supposed possible pricing later finalized in the 2009 Naphtha Contract. França testified that Costa was well versed in how the formula worked because various formulas were "presented to [Costa] by the technical department, a formula [where] he wanted to know what was the impact of that." Technical department staff would explain to Costa how various factors affected the outcome, stating, for example, "if I have a 'X' the impact is this much, if I have 'Y' the impact is that much" and then Costa would make a determination and "the final decision."[38]

45.     As an assistant director who shadowed Costa, França had direct knowledge of Costa's activities. When França was asked during his deposition whether Costa directly participated in negotiations for naphtha pricing, he testified that "after a certain time, that it must have been in the end of 2008, the Director Paulo Roberto began to take care of it directly."[39] França stated that "at a certain moment he became devoted, I mean, it was h[e] who started leading the negotiations." In the end, with regard to "formulas and minimums and maximums," "the final [say] inside Petrobras was Mr. Paulo Roberto Costa." *Id.* at 269.[40]

---

[36] *Id.* at 268.
[37] *Id.* at 268.
[38] *Id.* at 269.
[39] *Id.* at 268.
[40] *Id.* at 268. As just one example of Costa's scheme to obtain a lower pricing for Braskem, França described an Executive Board meeting where Petrobras was presented with Braskem's proposal of a 92.5% - 105% ARA spread, but rejected it in favor of a 97% - 103% ARA spread. *Id.* at 271. Petrobras had a system that action could not be taken on any resolutions until a revised agenda was submitted. *Id.* at 275. Yet, in this particular instance, the

46.     Based on the sworn testimony, above, the MPF argued that "[i]t is proven, therefore, that Paulo Roberto Costa acted so that the price proposed by Braskem would be approved by the Petrobras Board of Directors and established in the renewed contract."[41]

47.     As negotiations progressed for the design of the formula contained in the 2009 Naphtha Contract, Defendant Gradin, through the payment of bribes, caused Costa to manipulate the formula that would later be memorialized in the 2009 Naphtha Contract. For instance, França described an Executive Board meeting where Petrobras was presented with Braskem's proposal of a 92.5% - 105% ARA spread, but rejected it in favor of a 97% - 103% ARA spread. Petrobras had a system that action could not be taken on any resolutions—including the review of negotiations related to the 2009 Naphtha Contract—until a revised agenda was submitted to the Executive Board, after a resolution had been decided upon. Yet, in this particular instance, the resolution was never recorded, and the agenda of the meeting that otherwise could have been modified to include the resolution was locked in the software system. França testified that Costa "determined that the agenda would not be released, informing [us] that he was going to review it." Instead of updating the agenda, however, Costa requested a redrafted proposal with a spread of 92.5% - 105%, "because he was going to take the matter to the DE [Executive Board] again." In response, stated França, "*[w]e did what he told us to do*" and then, later, according to França, he and fellow employees learned that the more favorable proposal was approved.[42]

---

resolution was never recorded, and the agenda of the meeting that otherwise could have been modified to include the resolution was locked in the software system. *Id.* França testified that Costa "determined that the agenda would not be released, informing [us] that he was going to review it." *Id.* at 272. Instead of updating the agenda, however, Costa requested a redrafted proposal with a spread of 92.5% - 105%, "because he was going to take the matter to the DE [Executive Board] again." *Id.* In response, stated França, "*[w]e did what he told us to do* and then after the meeting of March 2nd we knew that it was approved." *Id.* (emphasis added).

[41] *Id.* at 269.

[42] *Id.* at 272-275 (emphasis added).

48.     After the March 2015 news, *infra* at ¶¶ 65-69, that Braskem had been implicated in a bribery scheme involving the purchase of naphtha from Petrobras, Petrobras launched an internal investigation to assess its prior approval process of the 2009 Naphtha Contract. Petrobras' internal committee that conducted the investigation concluded:

> Given the verified evidences, the Committee found that the inclusion of the Marlim into the Naphtha price formula and the definition of the minimum and maximum limits have **had no technical basis** within [] Petrobras that could clarify its advantages and disadvantages. The Committee also found that **the technical team** responsible for the preparation of price proposals **had to abide by superior decisions, arising from agreements made between representatives of Braskem and ex Diretor Paulo Roberto Costa.**[43]

49.     Indeed, consistent with França's testimony and Petrobras' own internal report, Judge Moro concluded in his March 8, 2016 Order that Costa received bribes and, as a result, failed to defend Petrobras' interests in negotiating the 2009 Naphtha Contract:

> [I]t is clear that the payment of bribes by Braskem to Paulo Roberto Costa has not caused him to defend with the necessary intensity the interests of Petrobras in the 2009 renegotiation. **In other words, in the 2009 negotiation table, the chief negotiator of Petrobras was on the 'payroll' of Braskem, which, to all evidence, from the start, has compromised the chances of the state-owned company [Petrobras] to obtain a more favorable result in the naphtha price review.** This partly explains why, after negotiation, the price of naphtha, from [100%] ARA plus USD 2.00 per ton, dropped to about 93% of ARA in favor of Braskem and to the detriment of Petrobras.[44]

50.     Judge Moro further concluded in his March 8, 2016 Order that meetings between Defendant Gradin and Costa were relevant to his conclusions that a bribery scheme had resulted in the manipulation of the 2009 Naphtha Contract to benefit Braskem, and that Marcelo Odebrecht was involved in the bribery scheme. Judge Moro found that "in matters relating to the [2009 Naphtha Contact] between Petrobras and Braskem …. it should be considered that there

---

[43] *See* Petrobras Internal Investigation Committee Final Report dated April 10, 2015 at p.18 (emphasis added), annexed as Exhibit 151 to Event 3 of the Car Wash investigation (filed on July 24, 2015), *available at* https://goo.gl/W2fcYE. The report summarizes the findings of an "Internal Verification Committee to 'verify, investigate and audit possible irregularities (non-conformities) in supply contracts raw material for Braskem, during May/2004 to April/ 2012, the then management of the former Director Paulo Roberto Costa.'" *Id.* at 1.
[44] March 8, 2010 Order at ¶ 747 (emphasis added).

are records of a meeting on 03/20/2009 between Paulo Roberto Costa, Marcelo Odebrecht, Bernardo Gradin (Braskem CEO) and José Sérgio Gabrielli (Petrobras CEO) on the subject of 'Naphtha,' *i.e.* just before Petrobras accepted the downward revision of the price it charged Braskem for the supply of naphtha." Indeed, Judge Moro concluded that this finding, and others in his March 8, 2016 Order, were supported by testimony from eight witnesses that was "rich in details and, in general, converge with the testimonies of each other ...." Judge Moro further concluded that this testimony from eight witnesses "support[ed] the legal thesis of the [MPF], that Odebrecht and its controlled entity Braskem paid kickbacks to Petrobras agents as a result of contracts entered into with the state-owned company [Petrobras]." [45]

51.    After Gradin's departure from Braskem in December 2010, Defendant Fadigas assumed the role of CEO. Defendant Fadigas continued to participate in the bribery scheme as well as negotiations of naphtha pricing. According to Costa and Youssef's testimony, Defendant Fadigas knew about and was involved in the bribery scheme to obtain lower naphtha pricing. *See, e.g. supra* at ¶¶ 36, 39. Moreover, as demonstrated by a November 2011 email string set forth in the Car Wash investigation, Defendant Fadigas was highly knowledgeable and heavily involved in naphtha sales and pricing.

52.    In the MPF's civil complaint against Marcelo Odebrecht and others seeking R$ 7 billion (USD $2 billion) in damages, *supra* at ¶ 8(b), the MPF cited deposition testimony of Rogério Arújo Santos ("Santos"), an employee of Odebrecht who was convicted and sentenced along with Marcelo Odebrecht in Judge Moro's March 8, 2016 Order.[46] In this testimony, Judge

---

[45] March 8, 2016 Order at ¶¶ 774-75, 834.

[46] Julia Affonso, et. al., *Marcelo Odebrecht é condenado a 19 anos e 4 meses de prisão na Lava Jato*, Estadão, March 8, 2016 (discussing Marcelo Odebrecht and Rogério Arújo's sentencing for several matters, including the "supply contract of Petrobras naphtha to Braskem, a company controlled by Odebrecht"), *available at* http://politica.estadao.com.br/blogs/fausto-macedo/marcelo-odebrecht-e-condenado-a-19-anos-de-prisao/.

Moro asked Santos about a series of emails discussing naphtha purchases. In particular, the judge asked to know why Marcelo Odebrecht would have been included in the series of emails discussing Braskem, Petrobras, and naphtha sales. Santos responded that Marcelo Odebrecht was included on the emails "because it involved [Defendant] Fadigas, who is the president of Braskem."[47] Indeed, the particular string of emails about which Santos was questioned was a series of email messages exchanged in November 2011 among Marcelo Odebrecht, Santos, and Defendant Fadigas in which Petrobras and naphtha purchases were discussed. With regard to this topic, Defendant Fadigas informed Santos that "I am available to educate you on these issues, if you need." In response, Santos proposed a time for Defendant and Fadigas to meet. Santos then followed-up with another email in which Santos stated that Petrobras executive Almir Guilherme Barbassa had been complaining about Petrobras' naphtha import issues and the fact that Petrobras sold only to one customer. In response to this issue, Santos' conclusion in his email sent to Defendant Fadigas and Marcelo Odebrecht was that:

> CONCLUSION: We have to think of a strategy for this NAFTA issue because [Petrobras] is very pressed with [(a)] the need to generate cash flow to enable their Investment Plan, (b) have to find a way to give more positive signs for the Financial Market- reflect stock price  (c) in addition to the discomfort of being given single customer, (d) in [Petrobras]'s reading the [Braskem]'s [*sic*] priority is an Investment Program aimed abroad (USA, Mexico, Peru- recently released with an emphasis on media !)

In response, Defendant Fadigas wrote Marcelo Odebrecht and Santos that:

> [Petrobras]'s argument does not stand a 2 minute conversation. They indeed import naphtha and in huge quantities. At the same time they deflect the production of naphtha to its central gasoline pool. It is easy to understand that they are importing naphtha to avoid importing gasoline.[48]

---

[47] Complaint at *supra* n.4, at 188.
[48] Exhibit 33 to Event 3 of the Car Wash investigation (filed on July 24, 2015), *available at* https://goo.gl/W2fcYE.

53.     As described above, testimony and documentary evidence in the Car Wash investigation demonstrate that Defendants Gradin and Fadigas were involved in the payment of bribes to the Progressive Party and to Petrobras for the purpose of obtaining lower naphtha pricing. The bribes that Braskem paid to price-fix its supply of naphtha were part of a larger business culture of political patronage that was rampant in the energy and petrochemicals industry. Indeed, the same individuals who coordinated Braskem's bribes paid to the Progressive Party from 2006 to 2012—Costa, Janene, and Youssef, with the knowledge and direct participation of Defendants Gradin and Fadigas and Braskem's executive consultant Alencar— are the *same* members of Petrobras' Car Wash scheme, a sixteen-company cartel, described below, run by Petrobras. The cartel, as described by Petrobras' Costa, was part of industry culture where executives understood that they could not achieve their professional and financial positions without the paid support of politicians as well as collusion of other company executives in the cartel. As such, the cartel organized the payment of bribes in the hundreds of millions of dollars as part of scheme in which Petrobras awarded construction contracts at inflated prices to businesses in the cartel. Similar to the practices described below, Petrobras and Odebrecht—key members of the Car Wash cartel—used the business practices to inflate the profitability and stock price of their subsidiary, Braskem.

**C.      The Bribes Paid by Braskem, Odebrecht and Petrobras to Fix Naphtha Prices Were Part of Regular Practices in the Petrochemical Industries that Also Gave Rise to the Car Wash Scandal**

54.     Petrobras is majority-owned by the Brazilian government, based in Rio De Janeiro, Brazil and throughout the Class Period was the second largest shareholder of Braskem. From May 14, 2004 through April 2012, Paulo Roberto Costa served as Petrobras' Chief Downstream Officer and Director of Supply and reported directly to Petrobras' CEO. Under Petrobras' corporate structure, the Downstream Officer is responsible for overseeing refining,

logistics, petrochemical production activities, and marketing and trade. During his time at Petrobras, according to his testimony in front of Brazilian federal court Judge Moro, Costa, and others, controlled a scheme in which companies paid kickbacks and bribes to Petrobras and in exchange, Petrobras considered these companies' contract bids at inflated prices that were up to 20% higher than Petrobras' own cost limits.[49] The cartel was called the "VIP Club" by its members.[50]

55.     In addition, as part of the VIP Club, subcontractors who had previously competed for Petrobras' work began secretly collaborating through a cartel managed by Petrobras and dependent on bribes that the subcontractors paid to politicians and Petrobras.

56.     In return, companies in the cartel would be awarded Petrobras projects or contracts at an inflated price that could not be achieved on the open market.[51] Petrobras used the money contributed by the cartel to then bribe politicians so that they would vote in line with the ruling party.[52]

57.     As part of this scheme of political patronage, Petrobras' Costa aligned himself with congressman Janene of the Progressive Party, who was an integral part of the Car Wash operation until his death in 2010.[53] The bribery scheme was motivated in part by the fact that, in

---

[49] Sabrina Valle and Juan Pablo Spinetto, *Brazil Fixated as 'Human Bomb' Revelations Rock Elections*, Bloomberg Business, Oct. 20, 2014, http://www.bloomberg.com/news/articles/2014-10-21/brazil-fixated-as-human-bomb-revelations-rock-elections..
[50] Sabrina Valle, *Petrobras's $100 Million Man Tops Graft Haul in Scandal*, Bloomberg Business, Dec. 2, 2014, http://www.bloomberg.com/news/articles/2014-12-03/petrobras-100-million-man-tops-graft-haul-in-scandal..
[51] David Segal, *Petrobras Oil Scandal Leaves Brazilians Lamenting a Lost Dream*, New York Times, Aug. 7, 2015, http://www.nytimes.com/2015/08/09/business/international/effects-of-petrobras-scandal-leave-brazilians-lamenting-a-lost-dream.html?_r=0.
[52] Valle and Spinetto, *supra* note 49.
[53] Fabio Serapião, *Operação Lava Jato: Fala o denunciante*, CartaCapital, May 25, 2015.

Brazil, senior management at state-controlled companies like Petrobras are often nominated by political parties, which, according to Costa, created this culture of political patronage.[54]

58.     Among the sixteen companies that federal prosecutors identified in open court as part of Petrobras' cartel was Odebrecht, the only Braskem shareholder larger than Petrobras itself and that enjoyed a voting majority in Braskem.[55]

59.     Additional testimony by Costa before Judge Moro revealed that Costa's position as Chief Supply Officer at Petrobras (from May 2004 until April 2012) was at the behest of the Brazil's Progressive Party. Costa explained in this testimony that nobody at Petrobras becomes a Director, CEO or Vice President, without a political sponsor from the government. Costa stated that, in early 2004, congressman Janene and congressman Pedro Correa from the Progressive Party sought him out to see if he had any interest in becoming Director of Supply at Petrobras, a position he resumed four months after the Progressive Party's nomination. Costa testified that Janene explained to him that Costa would have to assist Janene's political party in return. Costa summed up corporate culture: any high-ranking employee at Petrobras must have a political patron to be in a powerful position.[56]

60.     As part of Petrobras' bribery scheme, and also Braskem's bribery scheme, Youssef facilitated bribes by laundering money through companies owned by him and including his gas station business.[57] (The same building once housed a carwash. For this reason, the federal government's later investigation into the massive bribery scheme is called "Lava Jato,"

---

[54] Robson Bonin and Malu Gaspar, Petrobras takes a fall, Veja International, Apr. 1, 2014.

[55] Smith, et al., *supra* note 21.

[56] *See* NúcleoMultimídia Estadão, *Interrogatório de Paulo Roberto Costa na Justiça Federal – Part 1*, YouTube, Apr. 28, 2015, https://www.youtube.com/watch?v=007KrjeTtn8 (April 28, 2015 testimony by Costa before Judge Moro, posted by O Estado de S. Paulo, Sao Paulo's daily newspaper).

[57] Francisco Marcelino and Sabrina Valle, *The Talented Mr. Youssef, Brazil's Black-Market Central Banker*, Bloomberg Business, Jan. 13, 2015, http://www.bloomberg.com/news/articles/2015-01-14/the-talented-mr-youssef-brazil-s-black-market-central-banker.

Portuguese for "car wash.").[58] Youssef later testified in court that he worked with and eventually took over the role of Costa's political patron, Janene, after Janene's death in 2010.[59]

61.     As part of the Car Wash investigation, Brazil's Federal Audits Court known as the Tribunal de Contas da União (the "TCU") investigated irregularities identified in Petrobras' activities. The TCU found that Petrobras had a "corporate strategy" of restricting competition in the bidding process and that, by way of example, contractors on one particular project were hired at values of up to 19% above the initial estimate by the state-owned company.[60] In another example uncovered by the TCU, Petrobras' Costa facilitated the 2006 acquisition of a U.S. refinery for $1 billion—over *twenty times* more than the price a Belgian firm had paid just two years prior at a price of less than $50 million.[61] Costa later admitted to personally collecting USD $1.5 million to close the over-priced deal.[62]

62.     The impact of this overarching scandal orchestrated by the two companies that have a 97% stake in voting shares of Braskem cannot be overstated. When Youssef prepared to testify after his arrest about the Petrobras cartel that included Odebrecht, he reportedly told his lawyers, "'Guys, if I speak, the republic is going to fall.'" Hyperbole aside, Youssef's warning was apt: when the scandal broke, one million Brazilians took to the streets in protest. Numerous arrests of high-ranking executives followed.

63.     Costa, the head of Petrobras, was arrested and placed in jail as was Marcelo Odebrecht, CEO Odebrecht and chairman of Braskem. Dozens of other high-ranking executives

---

[58] Segal, *supra* note 51.
[59] Marcelino and Valle, *supra* note 57.
[60] *Auditoria do TCU culpa Gabrielli e executivos por dano em refinaria da Petrobras*, Portal Noar, Aug. 25, 2015 http://portalnoar.com/auditoria-do-tcu-culpa-gabrielli-e-executivos-por-dano-em-refinaria-da-petrobras/.
[61] Diego Iraheta, *Petrobras's Billion-Dollar Scandal: Behind The Chaos In Brazil's Biggest Company*, The World Post, Feb. 6, 2015, http://www.huffingtonpost.com/2015/02/06/petrobras-scandal-brazil_n_6615994.html.
[62] Nicolas Bourcier, *Petrobras, le scandale qui éclabousse le Brésil*, Le Monde, Jan. 29, 2015, http://www.lemonde.fr/economie/article/2015/01/29/petrobras-le-scandale-qui-eclabousse-le-bresil_4566011_3234.html.

were also arrested.[63] By March 2016, Marcelo Odebrecht, as well as two additional former executives of companies under Odebrecht's ownership, Marcio Faria and Rogerio Santos, were each sentenced to 19 years in prison for their conduct related to the Car Wash Operation.[64] At least one other member of the scheme, Nelma Kodama, had already received an 18-year prison sentence a year prior, in May 2015. Not surprisingly, the national discovery of the bribery scandal destabilized the country's politics, pushed the economy into recession, and resulted in the unemployment of thousands.[65] The Car Wash scandal motivated, and resulted in, an impeachment trial of Brazil's president.[66]

64.     As the Car Wash investigation unfolded and some members of the cartel began to testify, it became clear that corruption in the energy and petrochemicals industry was widespread and that many executives, unbeknownst to investors and the general public, paid bribes to meet their business goals and to inflate the profitability of the companies they ran. As described below, it was revealed that Braskem, like other companies in the cartel part of the Car Wash operation, was not immune to these widespread practices and had also paid bribes to inflate its profitability.

---

[63] Dom Phillips, *'Operation Carwash' in Brazil causes normally staid business meeting to go off script*, The Washington Post, Nov. 17, 2014, https://www.washingtonpost.com/news/worldviews/wp/2014/11/17/operation-carwash-in-brazil-causes-normally-staid-business-meeting-to-go-off-script/; Anna Flávia Rochas, *Brazilian police arrest Braskem board chairman*, Plasticsnews, Jun. 19, 2015, http://www.plasticsnews.com/article/20150619/NEWS/150619886/brazilian-police-arrest-braskem-board-chairman; Caroline Stauffer, *Jailed Odebrecht CEO Criticizes Plea Deals in Brazil*, Reuters, Sept. 1, 2015, http://www.reuters.com/article/us-brazil-corruption-odebrecht-idUSKCN0R14AU20150901..

[64] Blake Schmidt, *Brazil's Marcelo Odebrecht Gets 19 Years in Jail in Carwash*, Bloomberg, March 6, 2016, http://www.bloomberg.com/news/articles/2016-03-08/brazil-s-marcelo-odebrecht-gets-19-years-in-jail-in-carwash-case.

[65] Segal, *supra* note 51.

[66] Amy Erica Smith, *Is the Impeachment Trial of Brazil's Dilma Rousseff a Coup?*, The Washington Post, Apr. 20, 2016, https://www.washingtonpost.com/news/monkey-cage/wp/2016/04/20/is-the-impeachment-trial-of-brazils-dilma-rousseff-a-coup/; *see also* Samuel Jacobs and Simon Romero, *Brazil's Senate Votes to Begin Impeachment Trial of Dilma Rousseff*, The New York Times, May 12, 2016, http://www.nytimes.com/2016/05/13/world/americas/dilma-rousseff-brazil-impeachment.html

D.      **The Truth is Revealed**

65.      On March 11, 2015, Brazil's Office of the Comptroller General ("CGU")
announced that it had opened a case against ten additional construction firms with ties to
Petrobras.

66.      On that same day, a report from a local newspaper, *Folha de S. Paulo*, implicated
Braskem in the corruption scandal surrounding Petrobras. The report stated that Braskem paid
bribes to Petrobras executives and Progressive Party ("PP") party members in order to receive
lower prices on naphtha and propylene products from 2006 through 2012. According to the
release of testimony from Costa and Youssef, Costa received USD $5 million annually from
Braskem in exchange for assistance.[67]

67.      Bloomberg reported that "Braskem SA, Latin America's largest petrochemicals
producer, ***sank the most in more than 20 years*** after a newspaper cited court testimony that
linked the company to a graft scandal at Petroleo Brasileiro SA."[68]

68.      On this news, shares of Braskem fell over 20%, or $1.80 per share, on March 11,
2015.

69.      On April 24, 2015, Braskem filed a Form 6-K/A with the SEC announcing that it
had hired law firms to investigate the bribery allegations. The 6-K/A stated the following, in
pertinent part:

> In early March 2015, declarations made by defendants in lawsuits filed against
> third parties were made public, in which Braskem and two of its former executive
> officers were cited in allegations of supposed improper payments between 2006
> and 2012 to benefit the Company in raw-material supply agreements entered into

---

[67] David Friedlander, *Braskem pagou propina, dizem delatores*, Folha de S. Paulo, March 11, 2015,
http://www1.folha.uol.com.br/poder/2015/03/1601083-braskem-pagou-propina-dizem-delatores.shtml.
[68] Gerson Freitas Jr., *Braskem Plunges After Report on Ties to Petrobras Scandal*, Bloomberg, Mar. 11, 2015
(emphasis added), http://www.bloomberg.com/news/articles/2015-03-11/braskem-plunges-most-since-1994-after-
report-on-petrobras-graft.

with Petrobras. As of April 24, 2015, to the knowledge of the management, Braskem has not received any notification of the filing of any proceeding or investigation by Brazilian or U.S. authorities.

…

In light of such facts, the Company's Management and Board of Directors approved in April the internal plan for investigation into the allegations ("Investigation") to be carried out by law firms experienced in similar cases in the United States and in Brazil. The law firms will work under the coordination of an ad hoc committee formed by members of its Board of Directors, specially created for this purpose.

Braskem, S.A., Report of Foreign Issuer (Form 6-K/A) (Apr. 24, 2015) at 77.

70.     The investigation in Brazil is ongoing but on June 19, 2015, as part of the Brazilian Government's investigation, Marcelo Odebrecht was arrested for fraud and corruption concerning his dealings with Braskem and Petrobras.

**E.     Odebrecht Controlled Braskem**

71.     Defendant Odebrecht was, during the Class Period, Braskem's largest and most involved shareholder. Designees and employees of Odebrecht constituted a majority of the members of Braskem's board of directors and each of the Individual Defendants were affiliated with or employed by Defendant Odebrecht. Braskem's chairman of the board was Odebrecht's CEO, Marcelo Odebrecht, until his arrest on June 19, 2015 in connection with the bribery and kickback scheme alleged herein. By virtue of a shareholder agreement, Odebrecht exercised substantial control over Braskem's business functions. According to Braskem's 2014 Form 20-F, filed on April 24, 2015:

Under a shareholders' agreement to which Odebrecht and Petrobras are parties, Braskem have agreed to undertake certain actions only after Odebrecht and Petrobras have reached a consensus with respect to those actions and Odebrecht will have the sole power to approve the business plan of our company… As a result, Odebrecht will have the ability to determine the outcome of most corporate actions or decisions requiring the approval of our shareholders or our board of directors — in certain instances, with the consent of Petrobras.

35

2014 Form 20-F), 8 (Apr. 24, 2015).

72.     The referenced shareholder agreement was originally executed by Braskem,
Odebrecht and Petrobras at the beginning of the Class Period and was filed with the SEC on
Form 6-K on April 5, 2010. Under the Shareholder Agreement, Odebrecht was entitled to elect
six out of the total eleven Braskem board members; while Petrobras elected four.[69] Also under
the Shareholder Agreement, Odebrecht alone was responsible for nominating Braskem's chief
executive officer, while Petrobras and Odebrecht together caused ten (out of eleven) board
members to ratify Odebrecht's nomination. That elected CEO, during the Class Period an
Odebrecht employee (CEOs Gradin and Fadigas) from a list of three potential candidates
provided by Odebrecht. The CEO was also responsible for selecting an Investment and Portfolio
Officer chosen from a list of potential candidates provided by Petrobras. In both instances,
Odebrecht and Petrobras caused their Board Members to ratify the Odebrecht-appointed CEO's
choices.

73.     In short, Braskem's CEO and CFO are hired by Odebrecht, while the Investment
and Portfolio Officer is hired by Petrobras. The CEO, CFO, and Investment and Portfolio Officer
each serve for a period of three years.[70] Not surprisingly, Odebrecht lists Braskem among its
subsidiary businesses controlled by the President and CEO of Odebrecht SA.[71]

74.     By virtue of Defendant Odebrecht's influence and oversight of Braskem's
business activities, its Board and its senior management, including the Individual Defendants, as
well as its voting power over the decisions and actions of Braskem's senior management,

---

[69] See Braskem, S.A., Report of Foreign Private Issuer (Form-6-K) (Apr. 5, 2010), Ex. 3.01 at 3.3.3 ("Shareholder Agreement"). The election scheme described above is contingent on Petrobras owning more than 30% of voting capital, which Petrobras consistently held throughout the Class Period.
[70] See Shareholder Agreement at 3.6-3.9. This Shareholder Agreement is valid until 2045. See Credit Opinion: Braskem SA, Moody's Investors Service, Aug. 20, 2015.
[71] See, e.g. Odebrecht, 2013/2014 Annual Report, 6-7 (2014), http://odebrecht.com/sites/default/files/ra-odebrecht-2014-final_pdf_site_en.pdf.

Odebrecht controlled and culpably and directly participated in the securities violations complained of here.

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

75.   Throughout the Class Period, Defendants made multiple false and misleading statements and omissions that failed to disclose the true nature of the Company's business and the bribes that its employees, and its controlling shareholders were paying in exchange for undervalued naphtha purchases from Petrobras.

76.   On July 15, 2010, the Company published its 2009 Sustainability Report. Braskem regularly touted its sustainable practices, and knew that, in response to the Company's assertions on this subject, investors would refer to its 2009 Sustainability Report. For instance, the following month after Braskem published its 2009 Sustainability Report, Defendant Gradin promoted Braskem's sustainability efforts and market prestige. Gradin told investors that, "Although the international economy evolution requires careful oversight, Braskem remains confident of its capability to generate results and added value, making investments in capacity expansion to meet the market growth, considering its strategic view of becoming the world leader in sustainable chemical products, offering innovations to better serve people."[72]

77.   Braskem published its 2009 Sustainability Report to specifically target shareholders and promote the integrity of the Company's business practices. In particular, Braskem stated "[t]he report is addressed to shareholders, customers, members, media and other stakeholders in the activities of Braskem." Braskem explicitly solicited suggestions and clarification questions to be sent by the "stakeholders" it had identified, which included its shareholders, and requested that such feedback be sent to the Company at its physical address or

---

[72]   Braskem, 2Q10 EBITDA grows 15% and exceeds R$ 1.0 billion, Aug. 10, 2010, http://odebrecht.com/en/communication/releases/2q10-ebitda-grows-15-and-exceeds-r-10-billion.

email address. Braskem further stated that it had identified shareholders as part of the key group of "stakeholders," and stated that its next annual sustainability report would address "key issues of interest to stakeholders."[73]

78.     In the 2009 Sustainability Report, Defendant Gradin signed an introductory endorsement of the report in which he stated, "We thank our Clients and Shareholders for their trust and the tireless efforts made by our Members and Suppliers to overcome our daily challenges and to achieve our growth targets." The statement was signed by "Marcelo Odebrecht, Chairman of Braskem Board of Directors, [and] Bernardo Gradin, CEO of Braskem."[74] The 2009 Sustainability Report assured investors that Braskem maintained internal policies requiring transparency and ethical interactions with suppliers, such as Petrobras. In particular, 2009 Sustainability Report stated:

> Serving Clients with emphasis on quality, productiveness and social and environmental responsibility is one of Odebrecht Entrepreneurial Technology's (TEO) core principles. This is a concept that guides the actions of Company Members in all the enterprises controlled by the Odebrecht Organization. At Braskem the Client service culture is translated into long term business partnerships and ***transparent*** relationships.
>
> ***Transparency, ethics and respect to Clients, Company Members, Shareholders, Suppliers and society are inherent to Braskem culture and actions***. According to these principles, and in line with the best governance practices, Company reporting of results includes the disclosure of the Annual Balance Sheet and quarterly reports of results, with situation analyses.
>
> Braskem governance practices and processes described in this chapter value ethics, transparency and respect to Shareholders, Company Members, Suppliers, Clients and Society in general, adding value to Shareholders' equity and return on

---

[73]     Braskem, Website introduction to 2009 Sustainability Report in Portuguese, (2010), http://www.braskem.com/rao/2009/contexto_1.html.

[74]     Braskem, 2009 Sustainability Report 1 (July 15, 2010), http://www.braskem.com/rao/ 2009/en/pdf/braskem2009.pdf. The Portuguese-language version of the same report contained an audit certification by Det Norske Veritas dated July 15, 2010. *See* Relatório Annual de Sustentabilidade 2009 at 83, Braskem, July 15, 2010, *available at* http://www.braskem-ri.com.br/relatorios-anuais/2009, The English-language version does not contain the signed verification (which is in Portuguese), and instead cross-references the Det Norske Veritas verification certification otherwise contained in the Portuguese version. *See id.* at 9.

capital. These are the corporate governance principles enforced by Braskem: (i) care for and stand for its ethical conduct in corporate processes and internal and external relations governance systems; (ii) demonstrate the excellence of the Company's processes (punctuality, streamlined action, swiftness, discipline and accuracy); (iii) excellence of corporate relations with partners; (iv) *ensure conformity with legal and regulatory bodies to whose authority Braskem business are subject*; and, (v) guarantee the evolution of Corporate Governance practices and processes.

The Braskem Code of Conduct establishes the following fundamental principles: …. responsible conduct of corporate businesses: Members shall be responsible for performing the assigned tasks and for conducting Braskem businesses *with transparency and in strict conformity with the law in force* and with Company principles and guidance; …. *transparency of accounting and financial records: transparency is critical to enable a correct assessment of Braskem by market agents*;

Braskem Ethics Line is also in charge of seeing to the consolidation of *good Corporate Governance practices (in compliance with Section 301 of the Sarbanes Oxley Law)*, thus contributing to maintain and disseminate Braskem Ethical Principles and Standards, *in line with the transparency standards required by the market*.

Supplier Code of Conduct: Company Supply area has a Supplier Code of Conduct establishing the principles that guide the relations between Braskem and its service providers. *The Code of Conduct highlights fundamental values such as transparency, ethics, clarity of information and responsibility for Supply decisions.* The Code also details reprehensible practices that must not be adopted by area personnel, besides describing the type of behavior the Company expects from its service providers. Violations of set codes may be subject to penalties.[75]

79.    Each of the statements in Braskem's 2009 Sustainability Report, set forth above, was materially false and misleading because Braskem concealed from investors that it paid bribes to the Progressive Party and to Petrobras as part of a scheme to obtain below-market pricing for naphtha. Braskem's governance practices and its Code of Conduct required transparency about its activities and compliance with governing laws. The bribery scheme thus directly contravened Braskem's governance practices and Code of Conduct. Defendant Gradin and Braskem failed to comply with these policies because the Company was not transparent

---

[75] *Id.* at 38, 39, 40, 45, 56.

about the existence of its bribery scheme, and because the bribes it paid to Petrobras were illegal and did not conform with its Code of Conduct.

80.     Braskem's 2009 Sustainability Report informed investors of the importance of the Company's Code of Conduct, referenced the Code of Conduct at length, and also referred investors to consult the Company's complete Code of Conduct, which was located on its website.[76] The Code of Conduct was made available on the Company's website with the following introductory message:

> The purpose of this Code of Ethics is to establish the ethical principles and rules of conduct on which the internal and external relations of all Members of BRASKEM are to be based, regardless of its attributions and respons[i]bilities.
>
> It is expected that every Supplier and Member of the companies controlled by BRASKEM are acknowledged of this Code of Ethics and will comply with its terms in all negotiations with or by BRASKEM.
>
> The presence of BRASKEM on the domestic and international capital market and the participation of the Members of BRASKEM in different sectors of business, geographical regions and cultures, which constitute globalized and competitive markets, ***demand transparent standards of performance and compliance with various legal systems***.
>
> Our reputation and our trustworthiness are our most valuable assets, and the ethical principles on which our acts are based contribute to maintain the image of BRASKEM as a solid and reliable organization to our Customers, Suppliers and collaborators in general.
>
> We shall emphasize that our philosophy is based on integrity, independence, and freedom of expression, precepts that have always been encouraged in BRASKEM.

---

[76] Braskem published the referenced Code of Conduct on November 3, 2009. *See* Braskem, *Código de Conduta*, Nov. 3, 2009. An updated Code of Conduct was published in February 2014. *See* Braskem, Code of Conduct, Feb. 2014, *available at* http://www.braskem.com/Portal/Principal/Arquivos/ ModuloHTML/Documentos/1165/14-0294-CodigoBraskemIngles-20150430-Visualizacao.pdf.

Compliance with this Code of Ethics by each of the Members reaffirms one of our most important targets, which is to maintain and consolidate the reputation of BRASKEM.[77]

81.     Braskem's Code of Conduct assured investors of Braskem's ethical standards, transparency in all activities, avoidance of conflicts of interest, and compliance with applicable laws. Indeed, Braskem's Code of Conduct explicitly assured investors that the Company engaged ethically with other businesses and did not pay bribes to politicians. In particular, the Code of Conduct stated:

[Introduction:]

This Code of Conduct is to establish the ethical principles and rules of conduct that should guide the internal and external relations of all Members of BRASKEM, regardless of their duties and responsibilities.

It is expected that all suppliers and members of companies controlled by BRASKEM are aware of this Code of Conduct and comply with its terms in all negotiations with BRASKEM, or on behalf of it.

The presence of BRASKEM in the domestic and international capital markets as well as the participation of Members of BRASKEM in different business units, cas geographical regions and cultures which constitute globalized and competitive markets require both transparent standards of performance and compliance with various legal systems.

[Item 2.]

BRASKEM expects its members in the exercise of their duties to adhere to established corporate procedures and the same care and diligence that anyone would normally use in their personal affairs, *i.e.* **honest and dignified conduct, in accordance with the laws and ethical standards of society**.

[Item 4.]

The members shall perform their activities and conduct the business of BRASKEM with transparency and strict compliance with the law, respect for human rights , the environment and the principles and the company's guidelines.

---

[77] Braskem, *Homepage*, WayBackMachine (Feb. 18, 2010), http://www.braskem.com/site/portal_braskem/en/home/home.aspx,   [https://web.archive.org/web/20100218131513/http://www.braskem.com/site/portal_braskem/en/home/home.aspx] (the Way Back Machine is maintained by the Internet Archive, which is a 501(c)(3) nonprofit organization that captures images of webpages) (emphasis added).

The Members of BRASKEM are responsible for taking the appropriate action, if they have knowledge of irregularities committed by third parties that may compromise the name and interests of BRASKEM .

Any transaction involving BRASKEM must be supported by appropriate documents , coated with all legal formalities.

[Item 4.1.]

It is the obligation of all Member[s to] know and practice the provisions of this Code of Conduct. The members will also fit, within their responsibilities, to preserve the name and image of BRASKEM.

[Item 5.]

BRASKEM expects its members *to conduct business relations in compliance with the laws, the legal market practices and specially to national and international standards related to the economic order and competition defense*.

*It is strictly forbidden to all Members of BRASKEM make any improper, questionable or illegal payments , or favor by granting undue benefits or outside the usual practices of the trade, customers and suppliers, to the detriment of others, as well as make payments or grant privileges or advantages to public or equivalent employees, either directly or by third parties.*

[Item 5.3.]

The competitiveness of the products manufactured and / or marketed by BRASKEM must be exercised on the basis of free and fair competition.

They should not be made statements, oral or written, that may affect the image of competitors or contribute to spread rumors about them, the competitor should be treated with the respect with which BRASKEM expects to be treated.

It is expressly forbidden to provide strategic information, confidential or in any other way harmful to the business of BRASKEM , to any third party , including but not limited to competitors.

*It is forbidden to any Member to keep understandings with BRASKEM's competitor (s) aiming fixation of prices and/or conditions of sale, adopt or influence the adoption of an uniform commercial conduct or pre-agreed, divide markets, and subordinate the sale of one product to another.*

[Item 5.5.]

*It is strictly forbidden* to all Members of BRASKEM offer or promise, either directly or through third parties, *payments, gifts or benefits to public officials, political parties or their members*, and candidates for political office, and the

family or equivalent of any one described above, in order to obtain benefit for the company. Donations are allowed, if made in compliance with the internal procedure and current legislation.

[Item 14.]

Transparency is essential to allow the correct evaluation of BRASKEM by market agents.

BRASKEM's rules and accounting practices should be strictly observed, generating consistent records and reports and allowing an uniform base for evaluation and disclosure of BRASKEM's operations. Thus, it is necessary to ensure the accounting of all and any asset or right that BRASKEM is required to do.[78]

82.     Each of the statements in Braskem's then-current Code of Conduct, set forth above, was materially false and misleading because Braskem concealed from investors that it paid bribes to the Progressive Party and to Petrobras as part of a scheme to obtain below-market pricing for naphtha. Braskem's governance practices and its Code of Conduct required transparency about its activities and compliance with governing laws. The bribery scheme thus directly contravened Braskem's governance practices and Code of Conduct. Defendant Gradin and Braskem failed to comply with these policies because the Company was not transparent about the existence of its bribery scheme, and because the bribes it paid to Petrobras were illegal and did not conform with its Code of Conduct.

83.     On August 13, 2010, Braskem filed a Form 6-K with the SEC. The 6-K was signed by the then-current CFO Marcela Drehmer ("CFO Drehmer"). The Form 6-K contained false and misleading statements with regard to Braskem's purchase of naphtha from Petrobras:

---

[78]     Braskem,  *Code  of  Conduct*,  WayBackMachine  (Jul.  21,  2010), http://www.braskem.com.br/conduta/codigo_conduta_Braskem.pdf,  [https://web.archive.org/web/20100728025339/ http://www.braskem.com.br/conduta/codigo_conduta_Braskem.pdf] (emphasis added); *see supra* n.77 (explaining the Way Back Machine).

### 3.2 Cost of Goods Sold (CoGS)

Braskem's cost of goods sold (CoGS) was R$5.4 billion in 2Q10, up 2% from the previous quarter, basically reflecting the higher raw material prices.

In relation to 2Q09, CoGS in the quarter rose by 27%. The average ARA naphtha price increased by 41% between the periods and was partially offset by the higher operating efficiency in the period.

The average price of ARA naphtha in the quarter was US$691/ton, down 3% from 1Q10 (US$709/ton). However, based on the three-month moving average (which is the reference for the domestic market), the average naphtha price in 2Q10 increased by 5% to US$ 714/ton, from US$682/ton. Braskem acquires the bulk of its naphtha feedstock from Petrobras, with the remainder imported directly from suppliers in Argentina, Venezuela and countries from northern Africa.

In 1H10, CoGS came to R$11 billion, 27% higher than in 1H09. As previously mentioned, the higher CoGS is basically explained by the sharp increase in naphtha prices of 60% between the periods.[79]

84.    Each of the statements set forth above was materially false and misleading because Braskem concealed from investors that it paid bribes to the Progressive Party and to Petrobras as part of a scheme to obtain below-market pricing for naphtha. The price of naphtha was neither based on market factors related to naphtha nor the ARA for naphtha, and thus Braskem's statements that market factors influenced the pricing, or somehow provided the basis for pricing, of naphtha was false and misleading. Braskem's governance practices and its Code of Conduct required transparency and compliance with governing laws. The bribery scheme thus directly contravened Braskem's governance practices and Code of Conduct. Defendant Gradin, as control person, and Braskem failed to comply with these policies because the Company was not transparent about the existence of its bribery scheme, and because the bribes it paid to Petrobras were illegal and did not conform with its Code of Conduct.

---

[79] Braskem, EBITDA grows 17% to R$1.04 billion in 2Q10 6-7, Aug. 10, 2010, http://www.braskem-ri.com.br/Portal/RI/arquivos/resultado/105/2Q10%20Results.pdf.

85.   On August 24, 2010, Braskem filed a Form 6-K with the SEC. The 6-K was signed by CFO Drehmer. The Form 6-K contained false and misleading statements with regard to Braskem's purchase of naphtha from Petrobras:

> "The inter-company transactions between the Company and related companies are made on terms equivalent to the averages practiced with third parties, subject to the following: (i) For the purchase of naphtha from Petrobras and REFAP, *the price of naphtha and other oil byproducts is that practiced in the international market*, considering a clause related to the quality of parafinicity and contaminants in the naphtha delivered; and (ii) For the sales to foreign subsidiaries, the collection period of 180 days is longer than that established for other customers.[80]

86.   Each of the statements set forth above was materially false and misleading because Braskem concealed from investors that it paid bribes to the Progressive Party and to Petrobras as part of a scheme to obtain below-market pricing for naphtha. The price of naphtha was neither based on market factors nor the ARA, and thus Braskem's statements that market factors influenced the pricing, or somehow provided the basis for pricing, of naphtha was false and misleading. Braskem's governance practices and its Code of Conduct required transparency and compliance with governing laws. The bribery scheme thus directly contravened Braskem's governance practices and Code of Conduct. Defendant Gradin, as control person, and Braskem failed to comply with these policies because the Company was not transparent about the existence of its bribery scheme, and because the bribes it paid to Petrobras were illegal and did not conform with its Code of Conduct.

87.   On November 16, 2010, Braskem filed a Form 6-K with the SEC. The 6-K was signed by CFO Drehmer. The Form 6-K contained false and misleading statements with regard to Braskem's purchase of naphtha from Petrobras:

---

[80] Braskem, S.A., Report of foreign issuer (Form 6-K), 29 (Aug. 24, 2010) (emphasis added).

**Cost of Goods Sold (COGS)**

Cost of goods sold (COGS) was R$6.1 billion in 3Q10, up 14% from 2Q10, reflecting the growth in resin sales volume, which was partially offset by the lower feedstock prices.

In relation to 3Q09, COGS increased 35%, reflecting the 10% upturn in average ARA naphtha prices and, especially, the higher resin sales volume.

The average ARA naphtha price in the quarter was US$658/t, down 5% from 2Q10 (US$692/t). The three-month moving average of the ARA naphtha price in 3Q10 decreased by 4% to US$675/t. Braskem acquires the bulk of its naphtha feedstock from Petrobras, with the remainder imported directly from suppliers in Argentina, Venezuela and countries from northern Africa. [81]

88.     Each of the statements set forth above was materially false and misleading because Braskem concealed from investors that it paid bribes to the Progressive Party and to Petrobras as part of a scheme to obtain below-market pricing for naphtha. The price of naphtha was neither based on market factors nor the ARA, and thus Braskem's statements that market factors influenced the pricing, or somehow provided the basis for pricing, of naphtha was false and misleading. Braskem's governance practices and its Code of Conduct required transparency and compliance with governing laws. The bribery scheme thus directly contravened Braskem's governance practices and Code of Conduct. Defendant Gradin, as control person, and Braskem failed to comply with these policies because the Company was not transparent about the existence of its bribery scheme, and because the bribes it paid to Petrobras were illegal and did not conform with its Code of Conduct.

89.     On November 26, 2010, Braskem filed a Form 6-K with the SEC. The 6-K was signed by CFO Drehmer. The Form 6-K contained false and misleading statements with regard to Braskem's purchase of naphtha from Petrobras:

---

[81] Braskem, S.A., Report of foreign issuer (Form 6-K), 7 (Nov. 16, 2010).

> The inter-company transactions between the Company and related companies are made on terms equivalent to the averages practiced with third parties, subject to the following: (i) For the purchase of naphtha from Petrobras and REFAP, ***the price of naphtha and other oil byproducts is that practiced in the international market***, using a clause related to the quality of parafinicity and contaminants in the naphtha delivered; and (ii) For the sales to foreign subsidiaries, the collection period of 180 days is longer than that established for other customers.[82]

90.     Each of the statements set forth above was materially false and misleading because Braskem concealed from investors that it paid bribes to the Progressive Party and to Petrobras as part of a scheme to obtain below-market pricing for naphtha. The price of naphtha was neither based on market factors nor the ARA, and thus Braskem's statements that market factors influenced the pricing, or somehow provided the basis for pricing, of naphtha was false and misleading. Braskem's governance practices and its Code of Conduct required transparency and compliance with governing laws. The bribery scheme thus directly contravened Braskem's governance practices and Code of Conduct. Defendant Gradin, as control person, and Braskem failed to comply with these policies because the Company was not transparent about the existence of its bribery scheme, and because the bribes it paid to Petrobras were illegal and did not conform with its Code of Conduct.

91.     On June 10, 2011, the Company filed its annual report for the year ended December 31, 2010 on a Form 20-F with the SEC (the "2010 20-F"). The 2010 20-F was signed by Defendant Fadigas, the Company's then- and current CEO, and CFO Drehmer.

92.     In addition, the 2010 20-F contained a signed certification pursuant to SOX by Defendant Fadigas.[83] The SOX certification stated that the financial information contained in the 2010 20-F was accurate and disclosed any material changes to the Company's internal control

---

[82] Braskem, S.A., Report of foreign issuer (Form 6-K), 28 (Nov. 26, 2010) (emphasis added).
[83] CFO Drehmer also signed a SOX Certification.

over financial reporting. Specifically, the certification represented that the 2010 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certification also stated that Fadigas had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."[84] Fadigas' statements were attributable to the Company.

93.    The 2010 20-F stated that the Company's certifying officers "[d]isclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting."[85]

94.    Each of the statements set forth above was materially false and misleading because Braskem's internal controls were grossly ineffective during the Class Period. In the wake of the testimony from Costa, Youssef, and Lopes, the statements regarding the adequacy and effectiveness of the Company's internal controls during the Class Period were materially false and misleading, because Braskem engaged in a scheme where the Company paid bribes, called "under-the-table payments," to buy cheaper raw material from Petrobras between 2006 and at least 2012. As described above, the Company concealed from investors: (1) the expenditure of funds paid for bribes, (2) Braskem's collusion in an improper bribery scheme;

---

[84] Braskem, S.A., Annual Report (Form 20-F), Exs. 12.01, 12.02 (June 10, 2011) ("2010 20-F").
[85] Id.

(3) inflation of Braskem's profitability because, without naphtha purchases that were artificially cheaper, Braskem's profits would have been substantially reduced; and (4) a lack of adequate internal controls.

95.     The 2010 20-F also continued to describe the contracts that Braskem maintained with Petrobras for the purchase of naphtha and the factors that determined the price of that naphtha under those contracts.

> We purchase naphtha for use by our Basic Petrochemical Unit and our Quattor Unit from Petróleo Brasileiro S.A.—Petrobras, or Petrobras, at prices based on a variety of factors, including the Amsterdam-Rotterdam-Antwerp market prices of naphtha and a variety of other petrochemical derivatives, the volatility of the prices of these products in the international markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.[86]

96.     The 2010 20-F also explained:

> Our contracts with Petrobras provides for naphtha prices based on a variety of factors, including the market prices of naphtha and other basic petrochemical derivatives, the volatility of the prices of these products in the international markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.[87]

97.     Each of the statements set forth above was materially false and misleading because Braskem concealed from investors that it paid bribes to the Progressive Party and to Petrobras as part of a scheme to obtain below-market pricing for naphtha. The price of naphtha was neither based on market factors related to naphtha nor the ARA for naphtha, and thus Braskem's statements that market factors influenced the pricing, or somehow provided the basis for pricing, of naphtha was false and misleading. Braskem's governance practices and its Code of Conduct required transparency and compliance with governing laws. The bribery scheme thus directly contravened Braskem's governance practices and Code of Conduct. Defendant Gradin,

---

[86] 2010 20-F at 5.
[87] *Id.* at 91.

as control person, and Braskem failed to comply with these policies because the Company was not transparent about the existence of its bribery scheme, and because the bribes it paid to Petrobras were illegal and did not conform with its Code of Conduct.

98.     The 2010 20-F further assured investors that the Company had established a rigorous Code of Business Conduct and Ethics:

**Code of Business Conduct and Ethics**

The NYSE corporate governance standards require that a listed company must adopt and disclose a code of business conduct and ethics for directors, officers and employees and promptly disclose any waivers of the code for directors or officers. Each code of business conduct and ethics should address the following matters: (1) conflicts of interest; (2) corporate opportunities; (3) confidentiality; ***(4) fair dealing; (5) protection and proper use of company assets; (6) compliance with laws, rules and regulations (including insider trading laws); and (7) encouraging the reporting of any illegal or unethical behavio****r.

Although the adoption of a code of ethics is not required by Brazilian law, Braskem has adopted a code of ethics applicable to its directors, officers and employees, ***which addresses each of the items listed above***. Braskem's code of ethics is available on Braskem's website at www.braskem.com.br. The information included on our website or that might be accessed through our website is not included in this annual report and is not incorporated into this annual report by reference. ***No waivers of the provisions of the code of ethics are permitted***, except that the restrictions on outside activities do not apply to Braskem's directors and members of its fiscal council.[88]

99.     The statements above were false and misleading because they omitted the material fact that the price at which Braskem purchased naphtha from Petrobras under its 2009 Naphtha Contract was due to bribes and kickbacks paid to Petrobras and its political allies, that resulted in below-market naphtha prices for Braskem. In order to prevent these statements from being untrue and misleading investors, Defendants had a duty to disclose the illegal bribery scheme set forth herein. Braskem's governance practices and its Code of Conduct required transparency and compliance with governing laws. The bribes Braskem paid to Petrobras thus

---

[88] *Id.* at 185-86 (emphasis added).

directly contravened Braskem's governance practices and Code of Conduct. Defendant Fadigas and Defendant Braskem failed to comply with these policies because the Company was not transparent about the existence of its bribery scheme, and because the bribes it paid to Petrobras were illegal and did not conform with its Code of Conduct.

100.    On June 30, 2011, Odebrecht published a press release announcing that Braskem won the fourth edition of the 2011 Value Creation Award, promoted by the Brazilian Association of Publicly Traded Companies. The press release quoted then-CFO Drehmer: "'It is an honor to receive it," said Drehmer. "Creating value for shareholders is a crucial part of our work, ***aligned with a policy of transparency and good corporate governance practices***. Being recognized by the analysts is a sign that we are on the right path and serves as incentive to continue working in partnership with the market,' she said."[89]

101.    The statement above was false and misleading because it omitted the material fact that the price at which Braskem purchased naphtha from Petrobras under its 2009 Naphtha Contract was due to bribes and kickbacks paid to Petrobras and its political allies, that resulted in below-market naphtha prices for Braskem. In order to prevent this statement from being untrue and misleading investors, Defendants had a duty to disclose the illegal bribery scheme set forth herein. Braskem's governance practices and its Code of Conduct required transparency and compliance with governing laws. The bribes Braskem paid to Petrobras thus directly contravened Braskem's governance practices and Code of Conduct. Defendant Fadigas and Defendant Braskem failed to comply with these policies because the Company was not transparent about the existence of its bribery scheme, and because the bribes it paid to Petrobras were illegal and did not conform with its Code of Conduct

---

[89] Odebrecht,  Braskem Earns 2011 ABRASCA Award, June 30, 2011, http://odebrecht.com/ en/braskem-earns-2011-abrasca-award.

102.    On August 16, 2011, Braskem published its 2010 Sustainability Report. In it,

Defendant Fadigas signed an introductory endorsement of the report in which he stated:

> We would like to thank our Clients for trusting in Braskem, since this
> partnership is what moves us to continuously strive for excellence. We
> also would like to extend our gratitude to our Shareholders, especially
> Odebrecht and Petrobras, for their boundless support to strategic projects
> that have strengthened the Company. And finally, we would like to thank
> our Suppliers and Members for their dedication and competence, which
> are paramount in achieving our results.[90]

The 2010 Sustainability Report also included disclosures ensuring investors of Braskem's

transparency and ethical standards. In pertinent part, the 2010 Sustainability Report stated:

> Braskem's governance practices and processes are aimed at ensuring the
> observance of ethics, transparency and respect to Clients, Shareholders,
> Members, Suppliers and other stakeholders, in order to deliver value to the
> Shareholders, making payments on their capital and protecting their assets.
> The values and principles of governance observed by the Company are the
> following:
>
> •    Guarantee that ethical integrity permeates all systems of governance
>      dealing with the Company's internal and external relations.
>
> •    Ensure that the available information is **transparent, going beyond the
>      minimum obligations** to promote free, frank, precise and rapid
>      communication.
>
>      ….
>
> •    Require that governance agents (Managers, Fiscal Council Members and
>      Auditors) fully respond for their actions while exercising their mandates to
>      those who elected them.
>
>      ….
>
> •    ***Adhere to regulatory, legal, statutory and procedural guidelines.***

---

[90] Braskem, 2010 Annual and Sustainability Report 1, July 15, 2010, http://www.braskem-ri.com.br/annual-reports/2010. The Portuguese-language version of the same report contained an audit certification by Det Norske Veritas, an ecological/sustainability auditor, dated August 16, 2011. The English-language version does not contain the signed verification (which is in Portuguese), and instead refers to the Det Norske Veritas verification. *See id.* at 101.

….

- Responsibility in Business: Members are responsible for carrying out their activities and conducting Braskem's business in a transparent manner and in strict accordance with the law, Company principles and Company guidelines;

- Business Relationships with Clients, Suppliers and the Government: Braskem instructs and expects its member[s] *to carry out business relationships in accordance with the laws and legal practices of the market, and, particularly, in accordance with the domestic and international regulations on economic order and in defense of competition*;

- Accounting and Financial Transparency: transparency is essential to allowing the market to correctly evaluate Braskem;[91]

103.    Each of the statements set forth above was materially false and misleading because Braskem concealed from investors that it paid bribes to the Progressive Party and to Petrobras as part of a scheme to obtain below-market pricing for naphtha. The price of naphtha was neither based on market factors nor the ARA, and thus Braskem's statements that market factors influenced the pricing, or somehow provided the basis for pricing, of naphtha was false and misleading. Braskem's governance practices and its Code of Conduct required transparency and compliance with governing laws. The bribery scheme thus directly contravened Braskem's governance practices and Code of Conduct. Defendant Gradin, as control person, and Braskem failed to comply with these policies because the Company was not transparent about the existence of its bribery scheme, and because the bribes it paid to Petrobras were illegal and did not conform with its Code of Conduct.

104.    On April 10, 2012, the Company filed its annual report for the year ended December 31, 2011 on a Form 20-F with the SEC (the "2011 20-F"). The 2011 20-F was signed

---

[91] Braskem, 2010 Annual and Sustainability Report 31-32 (2010).(emphasis added).

by Defendant Fadigas, the Company's then- and current CEO, and CFO Drehmer. The Form 20-F stated the Company's financial results and financial position.

105.    In addition, the 2011 20-F contained a signed certification pursuant to SOX by Defendant Fadigas.[92] The SOX certification stated that the financial information contained in the 2011 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certification represented that the 2011 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certification also stated that Fadigas had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."[93] Fadigas' statements were attributable to the Company.

106.    In addition, the 2011 20-F stated that the Company's certifying officers "[d]isclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting."[94]

107.    Each of the statements set forth above was materially false and misleading because Braskem's internal controls were grossly ineffective during the Class Period. In the

---

[92] CFO Drehmer also signed a SOX Certification.
[93] Braskem, S.A., Annual Report (Form 20-F), Ex. 12.1 (Apr. 10, 2012) ("2011 20-F").
[94] *Id.*

wake of the testimony from Costa, Youssef, and Lopes, the statements regarding the adequacy

and effectiveness of the Company's internal controls during the Class Period were materially

false and misleading, because Braskem engaged in a scheme where the Company paid bribes,

called "under-the-table payments," to buy cheaper raw material from Petrobras between 2006

and 2012. As described above, the Company concealed from investors: (1) the expenditure of

funds paid for bribes, (2) Braskem's collusion in an improper bribery scheme; (3) inflation of

Braskem's profitability because, without naphtha purchases that were artificially cheaper,

Braskem's profits would have been substantially reduced; and (4) a lack of adequate internal

controls.

108.    The 2011 20-F also continued to describe the contracts that Braskem maintained

with Petrobras for the purchase of naphtha and the factors that determined the price of that

naphtha under those contracts.

> We purchase naphtha for use by our Basic Petrochemical Unit and our Quattor
> Unit from Petróleo Brasileiro S.A.—Petrobras, or Petrobras, at prices based on a
> variety of factors, including the Amsterdam-Rotterdam-Antwerp market prices of
> naphtha and a variety of other petrochemical derivatives, the volatility of the
> prices of these products in the international markets, the *real*/U.S. dollar exchange
> rate, and the level of paraffinicity of the naphtha that is delivered.[95]

109.    The 2011 20-F also explained:

> Our contracts with Petrobras provides for naphtha prices based on a variety of
> factors, including the market prices of naphtha and other basic petrochemical
> derivatives, the volatility of the prices of these products in the international
> markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the
> naphtha that is delivered.[96]

110.    These statements were false and misleading because they omitted the material fact

that the price at which Braskem purchased naphtha from Petrobras under its contract was based

---

[95] 2011 20-F at 5.
[96] 2011 20-F at 87.

in large part on bribes and kickbacks paid to Petrobras and its political allies, that resulted in below-market naphtha prices for Braskem. In order to prevent these statements from being untrue and misleading investors, Defendants had a duty to disclose the illegal bribery scheme set forth herein.

111.    The 2011 20-F further assured investors that the Company had established a rigorous Code of Business Conduct and Ethics:

**Code of Business Conduct and Ethics**

The NYSE corporate governance standards require that a listed company must adopt and disclose a code of business conduct and ethics for directors, officers and employees and promptly disclose any waivers of the code for directors or officers. Each code of business conduct and ethics should address the following matters: (1) conflicts of interest; (2) corporate opportunities; (3) confidentiality; *(4) fair dealing; (5) protection and proper use of company assets; (6) compliance with laws, rules and regulations (including insider trading laws); and (7) encouraging the reporting of any illegal or unethical behavio*r.

Although the adoption of a code of ethics is not required by Brazilian law, Braskem has adopted a code of ethics applicable to its directors, officers and employees, *which addresses each of the items listed above*. Braskem's code of ethics is available on Braskem's website at www.braskem.com.br. The information included on our website or that might be accessed through our website is not included in this annual report and is not incorporated into this annual report by reference. *No waivers of the provisions of the code of ethics are permitted*, except that the restrictions on outside activities do not apply to Braskem's directors and members of its fiscal council.[97]

112.    The statements above were false and misleading because they omitted the material fact that the price at which Braskem purchased naphtha from Petrobras under its 2009 Naphtha Contract was due to bribes and kickbacks paid to Petrobras and its political allies, that resulted in below-market naphtha prices for Braskem. In order to prevent these statements from being untrue and misleading investors, Defendants had a duty to disclose the illegal bribery scheme set forth herein. Braskem's governance practices and its Code of Conduct required

---

[97] 2011 20-F at 188.

transparency and compliance with governing laws. The bribes Braskem paid to Petrobras thus directly contravened Braskem's governance practices and Code of Conduct. Defendant Fadigas and Defendant Braskem failed to comply with these policies because the Company was not transparent about the existence of its bribery scheme, and because the bribes it paid to Petrobras were illegal and did not conform with its Code of Conduct.

113.    On April 8, 2013, the Company filed its annual report for the year ended December 31, 2012 on a Form 20-F with the SEC (the "2012 20-F"). The 2012 20-F was signed by Defendant Fadigas, the Company's then- and current CEO, and CFO Drehmer. The Form 20-F stated the Company's financial results and financial position.

114.    As in previous years, the 2012 Form 20-F contained a signed certification pursuant to SOX by Defendant Fadigas. [98] The SOX certification stated that the financial information contained in the 2012 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certification represented that the 2012 20-F did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certification also stated that Fadigas had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves

---

[98] CFO Drehmer also signed a SOX Certification.

management or other employees who have a significant role in the company's internal control over financial reporting."[99] Fadigas' statements were attributable to the Company.

115.    In addition, the 2012 20-F stated that the Company's certifying officers "[d]isclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting."[100]

116.    Each of the statements set forth above was materially false and misleading because Braskem's internal controls were grossly ineffective during the Class Period. In the wake of the testimony from Costa, Youssef, and Lopes, the statements regarding the adequacy and effectiveness of the Company's internal controls during the Class Period were materially false and misleading, because Braskem engaged in a scheme where the Company paid bribes, called "under-the-table payments," to buy cheaper raw material from Petrobras between 2006 and 2012. As described above, the Company concealed from investors: (1) the expenditure of funds paid for bribes, (2) Braskem's collusion in an improper bribery scheme; (3) inflation of Braskem's profitability because, without naphtha purchases that were artificially cheaper, Braskem's profits would have been substantially reduced; and (4) a lack of adequate internal controls.

117.    The 2012 20-F, as in previous years, continued to describe the contracts that Braskem maintained with Petrobras for the purchase of naphtha and the factors that determined the price of that naphtha under those contracts.

> We purchase naphtha for use by our Basic Petrochemical Unit and our Quattor Unit from Petróleo Brasileiro S.A.—Petrobras, or Petrobras, at prices based on a variety of factors, including the Amsterdam-Rotterdam-Antwerp market prices of

---

[99] Braskem, S.A., Annual Report (Form 20-F) (Apr. 8, 2013) at Exs. 12.01, 12.02 ("2012 20-F").
[100] *Id.*

naphtha and a variety of other petrochemical derivatives, the volatility of the prices of these products in the international markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.[101]

118.    The 2012 20-F also explained:

Our contracts with Petrobras provides for naphtha prices based on a variety of factors, including the market prices of naphtha and other basic petrochemical derivatives, the volatility of the prices of these products in the international markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.[102]

119.    These statements were false and misleading because they omitted the material fact that the price at which Braskem purchased naphtha from Petrobras under its contract was based in large part on bribes and kickbacks paid to Petrobras and its political allies, that resulted in below-market naphtha prices for Braskem. In order to prevent these statements from being untrue and misleading investors, Defendants had a duty to disclose the illegal bribery scheme set forth herein.

120.    The 2012 20-F further assured investors that the Company had established a rigorous Code of Business Conduct and Ethics:

**Code of Business Conduct and Ethics**

The NYSE corporate governance standards require that a listed company must adopt and disclose a code of business conduct and ethics for directors, officers and employees and promptly disclose any waivers of the code for directors or officers. Each code of business conduct and ethics should address the following matters: (1) conflicts of interest; (2) corporate opportunities; (3) confidentiality; ***(4) fair dealing; (5) protection and proper use of company assets; (6) compliance with laws, rules and regulations (including insider trading laws); and (7) encouraging the reporting of any illegal or unethical behavio***r.

Although the adoption of a code of ethics is not required by Brazilian law, Braskem has adopted a code of ethics applicable to its directors, officers and employees, ***which addresses each of the items listed above***. Braskem's code of ethics is available on Braskem's website at www.braskem.com.br. The

---

[101] 2012 20-F at 6.
[102] *Id.* at 82.

information included on our website or that might be accessed through our website is not included in this annual report and is not incorporated into this annual report by reference. ***No waivers of the provisions of the code of ethics are permitted***, except that the restrictions on outside activities do not apply to Braskem's directors and members of its fiscal council. [103]

121.    The statements above were false and misleading because they omitted the material fact that the price at which Braskem purchased naphtha from Petrobras under its 2009 Naphtha Contract was due to bribes and kickbacks paid to Petrobras and its political allies, that resulted in below-market naphtha prices for Braskem. In order to prevent these statements from being untrue and misleading investors, Defendants had a duty to disclose the illegal bribery scheme set forth herein. Braskem's governance practices and its Code of Conduct required transparency and compliance with governing laws. The bribes Braskem paid to Petrobras thus directly contravened Braskem's governance practices and Code of Conduct. Defendant Fadigas and Defendant Braskem failed to comply with these policies because the Company was not transparent about the existence of its bribery scheme, and because the bribes it paid to Petrobras were illegal and did not conform with its Code of Conduct.

122.    On April 14, 2014, the Company filed its annual report for the year ended December 31, 2013 on a Form 20-F with the SEC (the "2013 20-F"). Under the section titled "*Risks Relating to Our Company and the Petrochemical Industry*," Braskem discussed its reliance on the stable price of naphtha and its dependence on Petrobras for its naphtha supply. As described above, similar risk language was stated by the Company in previous 20-Fs filed with the SEC. The 2013 20-F stated, in pertinent part, as follows:

> Naphtha, a crude oil derivative, is the principal raw material used by our Basic Petrochemicals Unit and, indirectly, in our other business units. Naphtha accounted, directly and indirectly, for approximately 48.9% of our consolidated cost of sales and services rendered in 2013.

---

[103] *Id.* at 182.

> We purchase naphtha for use by our Basic Petrochemical Unit from Petróleo
> Brasileiro S.A.—Petrobras, or Petrobras, at prices based on a variety of factors,
> including the Amsterdam-Rotterdam-Antwerp market prices of naphtha and a
> variety of other petrochemical derivatives, the volatility of the prices of these
> products in the international markets, the *real*/U.S. dollar exchange rate, and the
> level of paraffinicity of the naphtha that is delivered.[104]

123.    These statements were false and misleading because the Company failed to
disclose the true factors concerning the price of naphtha purchased from Petrobras. In reality,
Braskem was paying annual bribes, set yearly and in amounts up to $5 million, to buy crude
derivatives such as naphtha at low prices from 2006 to 2014. In order to prevent these statements
from being untrue and misleading investors, Defendants had a duty to disclose the illegal bribery
scheme set forth herein.

124.    Furthermore, the 2013 20-F was signed by Defendant Fadigas, the Company's
then (and current) CEO, as well as the Company's then-current CFO Mario Augusto da Silva
("CFO da Silva"). The Form 20-F stated the Company's financial results and financial position.

125.    In addition, the 2013 Form 20-F contained a signed certification pursuant to SOX
by Defendant Fadigas.[105] The SOX certification stated that the financial information contained
in the 2013 20-F was accurate and disclosed any material changes to the Company's internal
control over financial reporting. Specifically, the certification represented that the 2013 20-F did
"not contain any untrue statement of a material fact or omit to state a material fact necessary to
make the statements made, in light of the circumstances under which such statements were made,
not misleading with respect to the period covered by this report." The certification also stated
that Fadigas had disclosed "[a]ll significant deficiencies and material weaknesses in the design or
operation of internal control over financial reporting which are reasonably likely to adversely

---

[104] Braskem, S.A., Annual Report (Form 20-F), 5 (Apr. 14, 2014) ("2013 20-F"). *See also* 2013 20-F at 61.
[105] CFO da Silva also signed a SOX Certification.

affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting." [106] Fadigas' statements were attributable to the Company.

126.    In addition, the 2013 20-F stated that the Company's certifying officers "[d]isclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting."[107]

127.    Each of the statements set forth above was materially false and misleading because Braskem's internal controls were grossly ineffective during the Class Period. In the wake of the testimony from Costa, Youssef, and Lopes, the statements regarding the adequacy and effectiveness of the Company's internal controls during the Class Period were materially false and misleading, because Braskem engaged in a scheme where the Company paid bribes, called "under-the-table payments," to buy cheaper raw material from Petrobras between 2006 and 2012. As described above, the Company concealed from investors: (1) the expenditure of funds paid for bribes, (2) Braskem's collusion in an improper bribery scheme; (3) inflation of Braskem's profitability because, without naphtha purchases that were artificially cheaper, Braskem's profits would have been substantially reduced; and (4) a lack of adequate internal controls.

128.    The 2013 20-F further assured investors that the Company had established a rigorous Code of Business Conduct and Ethics:

---

[106] 2013 20-F at Exs. 12.01, 12.02.
[107] *Id.*

**Code of Business Conduct and Ethics**

The NYSE corporate governance standards require that a listed company must adopt and disclose a code of business conduct and ethics for directors, officers and employees and promptly disclose any waivers of the code for directors or officers. Each code of business conduct and ethics should address the following matters: (1) conflicts of interest; (2) corporate opportunities; (3) confidentiality; *(4) fair dealing; (5) protection and proper use of company assets; (6) compliance with laws, rules and regulations (including insider trading laws); and (7) encouraging the reporting of any illegal or unethical behavio*r.

Although the adoption of a code of ethics is not required by Brazilian law, Braskem has adopted a code of ethics applicable to its directors, officers and employees, *which addresses each of the items listed above*. Braskem's code of ethics is available on Braskem's website at www.braskem.com.br. The information included on our website or that might be accessed through our website is not included in this annual report and is not incorporated into this annual report by reference. *No waivers of the provisions of the code of ethics are permitted*, except that the restrictions on outside activities do not apply to Braskem's directors and members of its fiscal council.[108]

129.    Braskem's 2013 20-F, published on April 14, 2014, referenced its Code of Conduct and referred investors to its website for a copy. The then-current Code of Conduct had been published in February 2014 and contained several policies. In its policy entitled, "Relationship with Public Officials and Private Individuals," the Code of Conduct stated:

All Braskem Team Members are prohibited from:

- financing, funding or in any way sponsoring the practice of illegal acts;

- using any person as an intermediary to disguise or hide his or her identity and real interest in order to practice illegal acts;

- offering, promising, granting, authorizing, accepting or receiving, either directly or indirectly, any type of benefit, payment, gift or form of entertainment that:

   - conflicts with Braskem's Policies or guidelines; or

   - may be interpreted as conferring some type of inappropriate advantage,

---

[108] *Id.* at 148-49.

- tip, bribe or payment in violation of any law, including inappropriate and/or illegal payments to any individual, whether associated with a public, private or non-profit entity; or

- violates any law or regulation to which Braskem is subject.

Furthermore, in its policy entitled, "Relationship with Suppliers," Braskem's Code of Conduct stated that:

- It is prohibited to engage in businesses with suppliers or service providers that have a questionable reputation or which do not respect the standards and requirements included in this Code of Conduct.[109]

130.   The statements above were false and misleading because they omitted the material fact that the price at which Braskem purchased naphtha from Petrobras under its 2009 Naphtha Contract was due to bribes and kickbacks paid to Petrobras and its political allies, that resulted in below-market naphtha prices for Braskem. In order to prevent these statements from being untrue and misleading investors, Defendants had a duty to disclose the illegal bribery scheme set forth herein. Braskem's governance practices and its Code of Conduct required transparency and compliance with governing laws. The bribes Braskem paid to Petrobras thus directly contravened Braskem's governance practices and Code of Conduct. Defendant Fadigas and Defendant Braskem failed to comply with these policies because the Company was not transparent about the existence of its bribery scheme, and because the bribes it paid to Petrobras were illegal and did not conform with its Code of Conduct.

---

[109] Braskem, 2014 Code of Conduct, Feb. 2014, *available at* http://www.braskem.com.br/Portal/Principal/Arquivos/ModuloHTML/Documentos/1165/14-0294-CodigoBraskemIngles-20150430-Visualizacao.pdf.

## VI.    THE FACTS GIVE RISE TO A STRONG INFERENCE THAT THE DEFENDANTS ACTED WITH SCIENTER

### A.    The Individual Defendants and Odebrecht Each Knew or Recklessly Disregarded Braskem's Bribery and Compliance Issues And Failed to Disclose Those Facts

131.    The facts set forth above, viewed collectively, give rise to a strong inference that the Individual Defendants acted knowingly, or at least recklessly, when they concealed from the market the material negative information that they were involved in a long-standing bribery and corruption scandal with its two largest shareholders.

132.    As set forth herein, the Individual Defendants were involved in every step of the Company's contract approvals. As set forth above:

(l)    Defendant Gradin personally requested from Costa that Petrobras set the price of naphtha lower than market prices;

(m)    Defendant Gradin and Defendant Fadigas were aware of the bribery scheme and continued to approve the annual bribery amounts;

(n)    Alencar personally facilitated the exchange of bribery funds by meeting with Youssef and Youssef's agent Lopes on numerous occasions when Alencar was an executive consultant at Braskem and Alencar continued these activities on behalf of Braskem as agent of Odebrecht;

(o)    Bribe amounts were never approved without the consent of Braskem's executives;

(p)    Defendants knew that disclosure of the bribes and kickbacks to investors would have had a materially negative impact on the Company; and

(q)    Petrobras consistently accepted Braskem's proposed price for naphtha that was below market prices, and Individual Defendants knew or recklessly disregarded the means that allowed Petrobras to sell naphtha below market.

133.     Furthermore, the following facts, among others set forth above, give rise to a strong inference that Odebrecht, knew or should have known, that Braskem was issuing false and misleading statements and making material omissions from its public statements concerning the Company business and compliance with U.S. and Brazilian anti-bribery laws, including:

(a)     Odebrecht executives, directors and senior management were involved in the bribes that were paid and received for Braskem's benefit;

(b)     Odebrecht (and Petrobras) maintained a culture of political patronage as part of the Car Wash cartel and sought, through its control of Braskem, to continue the culture of bribery and political patronage to maximize Braskem's apparent profitability;

(c)     Odebrecht exercised majority control over Braskem's voting share capital, and with Petrobras, almost complete control of the Company ;

(d)     Braskem could not perform most business actions without the consent of Odebrecht;

(e)     Odebrecht had complete control over Braskem's business plan;

(f)     All of the Individual Defendants who were involved in the kickback and bribery scheme were affiliated with or employed by Odebrecht and had the incentive to withhold the truth from investors;

(g)     Nearly all of the members of the board of directors were appointed as nominees of Odebrecht or Petrobras;

(h)     By virtue of the position and influence, Odebrecht had access to all of the information concerning Braskem's naphtha contracts and recklessly disregarded the truth about the bribes being paid for Braskem's benefit; and

(i)     Marcelo Odebrecht, the CEO of Odebrecht was found by Judge Moro to have engaged in a bribery scheme for the benefit of Braskem so that Braskem could purchase naphtha at a reduced price.

134.   In any event, there is strong circumstantial evidence, as stated herein, that Odebrecht and the Individual Defendants knew or recklessly disregarded the truth about Braskem's involvement in the bribery scheme in disseminating the Company's public statements.

### B.    The Individual Defendants Had the Motive and Opportunity to Withhold Braskem's Bribery and Compliance Issues

135.   In addition to the foregoing facts, all of which support a strong inference of scienter on the part of the Individual Defendants, the Individual Defendants also had the motive and opportunity to withhold the information concerning the Company's involvement in bribery and corruption scandals from investors. The Individual Defendants had motive and opportunity for the following reasons:

(a)     The petrochemical industry was dependent on a culture of political patronage and executive appointees were expected to carry out schemes on behalf of their political sponsors;

(b)     Due to Odebrecht's involvement in the Car Wash cartel, Odebrecht had the motive to and did in fact appoint Board Members, CEOs and CFOs at Braskem that would facilitate and further the culture of political patronage that was part of the Car Wash cartel's activities in order to inflate the Company's profitability;

(c)     Individual Defendants, as CEOs and CFOs, were appointed exclusively by the Company's largest shareholders pursuant to the Shareholder Agreement for a pre-determined two or three-year term and were controlled at the Company by

those shareholders who were integral players in the bribery and kickback scheme, and were thus motivated to carry-out tasks on behalf of their parent companies;

(d)     Because of Odebrecht's substantial ownership stake in the Company, Odebrecht had the opportunity and motive to, and did in fact, artificially inflate the Company's profitability and the Company's stock price for Odebrecht's own benefit, and Individual Defendants, as Odebrecht-appointed executives of the Company had the motive and did in fact carry-out tasks to artificially inflate the Company's profitability and the Company's stock price; and

(e)     Individual Defendants, by the Company's Bylaws, were charged with (i) carrying out all actions necessary for the functioning of the Company, and (ii) performing acts of any nature relating to business or operations that are not consistent with the Company's objectives—objectives that were dictated by the Individual Defendants' employers Petrobras and Odebrecht, key players in the Car Wash cartel.

136.    Odebrecht also has motive and opportunity for the following reasons:

(a)     Odebrecht maintained a culture of political patronage as part of the Car Wash cartel and the culture at Petrobras, and Odebrecht sought, through its control of Braskem, to continue the culture of bribery and political patronage to maximize Braskem's apparent profitability;

(b)     Because of Odebrecht's substantial ownership stake in the Company, Odebrecht had the ability and motive to, and did in fact, artificially inflate the Company's profitability and the Company's stock price for Odebrecht's own benefit;

(c)    Odebrecht exercised almost complete control over Braskem's voting share capital and a super-majority control over the Company's outstanding shares; and

(d)    Braskem could not perform most business actions without the consent of Odebrecht.

## VII.    CLASS ACTION ALLEGATIONS

137.    Plaintiff brings this action individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons or entities who purchased or otherwise acquired Braskem ADSs from July 15, 2010 to March 11, 2015, inclusive. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

138.    This action is properly maintainable as a class action.

139.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Braskem or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

140.    Lead Plaintiff's claims are typical of the claims of the members of the Class and Lead Plaintiff does not have any interests adverse to the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

141.    Lead Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

142.    There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. Among the questions of law and fact common to the Class are:

i.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

ii.    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Braskem;

iii.    whether the price of Braskem ADSs was artificially inflated during the Class Period; and

iv.    to what extent the members of the Class have sustained damages and the proper measure of damages.

143.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

144.    Lead Plaintiff anticipates that there will be no difficulty in the management of this litigation.

145.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

146.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**VIII.    LOSS CAUSATION**

147.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

148.    During the Class Period, Plaintiff and the Class purchased Braskem ADSs at artificially inflated prices and were damaged thereby. When the misrepresentations that had been made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, the price of the Company's ADSs significantly declined, causing investors' losses.

**IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

149.    At all relevant times, the market for Braskem's common stock was an efficient market for the following reasons, among others:

i.    Braskem ADS met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

ii.    As a regulated issuer, Braskem filed periodic public reports with the SEC and the NYSE;

iii. Braskem regularly communicated with public investors via established market communications mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through the other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and

iv. Braskem was followed by several securities analysts employed by major brokerage firms who wrote the reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

150.   As a result of the foregoing, the market for Braskem ADSs promptly digested current information regarding Braskem from all publicly available sources and reflected such information in Braskem ADS stock price. Under these circumstances, all purchasers of Braskem ADS during the Class Period suffered similar injury through their purchase of Braskem common stock at artificially inflated prices and a presumption of reliance applies to Lead Plaintiff's claims.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE
##      (*AFFILIATED UTE* DOCTRINE)

151.   Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because claims asserted herein against Defendants are predicated upon material omissions of fact that Defendants had a duty to disclose. Specifically, that Defendants failed to disclose the existence of a long-standing bribery scheme and that Braskem's naphtha purchase prices were the result of those bribes paid to Braskem's naphtha supplier and not the result of arms-length negotiations or market factors.

## XI.   NO SAFE HARBOR

152.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking

72

statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for purportedly those false forward-looking statements because at the time each of those purportedly forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Braskem who knew that those statements were false when made**.**

**FIRST CAUSE OF ACTION**
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Company and the Individual Defendants**

153.    Lead Plaintiff incorporates ¶¶ 1-152 by reference.

154.    Lead Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein. This claim is asserted against the Company, and Individual Defendants.

155.    During the Class Period, Braskem and the Individual Defendants and each of them, carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Braskem securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase Braskem securities at artificially inflated prices. In furtherance of this unlawful plan, scheme, and course of conduct, the Company and Individual Defendants, and each of them, took the actions set forth herein.

156.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Braskem's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The Company and the Individual Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of Braskem, as alleged herein.

157.    In addition to the duties of full disclosure imposed on the Company and the Individual Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S- X (17 C.F.R. § 210.01, *et seq.*) and S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition, and performance so that the market prices of the Company's publicly- traded securities would be based on truthful, complete, and accurate information.

158.    Braskem and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the adequacy of Braskem's internal and financial controls as specified herein. These Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct

as alleged herein in an effort to assure investors of Braskem's value and performance and substantial growth, which included omitting to state material facts necessary in order to make the statements made about Braskem and its internal and financial controls, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in practices and a course of business which operated as a fraud and deceit upon the purchasers of Braskem's securities during the Class Period.

159.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

160.    The Company and the Individual Defendants had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material omissions were made knowingly or recklessly and for the purpose and effect of concealing the state of Braskem's internal and financial controls from the

investing public and supporting the artificially- inflated price of its stock. As demonstrated by their omissions concerning the Company's accounting, internal controls, and financial condition throughout the Class Period, the Individual Defendants, even if they did not have actual knowledge of the omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking steps necessary to discover whether those omissions were false or misleading.

161.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Braskem securities was artificially inflated during the Class Period. In ignorance of the fact that the market price of Braskem shares was artificially inflated, and relying directly or indirectly on the omissions made by the Company and the Individual Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants but not disclosed to the public by these Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Braskem securities during the Class Period at artificially-inflated prices and were damaged thereby.

162.    At the time of said omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known of the true state of Braskem's internal and financial controls, which was not disclosed by the Company and the Individual Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired Braskem securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially-inflated prices which they paid.

163.     By virtue of the foregoing, Braskem and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

164.     As a direct and proximate result of the Company's and the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**SECOND CAUSE OF ACTION**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

165.     Lead Plaintiff incorporates ¶¶ 1-164 by reference.

166.     Lead Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. This claim is asserted against the Individual Defendants.

167.     The Individual Defendants were and acted as controlling persons of Braskem within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the dissemination of the various omissions which Lead Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the making of material omissions or cause affected statements to be corrected.

168.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control

or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

169.    As set forth above, Braskem and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**THIRD CAUSE OF ACTION**
**Violations of Section 20(a) of the Exchange Act**
**Against Odebrecht**

170.    Lead Plaintiff incorporates ¶¶ 1-169 by reference.

171.    Lead Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. This claim is asserted against Odebrecht for the period November 5, 2010 through March 11, 2015.

172.    Odebrecht was and acted as a controlling person of Braskem within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of its controlling share of Braskem, as well as the actions of its employees, agents and nominees on behalf of Braskem as described above, and Odebrecht's control over Braskem's business plan and actions by virtue of the Shareholder Agreement, Odebrecht had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the dissemination of the various statements and omissions which Lead Plaintiff contends are false and misleading.

173.    In addition, Odebrecht, as a controlling shareholder with power over the business activities and decisions of Braskem and its day-to-day involvement in the operations of the Company, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

174.    As set forth above, Braskem and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of its controlling position, Odebrecht is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiff as a Class representative;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Lead Plaintiff demands a trial by jury.

Dated: May 19, 2016

Respectfully submitted,

COHEN MILSTEIN SELLERS
& TOLL PLLC

/s/Christopher Lometti
Christopher Lometti
Kenneth M. Rehns (KR-9822)
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Steven J. Toll
Daniel S. Sommers
Genevieve Fontan
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

*Attorneys for Lead Plaintiff and the Proposed Class*

## CERTIFICATION OF SECURITIES CLASS ACTION
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Mario Rodriguez, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the Chief Investment Officer of the Boilermaker-Blacksmith National Pension Trust ("Boilermaker Pension Trust").

2.      I have reviewed the First Amended Class Action Complaint (the "Complaint") filed in *Peters v. Braskem S.A., et al.*, Civ. No. 15-5132-PAE (S.D.N.Y.) and authorize the filing of this Certification and Lead Plaintiff Motion on behalf of Boilermaker Pension Trust.

3.      Boilermaker Pension Trust is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.      During the Class Period (as defined in the Complaint), Boilermaker Pension Trust purchased and/or sold the securities that are the subject of the Complaint as set forth on the attached Schedule A.

5.      Boilermaker Pension Trust did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.      Boilermaker Pension Trust has sought to serve or served as a representative party on behalf of a class in the following private action(s) arising under the Securities Act or the Exchange Act filed during the three-year period preceding the date of my signing this Certification:

*New Jersey Carpenters Vacation Fund, et al., v. The Royal Bank of Scotland Group PLC, et al.*, Civ. No. 08-5093-HB (S.D.N.Y.)
*New Jersey Carpenters Health Fund, et al., v. Residential Capital, LLC, et al.*,  Civ. No. 08-8781-HB (S.D.N.Y.)
*City of Taylor General Employees Retirement System v. Magna International Inc. et al.*, Civ. No. 12-3553-NRB (S.D.N.Y.)
*In re Bear Stearns Mortgage Pass-Through Certificates Litigation*, Civ. No. 08-8093-LTS (S.D.N.Y.)
*Donio v. Linn Energy, LLC et al.*, Civ. No. 13-4875-CM (S.D.N.Y.)
*Mulligan v. Impax Laboratories, Inc., et al.*, Civ. No. 13-1037-EMC (N.D. Cal)

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 3/ɜᵀ day of August, 2015.

Mario Rodriguez
Chief Investment Officer

1

## SCHEDULE A

## TRANSACTIONS IN BRASKEM S.A. AMERICAN DEPOSITORY SHARES

| Trade Date | Transaction Type (Buy/Sell) | Share Quantity | Share Price ($) |
|---|---|---|---|
| 9/4/2013 | Purchase | 16,772 | 15.41 |
| 9/17/2013 | Purchase | 8,510 | 16.51 |
| 10/23/2013 | Purchase | 6,898 | 18.39 |
| 11/14/2013 | Purchase | 51,141 | 17.60 |
| 11/26/2013 | Purchase | 7,562 | 17.73 |
| 2/13/2014 | Sale | -4,234 | 15.40 |
| 2/26/2014 | Sale | -10,487 | 14.14 |
| 5/28/2014 | Sale | -15,487 | 12.98 |
| 6/10/2014 | Sale | -15,857 | 13.66 |
| 6/23/2014 | Sale | -6,400 | 13.48 |
| 7/18/2014 | Sale | -24,078 | 12.67 |
| 8/1/2014 | Sale | -14,340 | 12.32 |
| 11/3/2014 | Purchase | 50,820 | 14.44 |
| 11/11/2014 | Purchase | 7,090 | 14.52 |
| 11/21/2014 | Purchase | 67,645 | 15.35 |
| 12/9/2014 | Purchase | 33,311 | 14.34 |
| 2/18/2015 | Sale | -8,956 | 9.04 |

## <u>CERTIFICATE OF SERVICE</u>

I, Genevieve Fontan, hereby certify that, on May 19, 2016, I caused the foregoing Consolidated Class Action Complaint document to be served on counsel of record through this Court's Electronic Case Filing System.

*/s/ Genevieve Fontan*
Genevieve Fontan
