UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                    :
IN RE BRASKEM S.A. SECURITIES LITIGATION            :
                                                    :
------------------------------------------------------------------ X

15 Civ. 5132 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

These consolidated putative class actions involve claims that a Brazilian petrochemical company's failure to disclose its long-running bribery scheme violated federal securities law. Plaintiffs are purchasers of purchasers of U.S.-traded securities of Braskem S.A. ("Braskem") between July 15, 2010, and March 11, 2015 (the "Class Period"). In its Second Amended Consolidated Class Action Complaint, Dkt. 69 ("SAC"), lead plaintiff Boilermaker-Blacksmith National Pension Trust ("BBNPT") claims that Braskem participated in, but did not publicly disclose, a bribery scheme that long enabled it to buy naphtha, a raw material central to its manufacturing operations, at materially below-market prices. The SAC alleges that Braskem's share price was artificially inflated by various false and misleading statements by the company, which tended to create the false impression that the price at which it bought naphtha was based on market forces. The SAC further alleges that, on March 11, 2015, when the media exposed this scheme, Braskem's share price fell more than 20%, harming shareholders. Plaintiffs sue Braskem; two of its former officers—Carlos José Fadigas de Souza Filho ("Fadigas") and Bernardo Afonso de Almeida Gradin ("Gradin"); and a major shareholder, Odebrecht S.A. ("Odebrecht").

Braskem and Fadigas have jointly filed a motion to dismiss, and Gradin and Odebrecht have each filed separate motions to dismiss. All defendants moved under Federal Rule of Civil Procedure 12(b)(6). Odebrecht separately moves under Rule 12(b)(2).

1

For the reasons that follow, the Court (1) denies in part, and grants in part, Braskem's and Fadigas's motion to dismiss; (2) grants Gradin's motion to dismiss; and (3) grants Odebrecht's motion to dismiss.

## I.    Background[1]

### A.    The Parties

Plaintiffs, including lead plaintiff BBNPT, are purchasers in United States markets of Braskem securities during the Class Period.  *See* SAC ¶ 23.

Braskem is a Brazilian petrochemical company, headquartered in Camaçari, Brazil.  *Id.* ¶¶ 2, 24.  It is the largest petrochemical producer in Latin America and the largest producer of thermoplastic resins in the Americas.  *Id.*  Its American Depositary Shares ("ADSs") are listed on the New York Stock Exchange ("NYSE") under the ticker symbol "BAK."  *Id.* ¶ 20.[2]

---

[1] The Court draws these facts principally from the SAC.  In assessing the motions to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the SAC as true, drawing all reasonable inferences in plaintiffs' favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).  In assessing the motion to dismiss under Rule 12(b)(2), the Court "'construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor.'"  *AmTrust Fin. Servs., Inc. v. Lacchini*, No. 16 Civ. 2575 (PAE), 2017 WL 728262, at *6 (S.D.N.Y. Feb. 23, 2017) (quoting *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (per curiam))).

[2] As the Second Circuit has explained:

> [I]n order for a foreign corporation to trade on the American stock exchange without listing its ordinary shares on the exchange, the foreign corporation must issue and deposit American Depositary Shares or ADSs with an American financial institution.  *See Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, Nos. 01 Civ. 2946 (DLC) *et al.*, 2004 WL 1944457, at *1 n.1 (S.D.N.Y. Aug. 31, 2004).  The depositary institution then issues American Depositary Receipts or ADRs to the beneficial owners of the ADSs, who are then free to sell the ADSs on American securities exchanges.  *Id.*  The listing of ADSs on an American exchange "makes trading an ADR simpler and more secure for American investors than trading in the underlying security in the foreign market."  *In re Nat'l Australia Bank Sec. Litig.*, No. 03 Civ. 6537 (BSJ), 2006 WL 3844465, at

Odebrecht is Brazil's largest infrastructure company.  With an approximate 38% ownership stake in Braskem's outstanding share capital alone, Odebrecht is one of Braskem's largest shareholders.  *Id.* ¶¶ 2, 13.  Braskem's other two largest shareholders are Petróleo Brasiliero S.A. – Petrobras ("Petrobras"), an energy company, and the Brazilian Development Bank, the primary financing agent for development in Brazil.  *Id.*

Fadigas has been Braskem's Chief Executive Officer ("CEO"), and a member of its executive management, since December 2010.  *Id.* ¶ 26.  He was elected to Braskem's board of directors as a nominee of Odebrecht.  *Id.*  He previously served as Vice President of Braskem's International Business Unit from an unknown date until 2011, as Braskem's Chief Financial Officer ("CFO") and Executive Vice President of Investor Relations between 2007 and 2010, and as Braskem's Director of Investor Relations between December 2006 and 2007.  *Id.*  Fadigas also served as Odebrecht's CFO between 2002 and 2006.  *Id.*

Gradin was Braskem's CEO between July 2008 and December 2010.  *Id.* ¶ 25.  He also served as Braskem's Vice President of Basic Supplies between 2004 and 2007, and as Braskem's Executive Vice President of Vinyl Products between December 2002 and 2004.  *Id.*  From 1987 through his tenure as Braskem's CEO, Gradin also worked for Odebrecht.  *Id.*

**B.      The Role of Naphtha in Braskem's Operations**

---

*1 n.3 (S.D.N.Y. Oct. 25, 2006) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (3d Cir. 2002)).

ADSs share several of the same characteristics as ordinary shares.  For example, "ADRs are tradeable in the same manner as any other registered American security, may be listed on any of the major exchanges in the United States or traded over the counter, and are subject to the [federal securities laws.]" *Id.* at *1 n.3.

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 464 (2d Cir. 2010).

Braskem has three major production units: the Basic Petrochemicals Unit, the Polyolefins Unit, and the Vinyls Unit. *Id.* ¶ 2. The Basic Petrochemicals Unit purchases naphtha, a raw material, and then transforms it into materials used by the Polyolefins Unit and the Vinyls Unit. *Id.* ¶ 3. During the Class Period, naphtha accounted for approximately half of Braskem's consolidated cost of sales and services rendered. *Id.*

Braskem purchases approximately 70% of its naphtha from its shareholder Petrobas under long-term agreements. *Id.* Petrobas is Braskem's only domestic naphtha supplier; Braskem buys the remaining 30% of its naphtha from sources abroad. *Id.*

The SAC alleges that Odebrecht "had the power to direct and cause the direction of [Braskem] and the terms of its naphtha contract with Petrobas." *Id.* ¶ 13.

**C.      The Bribery Scheme**

In or about 2014, Brazilian authorities launched an investigation into Petrobras, which revealed that Petrobras had been involved in a multibillion dollar money laundering and corruption scandal, in which "billions of dollars in kickbacks" were "funnel[ed]" to executives at Petrobras. *Id.* ¶ 5; *see* Dkt. 71 ("Braskem Def. Br.") at 9. Brazilian authorities uncovered ties between Petrobras' former head of refining and director of supply, Paulo Roberto Costa ("Costa"), and a black-market money dealer, Albert Youssef ("Youssef"), who facilitated the bribery payments. SAC ¶ 5. The investigation into the Petrobas scandal led to the discovery of Braskem's bribery scheme. *See id.* ¶ 64.

As alleged by the SAC, the basic outline of the Braskem bribery scheme was as follows: Before and during the Class Period, Braskem, and Odebrecht for Braskem's benefit, controlled the price of naphtha that Braskem purchased from Petrobas. They did so by paying bribes both to Petrobas and to politicians in Brazil's Progressive Party, the "Partido Progressista." *Id.* ¶¶ 4,

35–36. In return for these bribes, Braskem was able to purchase naphtha from Petrobas at prices materially below the prevailing market rate. *Id.* ¶¶ 4, 33–35. The SAC alleges that, "despite the appearance of a new agreement in 2009 for naphtha sales between Petrobas and Braskem [("the 2009 Naphtha Agreement")], Braskem had already been paying and continued to pay bribes to Petrobas in a price-fixing scheme [since 2006]." *Id.* ¶ 35.

Multiple Petrobas executives, Odebrecht executives, Braskem executives, and others—including Costa; Youssef; and Marcelo Odebrecht, who served simultaneously as Odebrecht's CEO and Braskem's chairman of the board—have been arrested and, in some cases, convicted and sentenced to prison in connection with their roles in the bribery scheme. *Id.* ¶¶ 15, 28, 62–63, 71. The SAC's allegations regarding the scheme draw upon testimony, in Brazilian federal court, of individuals connected with the scheme. In particular, the SAC recites such testimony from three sources—Youssef, Youssef's assistant Rafael Angulo Lopes ("Lopes"), and Costa—to describe the operation of the bribery scheme and the involvement of the individual defendants here in it.

Youssef testified that that Gradin and Fadigas set bribe amounts. *Id.* ¶ 36. He also testified that he worked with other Braskem employees, including executive Alexandrino Alencar ("Alencar"), to facilitate payment of Braskem's bribes to Progressive Party politicians. *Id.* ¶¶ 35–36. According to Youssef, Petrobas's Costa received 30% of the bribes and the remaining amount went to the Progressive Party. *Id.* ¶ 35. Youssef testified that Alencar repeatedly represented that he was seeking authorization from Braskem's CEO for the bribes. *Id.* ¶ 36.

Lopes testified that Alencar met regularly with both Youssef and Lopes. *Id.* ¶ 38. Lopes admitted to giving Alencar bank account numbers and swift codes for deposit slips confirming the transfer of bribes. *Id.*

Costa testified as to how he coordinated bribes with Braskem. He testified that he had personally spoken with both Gradin and Fadigas about bribes and that both men participated in determining naphtha prices. *Id.* ¶¶ 39, 51. Costa testified that Gradin personally asked Costa to keep naphtha prices for Braskem at a specific below-market rate. *Id.* ¶ 41.

### D.     Statements During the Class Period

The SAC alleges that, during the Class Period, Braskem, and in one instance Odebrecht, made public statements regarding Braskem's operations and policies generally and/or Braskem's naphtha purchases specifically. *See, e.g.*, *id.* ¶ 9. Braskem and Odebrecht, however, never disclosed the bribery scheme. *Id.* ¶ 10. In particular, plaintiffs base their claims of liability for securities fraud on statements made in (1) an Odebrecht press release regarding Braskem, (2) Braskem's Sustainability Reports, (3) Braskem's Code of Conduct, (4) Braskem's Form 6-K filings with the SEC, and (5) Braskem's Form 20-F filings with the SEC. The Court describes these categories of statements in turn.

### 1.     Odebrecht's Press Release

On June 30, 2011, Odebrecht published a press release announcing an award won by Braskem. The press release included the following statement from CFO Marcela Drehmer: "Creating value for shareholders is a crucial part of our work, *aligned with a policy of transparency and good corporate governance practices*." SAC ¶ 100 (quoting Odebrecht, Braskem Earns 2011 ABRASCA Award, June 30, 2011, http://odebrecht.com/en/braskem-earns-2011-abrasca-award) (emphasis added).

### 2.     Braskem's Sustainability Reports

On January 15, 2010, Braskem published its 2009 Sustainability Report, which, Braskem stated, was "addressed to shareholders, customers, members, media and other stakeholders in the

activities of Braskem." *Id.* ¶¶ 76–77.  The report made a series of general statements touting

Braskem's ethical policies and culture, emphasizing the company's transparency and its

compliance with applicable laws and regulations.  The following statements are representative:

> (1) "At Braskem the Client service culture is translated into long term business partnerships and transparent relationships."
>
> (2) "Transparency, ethics and respect to Clients, Company Members, Shareholders, Suppliers and society are inherent to Braskem culture and actions."
>
> (3) "[A] Supplier Code of Conduct establish[es] the principles that guide the relations between Braskem and its service providers.  The Code of Conduct highlights fundamental values such as transparency, ethics, clarity of information and responsibility for Supply decisions."
>
> (4) "[C]orporate governance principles enforced by Braskem [include . . . ] ensur[ing] conformity with legal and regulatory bodies to whose authority Braskem business are subject."
>
> (5) "The Braskem Code of Conduct establishes the following fundamental principles: . . . Members shall be responsible for performing the assigned tasks and for conducting Braskem businesses with transparency and in strict conformity with the law in force and with Company principles and guidance; . . . transparency of accounting and financial records: transparency is critical to enable a correct assessment of Braskem by market agents."

*Id.* ¶ 78 (quoting Braskem, 2009 Sustainability Report 1 (July 15, 2010),

http://www.braskem.com/rao/2009/en/pdf/braskem2009.pdf ("2009 Sustainability Report")).

The report also contained an introduction, signed by "Marcelo Odebrecht, Chairman of Braskem

Board of Directors, [and] Bernardo Gradin, CEO of Braskem," stating, *inter alia*, "We thank our

Clients and Shareholders for their trust."  SAC ¶ 78 (quoting 2009 Sustainability Report).

On August 16, 2011, Braskem published its 2010 Sustainability Report, which included

an introduction signed by Fadigas.  SAC ¶ 102.  This 2010 Sustainability Report, like the 2009

Sustainability Report, included statements lauding Braskem's ethical practices, including, *inter*

*alia*, statements about the company's "ethical integrity permeat[ing] all systems of governance

7

dealing with the Company's internal and external relations," "transparency, going beyond the minimum obligations," and "adhere[nce] to regulatory, legal, statutory and procedural guidelines." *Id.* (quoting Braskem, 2010 Annual and Sustainability Report 31–32 (2010)).

### 3.    Braskem's Code of Conduct

During the Class Period, Braskem maintained a Code of Conduct.  It recited the company's "expect[ation]" that "all suppliers and members of companies controlled by BRASKEM are aware of this Code of Conduct and comply with its terms in all negotiations with BRASKEM, or on behalf of it."  SAC ¶ 80.

The Code of Conduct also contained a series of statements regarding Braskem's ethics policies and culture.  Some statements broadly emphasized Braskem's general compliance with ethical and legal standards.  The following statements are representative:

> (1) "Our reputation and our trustworthiness are our most valuable assets, and the ethical principles on which our acts are based contribute to maintain the image of BRASKEM as a solid and reliable organization to our Customers, Suppliers and collaborators in general.  We shall emphasize that our philosophy is based on integrity, independence, and freedom of expression, precepts that have always been encouraged in BRASKEM.  Compliance with this Code of Ethics by each of the Members reaffirms one of our most important targets, which is to maintain and consolidate the reputation of BRASKEM."

> (2) "The presence of BRASKEM on the domestic and international capital market and the participation of the Members of BRASKEM in different sectors of business, geographical regions and cultures, which constitute globalized and competitive markets, demand transparent standards of performance and compliance with various legal systems."

> (3) "BRASKEM expects its members in the exercise of their duties to adhere to established corporate procedures and the same care and diligence that anyone would normally use in their personal affairs, *i.e.* honest and dignified conduct, in accordance with the laws and ethical standards of society."

> (4) "BRASKEM expects its members to conduct business relations in compliance with the laws, the legal market practices and specially to national and international standards related to the economic order and competition defense."

> (5) "The Members of BRASKEM are responsible for taking the appropriate action, if they have knowledge of irregularities committed by third parties that may compromise the name and interests of BRASKEM.  Any transaction involving BRASKEM must be supported by appropriate documents, coated with all legal formalities."

SAC ¶¶ 80–81 (quoting Braskem, Code of Conduct, Feb. 2014, *available at*

http://www.braskem.com/Portal/Principal/Arquivos/ModuloHTML/Documentos/1165/14-0294-

CodigoBraskemIngles-20150430-Visualizacao.pdf ("2014 Code of Conduct")); *see also* SAC ¶

129.

Other statements in the Code of Conduct identified specific conduct that Braskem

prohibited.  For example:

> (1) "It is strictly forbidden to all Members of BRASKEM [to] make any improper, questionable or illegal payments, or favor by granting undue benefits or outside the usual practices of the trade, customers and suppliers, to the detriment of others, as well as [to] make payments or grant privileges or advantages to public or equivalent employees, either directly or by third parties."
>
> (2) "It is forbidden to any Member to keep understandings with BRASKEM's competitor(s) aiming fixation of prices and/or conditions of sale, adopt or influence the adoption of an uniform commercial conduct or pre-agreed, divide markets, and subordinate the sale of one product to another."
>
> (3) "It is strictly forbidden to all Members of BRASKEM [to] offer or promise, either directly or through third parties, payments, gifts or benefits to public officials, political parties or their members, and candidates for political office, and the family or equivalent of any one described above, in order to obtain benefit for the company."

SAC ¶ 81 (quoting 2014 Code of Conduct).

### 4.   Braskem's Form 20-F Filings

Braskem's annual reports were each filed with the SEC on a Form 20-F.

9

Braskem's 2010 annual report was filed on June 10, 2011.  SAC ¶ 91.  It was signed by Drehmer and Fadigas, *id.*, and accompanied by a certification under the Sarbanes-Oxley Act of 2002 ("SOX") signed by Fadigas, *id.* ¶ 92.

The annual report made the following statements describing Braskem's naphtha purchase contracts with Petrobas:

> We purchase naphtha for use by our Basic Petrochemical Unit and our Quattor Unit from Petróleo Brasileiro S.A.–Petrobras, or Petrobras, at prices based on a variety of factors, including the Amsterdam-Rotterdam-Antwerp market prices of naphtha and a variety of other petrochemical derivatives, the volatility of the prices of these products in the international markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.

SAC ¶ 95 (quoting 2010 20-F at 5).  The Form 20-F later stated:

> Our contracts with Petrobras provide[] for naphtha prices based on a variety of factors, including the market prices of naphtha and other basic petrochemical derivatives, the volatility of the prices of these products in the international markets, the *real*/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.

SAC ¶ 96 (quoting 2010 20-F at 91).  The annual report also noted Braskem's code of business conduct and ethics, including the code's principles regarding "fair dealing," "compliance with laws, rules and regulations," and "encouraging the reporting of any illegal or unethical behavior." SAC ¶ 98 (quoting 2010 20-F at 185–86).

Braskem's ensuing annual reports for 2011, 2012, and 2013 contained the same or similar statements regarding the company's naphtha purchase contracts with Petrobas, *id.* ¶¶ 108–09, 117–118, 122, and its code of business conduct and ethics, *id.* ¶¶ 111, 120, 128.  The 2011 annual report was filed on April 10, 2012, *id.* ¶ 104; the 2012 annual report, on April 8, 2013, *id.* ¶ 113; and the 2013 annual report, on April 14, 2014, *id.* ¶ 122.  The 2011 and 2012 reports were signed by both Drehmer and Fadigas; the 2013 report was signed by Fadigas and Braskem's then-CFO Mario Augusto da Silva.  *Id.* ¶¶ 104, 113, 124.

All four reports were accompanied by SOX certifications signed by Fadigas.  The 2010

SOX certification certified that:

> [The Form 20-F does] not contain any untrue statement of a material fact or omit
> to state a material fact necessary to make the statements made, in light of the
> circumstances under which such statements were made, not misleading with
> respect to the period covered by this report.

*Id.* (citation omitted).  It further certified that the Form 20-F had disclosed:

> [a]ll significant deficiencies and material weaknesses in the design or operation of
> internal control over financial reporting which are reasonably likely to adversely
> affect the company's ability to record, process, summarize and report financial
> information [and . . .] *[a]ny fraud*, whether or not material, that involves
> management or other employees who have a significant role in the company's
> internal control over financial reporting.

*Id.* (quoting Braskem, S.A., Annual Report (Form 20-F), Exs. 12.01, 12.02 (June 10, 2011)

("2010 20-F) (emphasis added)).  Finally, it certified that the Form 20-F had disclosed:

> any change in the company's internal control over financial reporting that
> occurred during the period covered by the annual report that has materially
> affected, or is reasonably likely to materially affect, [Braskem's] internal control
> over financial reporting.

SAC ¶ 93 (quoting 2010 20-F, Exs. 12.01, 12.02).  The 2011, 2012, and 2013 certifications

contained similar language.  SAC ¶¶ 105–06, 114–15, 125–26.

### 5.     Braskem's Form 6-K Filings

Braskem made four Form 6-K filings with the SEC, all in 2010, each signed by then-CFO

Drehmer.  These contained the following statements regarding naphtha pricing:

> A Form 6-K filed on August 13, 2010, contained the following statements:

> Braskem's cost of goods sold (CoGS) was R$5.4 billion in 2Q10, up 2% from the
> previous quarter, basically reflecting the higher raw material prices.

> In relation to 2Q09, CoGS in the quarter rose by 27%. The average [international
> Amsterdam-Rottingham-Antwerp ("ARA")] naphtha price increased by 41%
> between the periods and was partially offset by the higher operating efficiency in
> the period.

The average price of ARA naphtha in the quarter was US$691/ton, down 3% from 1Q10 (US$709/ton). However, based on the three-month moving average (which is the reference for the domestic market), the average naphtha price in 2Q10 increased by 5% to US$ 714/ton, from US$682/ton. Braskem acquires the bulk of its naphtha feedstock from Petrobras, with the remainder imported directly from suppliers in Argentina, Venezuela and countries from northern Africa.

In 1H10, CoGS came to R$11 billion, 27% higher than in 1H09. As previously mentioned, the higher CoGS is basically explained by the sharp increase in naphtha prices of 60% between the periods.

*Id.* ¶ 83 (quoting Braskem, EBITDA grows 17% to R$1.04 billion in 2Q10 6-7, Aug. 10, 2010,

http://www.braskemri.com.br/Portal/RI/arquivos/resultado/105/2Q10%20Results.pdf).

A Form 6-K filed on August 24, 2010, contained the following statements:

The inter-company transactions between [Braskem] and related companies are made on terms equivalent to the averages practiced with third parties, subject to the following: (i) For the purchase of naphtha from Petrobras and REFAP, the price of naphtha and other oil byproducts is that practiced in the international market, considering a clause related to the quality of parafinicity and contaminants in the naphtha delivered; and (ii) For the sales to foreign subsidiaries, the collection period of 180 days is longer than that established for other customers.

SAC ¶ 85 (quoting Braskem, S.A., Report of Foreign Issuer (Form 6-K), 29 (Aug. 24, 2010)).

A Form 6-K filed on November 16, 2010, contained the following statements:

Cost of goods sold (COGS) was R$6.1 billion in 3Q10, up 14% from 2Q10, reflecting the growth in resin sales volume, which was partially offset by the lower feedstock prices.

In relation to 3Q09, COGS increased 35%, reflecting the 10% upturn in average ARA naphtha prices and, especially, the higher resin sales volume.

The average ARA naphtha price in the quarter was US$658/t, down 5% from 2Q10 (US$692/t). The three-month moving average of the ARA naphtha price in 3Q10 decreased by 4% to US$675/t. Braskem acquires the bulk of its naphtha feedstock from Petrobras, with the remainder imported directly from suppliers in Argentina, Venezuela and countries from northern Africa.

SAC ¶ 87 (quoting Braskem, S.A., Report of Foreign Issuer (Form 6-K), 7 (Nov. 16, 2010)).

Finally, a Form 6-K filed on November 26, 2010, contained the following statements:

> The inter-company transactions between the Company and related companies are made on terms equivalent to the averages practiced with third parties, subject to the following: (i) For the purchase of naphtha from Petrobras and REFAP, the price of naphtha and other oil byproducts is that practiced in the international market, using a clause related to the quality of parafinicity and contaminants in the naphtha delivered; and (ii) For the sales to foreign subsidiaries, the collection period of 180 days is longer than that established for other customers.

SAC ¶ 89 (quoting Braskem, S.A., Report of Foreign Issuer (Form 6-K), 28 (Nov. 26, 2010)).

### E.  Exposure of the Bribery Scheme and the Drop in Braskem's Stock Price

On March 11, 2015, a Brazilian newspaper exposed Braskem's involvement in the bribery scheme. *Id.* ¶ 66. That day, after news of the bribery scheme broke, the price of Braskem ADSs dropped by more than 20%, or $1.80 per ADR. *Id.* ¶¶ 16, 68.

### F.  Events and Disclosures After the Class Period

On February 8, 2016, Braskem received a subpoena from the SEC. *Id.* ¶ 8. Braskem did not disclose the subpoena. *Id.*

On March 8, 2016, a Brazilian federal court sentenced Marcelo Odebrecht to 19 years in prison for his involvement in bribing politicians and in bribing Costa. *Id.* ¶¶ 4, 7. Relevant here, the Brazilian judge found that a naphtha supply contract between Petrobas and Braskem involved the payment, by Braskem or on its behalf, of $35 million in bribes ($5 million/year between 2006 and 2012). *Id.* ¶ 7.

On March 11, 2016, Brazilian prosecutors brought a civil action against Odebrecht's CEO and others, seeking $2 billion in damages for their participation in bribery schemes. *Id.* ¶ 8.

On March 29, 2016, a Brazilian newspaper reported that the United States Department of Justice ("DOJ") was investigating Braskem for violating the Federal Corrupt Practices Act ("FCPA") in connection with its naphtha purchases. *Id.* Braskem publicly responded to the

news report.  Without disclosing the SEC subpoena, it characterized the investigation as one it

voluntarily undertook.  Braskem stated that it had "t[aken] the initiative to open an independent

inquiry to investigate the allegations" and that "[t]he process is being conducted by outside law

firms hired by the company with the [DOJ] and [SEC]." *Id.*  After the announcement of the U.S.

investigation, the price of Braskem's ADSs dropped by 2.1%. *Id.*

On March 31, 2016, a Brazilian newspaper reported that Brazilian authorities had

charged a Progressive Party congressman and others with taking bribes to enable Braskem to

receive a favorable naphtha purchase agreement from Petrobras. *Id.*  In its public response,

Braskem reiterated that it had "[t]aken the initiative to open an independent inquiry to investigate

the allegations" and had "offered access to information, data and files" to the SEC and DOJ. *Id.*

On May 5, 2016, Braskem first disclosed the SEC subpoena to investors. *Id.*

In December 2016, Braskem and Odebrecht each entered into a plea agreement with the

DOJ and pled guilty in federal court to a felony violation of the FCPA.  Each admitted

participating in a broad-ranging bribery scheme that, as relevant here, including bribing

Petrobras and Brazilian officials to secure favorable pricing of naphtha for Braskem. *See* Dkts.

99, 102.[3]

G.    **Procedural History**

_____

[3] The December 2016 plea agreements and guilty pleas post-dated the SAC and the briefing and argument on the motions to dismiss.  On December 28, 2016, BBNPT filed a letter informing the Court of these developments and attaching relevant materials ("the December BBNPT Letter"), Dkt. 99; defendants responded with letters asking the Court to disregard BBNT's letter and not to take notice of these post-SAC events, Dkts. 101–104.  The Court is, however, permitted to take judicial notice of the plea agreement and the guilty pleas. *See S.E.C. v. Aragon Capital Advisors, LLC*, No. 07 Civ. 919 (FM), 2011 WL 3278907, at *10 (S.D.N.Y. July 26, 2011) (court may take notice of "indisputable facts, such as a guilty plea").  The Court has considered these materials, for the limited purpose of noting the two companies' admission to a bribery scheme involving naphtha pricing consistent with that alleged in the SAC.  The Court's consideration of these materials did not, however, affect its resolution of the motions to dismiss.  The companies' participation in the bribery scheme was already well-pled in the SAC. *See, e.g.*, SAC ¶¶ 35–36.

On July 1, 2015, plaintiff Douglas W. Peters filed a complaint, Dkt. 1, and published a notice of the action on *BusinessWire*, *see id.*, Ex. 1.  On July 2, 2015, plaintiff Carmine Vitolo filed a separate complaint.  15 Civ. 5183, Dkt. 1.  On September 8, 2015, the Court consolidated these two actions and appointed BBNPT lead plaintiff.  Dkt. 24.

On November 6, 2015, BBNPT filed an initial consolidated complaint against Braskem, Odebrecht, Gradin, Fadigas, Drehmer, and da Silva.  Dkt. 37.  On December 21, 2015, Braskem, Fadigas, da Silva, and Drehmer together moved to dismiss that complaint, Dkt. 46, as did Gradin separately, Dkt. 49.  On May 20, 2016, BBNPT filed the SAC, which brought claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t, against the above defendants, except for da Silva and Drehmer, whom the SAC dropped.  Dkt. 69.

On July 6, 2016, Braskem and Fadigas filed a motion to dismiss the SAC, Dkt. 70, and a supporting memorandum of law, Dkt. 71 ("Braskem Def. Br."), and declaration, Dkt. 72.  The same day, Gradin filed a motion to dismiss, Dkt. 73, and a supporting memorandum of law, Dkt. 74 ("Gradin Def. Br."), and declaration, Dkt. 75.  These motions were all based on Rule 12(b)(6), arguing that the SAC failed to state a claim.  On August 22, 2016, BBNPT filed an opposition to these motions.  Dkt. 78 ("Pl. First Opp. Br.").  On September 21, 2016, Braskem and Fadigas filed a reply, Dkt. 79 ("Braskem Def. Reply Br."), and a supporting declaration, Dkt. 80.  The same day, Gradin filed a reply ("Gradin Def. Reply Br."), Dkt. 82, and a supporting declaration, Dkt. 83.  On October 17, 2016, the Court held argument on these motions to dismiss.

On November 14, 2016, Odebrecht filed a motion to dismiss the SAC, Dkt. 96, as well as a supporting memorandum of law, Dkt. 97 ("Odebrecht Def. Br.").  Odebrecht's motion was based both on Rule 12(b)(2), for lack of personal jurisdiction, and Rule 12(b)(6).  On December

16, 2017, BBNPT filed an opposition to Odebrecht's motion to dismiss. Dkt. 98 ("Pl. Second Opp. Br."). On January 6, 2017, Odebrecht filed a reply brief, Dkt. 105 ("Odebrecht Def. Reply Br."), and a letter motion seeking additional oral argument, Dkt. 106, which the Court denied on January 17, 2017, Dkt. 107.

## II.   Applicable Legal Standards

### A.   Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A complaint is properly dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Accordingly, a district court must accept as true all well-pleaded factual allegations in the complaint, and draw all inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("ATSI"). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI*, 493 F.3d at 99; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan*

*Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("ECA"). Rule 9(b) states that "[i]n alleging fraud

or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

Fed. R. Civ. P. 9(b). Rule 9(b) requires that a complaint "(1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at

99 (citation omitted). "Allegations that are conclusory or unsupported by factual assertions are

insufficient." *Id.*

Second, a complaint alleging securities fraud must comply with the pleading

requirements of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u–

4(b). *See Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 Civ. 2700 (PKC), 2012 WL 3957916, at *7

(S.D.N.Y. Sept. 10, 2012). In particular, where a plaintiff's claims depend upon allegations that

the defendant has made an untrue statement of material fact or that the defendant omitted a

material fact necessary in order to make the statements not misleading, the plaintiff "shall specify

each statement alleged to have been misleading, the reason or reasons why the statement is

misleading, and, if an allegation regarding the statement or omission is made on information and

belief, the complaint shall state with particularity all facts on which that belief is formed." 15

U.S.C. § 78u–4(b)(1). Thus, to plead a claim of securities fraud, plaintiffs "must do more than

say that the statements . . . were false and misleading; they must demonstrate with specificity

why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see also In re*

*Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ. 11278 (DLC), 2009 WL 4823923, at *7

(S.D.N.Y. Dec. 14, 2009).

In addition, a plaintiff pleading scienter in a securities fraud action "shall, with respect to

each act or omission alleged to violate this chapter, state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as *compelling* as any opposing inference one could draw from the facts alleged.'" *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (alteration and emphasis in original).

**B.      Rule 12(b)(2)**

"[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester*, 722 F.3d at 84 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Relevant here, before discovery, "a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's prima facie showing may be established solely by allegations." *Id.* (quoting *Ball*, 902 F.2d at 197); *accord In re Terrorist Attacks*, 714 F.3d at 673 ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." (citation omitted)).

A showing of personal jurisdiction "may be made through the plaintiff's 'own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant.'" *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)). The Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Dorchester*, 722 F.3d at 85 (quoting *S. New Eng.*

18

*Tel.*, 624 F.3d at 138).   Nevertheless, the Court "will not draw argumentative inferences in the

plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation."

*In re Terrorist Attacks*, 714 F.3d at 673 (citations omitted).

## III.   Discussion

Plaintiffs bring claims under § 10(b) and § 20(a) of the Exchange Act.   In their Rule

12(b)(6) motions, Braskem, Fadigas, and Gradin argue that the SAC's § 10(b) claims fail to

plead either an actionable misrepresentation or omission or scienter.   Gradin separately argues

that these claims fail to plead loss causation.   And all defendants argue that the SAC's § 20(a)

claims fail to plead control person liability.   Finally, in its Rule 12(b)(2) motion, Odebrecht

argues that the claim against it, under § 20(a), must be dismissed for lack of personal jurisdiction.

The Court addresses the various arguments in turn.

### A.   Actionable Misrepresentation or Omission

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection

with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance

in contravention of such rules and regulations as the Commission may prescribe."   15 U.S.C. §

78j(b).   The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any

untrue statement of a material fact or to omit to state a material fact necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading."

17 C.F.R, § 240.10b-5.   To state a claim for securities fraud under § 10(b) and Rule 10b-5, a

plaintiff must, therefore, adequately plead these six elements: "(1) a material misrepresentation

or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or

omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

The SAC here faults defendants for not disclosing the criminal bribery scheme in which Braskem participated so as to secure favorable prices for naphtha. The non-disclosure of that scheme, plaintiffs allege, made various of defendants' statements misleading and/or constituted a material omission. In moving to dismiss, Braskem, Fadigas, and Gradin counter that the SAC does not adequately allege a material misrepresentation or omission, and therefore does not state a § 10(b) claim. Braskem Def. Br. at 18; Gradin Def. Br. at 15.

Three background legal principles frame this dispute.

*First*, as to whether defendants had a duty to disclose the naphtha bribery scheme, for plaintiffs to state a § 10(b) claim, the SAC must adequately plead that Braskem made a statement that—absent disclosure of the bribery scheme—was "'misleading as to a material fact.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis omitted). That is because—as plaintiffs acknowledge[4]—Braskem did not have a freestanding legal duty to disclose the bribery scandal, no matter how unseemly the scandal was and no matter how significant the scandal would have been to the market. Federal securities law "do[es] not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc.*, 563 U.S. at 44. And "[d]isclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable investor." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 23 (S.D.N.Y. 2016) (quoting *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002)). Rather, an omission is actionable only when disclosure of the information in question is "necessary 'to make . . . statements made,

---

[4] *See* Pl. First Opp. Br. at 21; Dkt. 94 at 29.

in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)) (ellipses in original).

Based on this principle, courts presented with the specific context here—of undisclosed corporate malfeasance or allegations of the same—have held that disclosure was not required except where doing so was necessary to prevent the corporation's *other* statements from being misleading. *See, e.g.*, *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp.2d 452, 469 (S.D.N.Y. 2006) ("the securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct"; disclosure required only "where 'a failure to disclose facts that amount to mismanagement may render other statements misleading'" (quoting *In re NTL Inc. Sec. Litig.*, 347 F. Supp.2d 15, 27 (S.D.N.Y. 2004)); *see also In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) (defendants did not have duty to disclose SEC investigation); *Perez v. Higher One Holdings, Inc.*, No. 3:14 Civ. 755 (AWT), 2016 WL 6997160, at *15 (D. Conn. Sept. 13, 2016) (defendants did not have duty to disclose improper business practices); *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) (defendants did not have duty to disclose predatory recruiting tactics). And a corporation, by reporting its income, does not take on a duty to disclose that some of that income may be due, in part, to unlawful conduct. *In re Marsh & Mclennan*, 501 F. Supp. 2d at 470 ("[T]he allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability"; "a company's misleading statements about the sources of its revenue do not make the company's statements of the revenue figures misleading; rather, liability is limited to the misleading statements themselves."). *Id.* Of course, a disclosure obligation may alternatively

arise from a separate statute or regulation.  But the SAC does not identify any statute or regulation that obliged Braskem to publicly disclose its bribery.

*Second*, as to the requirement of materiality, it "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *Id.* at 28 (quoting *Basic*, 485 U.S. at 231–32).  The Supreme Court has rejected a lower standard—for example, defining a "material fact" as any "fact which a reasonable shareholder might consider important"—because such a standard would lead corporations to "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976). The "materiality hurdle" is, therefore, "a meaningful pleading obstacle." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013).  However, because the materiality inquiry is fact-intensive, a court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Carpenters Pension Trust Fund*, 750 F.3d at 235 (quoting *ECA*, 553 F.3d at 197).

*Third*, to the extent that a § 10(b) claim implicates subjective statements of opinion, such statements, like objective statements of material fact, can be actionable as fraud.  Such statements of opinion can give rise to liability in two distinct ways.  First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct.

1318, 1327 (2015)).[5]  Second, "opinions, though sincerely held and otherwise true as a matter of

fact, may nonetheless be actionable if the speaker omits information whose omission makes the

statement misleading to a reasonable investor."  *Sanofi*, 816 F.3d at 210 (citing *Omnicare*, 135 S.

Ct. at 1332).[6]

The Court now applies these principles to the public statements which plaintiffs claim

were materially misleading absent disclosure of the naphtha bribery scheme.  These statements

are usefully sorted into three categories: (1) Braskem's standards of conduct and code of ethics,

as articulated in the Odebrecht press release, Braskem's sustainability reports, and Braskem's

code of conduct; (2) Braskem's statements relating to its internal controls, as articulated in

Braskem's SOX certifications attached to the company's Form 20-F filings; and (3) Braskem's

statements relating to the basis for prices it paid for naphtha, as articulated in the company's

Form 20-F and Form 6-K filings.

### 1.      Statements Regarding Code of Ethics and Standards of Conduct

The Court considers first the general statements by Braskem—and, in its press release

about Braskem, by Odebrecht—with respect to Braskem's ethics and standards of conduct.  For

the reasons that follow, the Court holds that, whether viewed as statements of fact or opinion,

---

[5] "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events."  *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004).  "The Second Circuit has firmly rejected this 'fraud by hindsight' approach."  *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (citing *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

[6] To state a claim on this theory, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Id.* (quoting *Omnicare*, 135 S. Ct. at 1332).

these statements—which principally appear in the press release, the sustainability reports, and the code of conduct—are non-actionable as immaterial puffery.

"The materiality of a misstatement depends on whether 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" *JP Morgan*, 553 F.3d at 197 (quoting *Basic*, 485 U.S. at 231–32) (alteration in original) (internal quotation marks omitted). "In other words, in order for the misstatement to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Id.* (quoting *Basic*, 485 U.S. at 231–32) (internal quotation marks omitted).

Significant here, the Second Circuit has held that statements that are too vague or general or are merely reflections of corporate puffery are not actionable. "To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014). As the Circuit has explained: "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" *Id.* at 183 (quoting *JP Morgan*, 553 F.3d at 206).

A useful illustration of this principle is contained in *City of Brockton Ret. Sys. v. Avon Prod., Inc.*, holding non-actionable a series of general statements found in Avon's ethics code and corporate responsibility reports. No. 11 Civ. 4665 (PGG), 2014 WL 4832321, at *16 (S.D.N.Y. Sept. 29, 2014). These statements included an assurance that "[o]ne of Avon's fundamental

principles is that its associates will observe the very highest standards of ethics in the conduct of Avon's business, so that even the mere appearance of impropriety is avoided," *id.* at *13, and a pronouncement that "[b]ribes, kickbacks and payoffs to government officials, suppliers and other[s] are strictly prohibited" and that "[n]o gift, entertainment or favor of any kind may be given to any government employee without the prior approval of the Legal Department or officer in charge of legal affairs in your country," *id.* at *14 (internal quotation marks omitted). The district court held that a reasonable investor would not rely on these statements "as a guarantee that Avon would, in fact, maintain a heightened standard of legal and ethical compliance," *id.* at *16. Such statements, the Court explained, "offer no assurance that Avon's compliance efforts will be successful, and do not suggest that Avon's compliance systems give the Company a competitive advantage over other companies." *Id.* Accordingly, the court held, the statements at issue were "not material," as they "merely set forth standards in generalized terms that Avon hoped its employees would adhere to." *Id.*

The statements here were similarly inherently immaterial puffery. The statements which plaintiffs claim were materially misleading at issue broadly touted Braskem's "trustworth[y]" culture, SAC ¶ 80, its commitment to "integrity," *id.*, its "compliance with the laws," *id.*, its "fundamental values such as transparency, ethics, clarity of information and responsibility for Supply decisions," *id.* ¶ 78, and its commitment to "transparency and good corporate governance practices," *id.* ¶ 100. Such statements "consist of precisely the type of 'puffery' that [the Second] and other circuits have consistently held to be inactionable." *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (per curiam) (statements regarding company's "financial integrity" non-actionable); *see In re Marsh & Mclennan Cos.*, 501 F. Supp. 2d at 475 (statements regarding company's "culture of excellence" were puffery); *Boca Raton Firefighters*

*& Police Pension Fund v. Bahash*, 506 F. App'x. 32, 36–37 (2d Cir. 2012) (summary order)

(statement that "recently posted code of practices and procedures 'underscores [company's]

dedication towards transparent and independent decision-making process'" non-actionable).

To the extent that plaintiffs rely on Braskem's code of conduct, it is a particularly inapt

candidate to serve as the basis for § 10(b) liability. As the Second Circuit has noted, statements

within such codes tend to be "explicitly aspirational, with qualifiers such as . . . 'should.'" *UBS*,

752 F.3d at 183. Such is the case here, even based on the code excerpts extracted by plaintiffs in

the SAC. *See, e.g.*, SAC ¶ 81 (Braskem's code was adopted "to establish . . . ethical principles

and rules of conduct"); *id.* (noting that under code, Braskem *"expects* its members" to adhere to

certain standards and that employees *"should* not [make certain] statements") (emphasis added)).

Braskem's statement in the Form 20-F filed on June 10, 2011, to the effect that "[n]o

waivers of the provisions of the code of ethics are permitted," *id.* ¶ 98, does not alter this

analysis.[7] Because "a code of ethics is inherently aspirational[,] it simply cannot be that every

time a violation of that code occurs, a company is liable under federal law for having chosen to

adopt the code at all." *Retail Wholesale & Dep't Store Union Local 338 Retirement Fund v.*

*Hewlett-Packard Co.*, 52 F. Supp. 3d 961, 970 (N.D. Cal. 2014), *aff'd sub nom. Retail Wholesale*

*& Dep't Store Union Local 338 Ret. Fund v. Hewlett–Packard Co.*, 845 F.3d 1268 (9th Cir.

2017); *see City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415

(D. Del. 2009) ("untenable" to hold that "any company with a code of ethics in compliance with

§ 229.406 would be required to disclose all violations of that code or face liability under federal

securities law").

---

[7] This statement was made in accordance with NYSE requirements that "a listed company . . . promptly disclose any waivers of the code for directors or officers." NYSE Listed Companies Manual § 303A.10.

Plaintiffs, finally, rely on the code's anti-bribery prohibitions. *See, e.g.*, SAC ¶ 81 ("It is strictly forbidden to all Members of BRASKEM [to] offer or promise . . . payments, gifts or benefits to public officials . . . in order to obtain benefit for the company."). An undisclosed breach of this standard of conduct is, however, without more, not actionable under the securities laws. There is an important difference between a company's announcing rules forbidding bribery and its factually representing that no officer has engaged in such forbidden conduct. *See In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 360 (S.D.N.Y. 2015) ("Although the Company's codes of ethics prohibit bribery and other forms of fraudulent conduct, they do not claim that PetroChina's officers are abiding by them. Since the SAC does not challenge the actual existence of these rules, nor PetroChina's description of them, Plaintiffs have not demonstrated that the Company's statements were false or misleading."). The SAC does not allege any historical representation by Braskem to the effect that its officers had uniformly abided by these rules.

To be sure, in some cases, corporate statements regarding compliance policies have been held actionable. But the statements at issue in these cases went beyond aspirational or general puffery, so as, for example, to falsely represent a record of past or present compliance with such policies. In *In re Goldman Sachs Group Inc. Securities Litigation*, for example, plaintiffs brought § 10(b) claims based, in part, on Goldman Sachs's statements about its integrity and reputation, which plaintiffs claimed were "directly at odds with [the defendants'] alleged conduct." No. 10 Civ. 3461 (PAC), 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014)); *see also Richman v. Goldman Sachs Grp.*, Inc., 868 F. Supp. 2d 261, 279–80 (S.D.N.Y. 2012); *Lapin v. Goldman Sachs Grp. Inc.*, 506 F. Supp. 2d 221, 240–241 (S.D.N.Y. 2006). The district court sustained such claims, but, importantly, noted that the complaints alleged more pointed

misrepresentations. For example, Goldman had stated that it was free from conflicts of interest when, as alleged, it knew it was not.[8] Here, in contrast, the Braskem statements at issue about the company's culture, reputation, and compliance were all pitched at a general and an aspirational level. They do not contain historical representations. And they do not address any concrete policy or practice with sufficient specificity to render them analogous to the statements held actionable in the *Goldman* cases.

Also distinguishable is *In re Petrobras Securities Litigation,* 116 F. Supp. 3d 368 (S.D.N.Y. 2015), a putative securities class action based, as here, on the failure to disclose a Brazilian bribery and kickback scheme. Plaintiffs claimed that various statements by Petrobas, and associated officers and entities, were false and misleading. *Id.* at 372–73. Relevant here, the district court held that some of Petrobras's statements about its "general integrity and ethical soundness" were not immaterial as a matter of law. *Id.* at 381. "[V]iewed in isolation," the court noted, the statements "may be mere puffery"; in fact, Petrobas had repeatedly used the statements "in an effort to reassure the investing public about the Company's integrity," so as to cause "a reasonable investor [to] rely on them as reflective of the true state of affairs at the Company." *Id.* Thus, the Court emphasized, "[w]hether a representation is 'mere puffery' depends, in part on the context in which it is made." *Id.*

The context of the statements here about corporate integrity and ethics is very different than in *In re Petrobras Securities Litigation.* Petrobras had made such statements to parry, and reassure investors in the face of, growing concerns about corporate wrongdoing. *Id.* In contrast,

---

[8] *See In re Goldman Sachs,* 2014 WL 2815571, at *5 (Goldman's representation that it "ha[d] extensive procedures and controls that are designed to . . . address conflicts of interest" was directly contrary to its alleged participation in conflicted transactions (internal quotation marks omitted)); *Lapin,* 506 F. Supp. 2d at 240 (complaint "does more than identify rosy predictions or vague statements about Goldman's integrity"; as alleged, Goldman had sought to distinguish itself from competitors by falsely touting its "truly independent investment research").

here, there is no allegation that Braskem touted its culture and ethics for such a purpose.  There are, for example, no allegations that Braskem published its sustainability reports and its code of conduct other than in the ordinary course of business.  And the SAC does not allege that Braskem deployed these documents to quell a controversy or to lull a discontented investor or regulator.  And the statement in the Odebrecht's press release, as alleged, was made in an extraneous context: in the course of an announcement that Braskem had won an award.  SAC ¶ 100.  Thus, the context of the statements here does not support the inference that Braskem touted its ethics and principles in a defensive maneuver to fend off inquiries about wrongdoing.

For these reasons, the Court holds, the statements identified in the SAC regarding Braskem's corporate culture are all immaterial puffery.  None are actionable under the securities laws.

### 2.      Statements Regarding Braskem's Internal Controls

The statements regarding Braskem's internal controls, contained in the SOX certifications attached to Braskem's Form 20-F filings, are also not actionable under § 10(b).  As alleged, these certifications recited, in essence, that, to the knowledge of the certifying party, Braskem's financial statements were accurate, and that Braskem had disclosed all significant deficiencies and internal controls over financial reporting, and any fraud in connection with financial reporting.  *See* SAC ¶ 93.  Plaintiffs' claims that the certifications were misleading founder because there are no concrete factual allegations in the SAC that made those statements false or misleading.  Indeed, the SAC is devoid of *any* allegations indicative of undisclosed control deficiencies affecting Braskem's financial reporting.

In three relatively recent cases, district courts have dismissed § 10(b) claims on materially indistinguishable facts.

In *In re Gentiva Securities Litigation*, the plaintiff claimed that SOX certifications were misleading because the defendant's "disclosure controls and procedures and internal controls over financial reporting were not 'effective.'"  932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013).  The district court dismissed this claim.  The complaint, the court noted, did not "allege any particularized facts which would suggest that the actions articulated in the SOX Certifications were not undertaken by the individual defendants or for that matter any factual allegations concerning [the company's] financial reporting processes." *Id.*  Thus, the allegations as to the company's deficient financial controls and accounting were wholly conclusory. *Id.* (internal quotation marks omitted).

In *City of Monroe Employees' Retirement System v. Hartford Financial Services Group, Inc.*, the district court similarly rejected a § 10(b) claim based on allegedly misleading SOX certifications.  The plaintiffs had not pled "any facts pertaining to [defendants'] internal structure for financial reporting, much less that [defendants'] lacked adequate internal controls."  No. 10 Civ. 2835 (NRB), 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011); *see also La Pietra v. RREEF Am., L.L.C.*, 738 F. Supp. 2d 432, 443 (S.D.N.Y. 2010) (dismissing § 10(b) claim where plaintiffs' "allegations of lack of controls" were "conclusory assertion[s] without any factual support").

Finally, in *In re PetroChina Co. Ltd. Securities Litigation*, the district court rejected a § 10(b) claim based on PetroChina's SOX certifications.  As the court explained, the complaint did not "claim that PetroChina failed to evaluate its internal controls or disclose any weaknesses to its auditors," "assert that the certifying officers neglected to inform PetroChina's auditor of any relevant fraud," or allege "how or why PetroChina's internal controls were inadequate."  120 F. Supp. 3d at 359 (citing *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL

1080306, at *9 (S.D.N.Y. Mar. 30, 2012)).  While the complaint alleged that "PetroChina officials were engaging in bribery," the court noted, that did not mean—and the complaint did not allege—"that the Company had flawed internal controls *over financial reporting*."  120 F. Supp. 3d at 359 (emphasis added).

The SAC here has the same infirmities.  It lacks any concrete factual allegations that Braskem had deficient internal controls governing its financial reporting.  Indeed, the SAC does not concretely allege that any of Braskem's financial reports were in any way inaccurate. Accordingly, to the extent the SAC brings claims based on Braskem's SOX certifications, these do not state a claim.

### 3.    Statements Regarding Naphtha Pricing

The final category of challenged statements are those in which Braskem addressed the bases for the prices at which it purchased naphtha, its critical raw material input, from Petrobras. These statements appear in Braskem's 20-F and 6-K filings.

The SAC alleges that such statements were materially false and misleading because, while reciting various benign factors as bases for the naphtha prices Braskem was paying, they omitted the fact that these prices had been set as a result of a side agreement enabled by Braskem's payment of substantial bribes to Petrobras and to Brazilian political leaders.  The SAC alleges that Braskem's portrait of the relevant factors left the market with the misleading impression that the cost of this vital input was the product of unremarkable market forces, when in fact it, largely, resulted from corporate corruption.  *See* SAC ¶¶ 84, 86, 88, 90.

For the reasons below, the Court finds that, as to these statements, the SAC does allege "a material misrepresentation or omission," actionable under § 10(b).  *See Stoneridge Inv. Partners, LLC*, 552 U.S. at 157.

As noted, Braskem made a variety of statements in its Form 20-F and Form 6-K filings explaining the bases of the price it paid for naphtha.  The Form 20-F filings explain that Braskem purchases naphtha "at prices based on a variety of factors."  *See e.g.*, SAC ¶ 95.  The Form 20-F filings state that those factors "include[e]": (1) "the Amsterdam-Rotterdam-Antwerp market prices of naphtha and a variety of other petrochemical derivatives," (2) "the volatility of the prices of these products in the international markets," (3) "the *real*/U.S. dollar exchange rate," and (4) "the level of paraffinicity of the naphtha that is delivered."  *Id.*  The Form 6-K filings similarly depict the price for naphtha as a function of "the average price of ARA naphtha," with "ARA" referring to a recognized international rate.  *See, e.g.*, *id.* ¶ 83.

To be sure, these statements were not literally false.  Neither the 20-F filings nor the 6-K filings stated that factors they recited were the only price determinants.  And the SAC does not allege that any of the factors listed in the 20-F filings, or the ARA benchmark cited in the 6K filings, did not contribute to the prices that Braskem paid Petrobras for naphtha.  The Court therefore rejects—and plaintiffs at argument abandoned, *see* Dkt. 94 at 30–31—any claim that these filings contained an affirmative misstatement.

However, the SAC validly alleges that each filing was misleading, because each, while commenting on naphtha pricing, omitted to reveal the—or at least an—elephant in the room: that the favorable purchase price that Braskem secured was subsantially due to its bribery of Petrobras and public officials.

As noted, the SAC alleges that, as early as 2006, Braskem began its practice of paying bribes so as to reduce the price of naphtha.  SAC ¶ 53.  Costa testified that CEO "Gradin himself asked Costa to maintain the naphtha prices for Braskem below 95% of the ARA—the standard ARA being the price reference used in Braskem's international purchases."  *Id.* ¶ 41.  The

bribery-infused naphtha negotiations were later "memorialized" in Braskem's and Petrobras's 2009 Naphtha Agreement. *Id.* ¶ 42. The SAC alleges that, in that agreement, while "Petrobras and Braskem did not agree on a fixed price for naphtha[,] . . . executives from both companies agreed on a formula" for naphtha pricing and agreed on means of manipulating the formula so as to produce a below-market purchase price for Braskem. *Id.* Under the agreement, the price that Braskem would pay for naphtha would ostensibly be based on "an aggregate calculation of the average standard prices for a pre-determined group of raw materials." *Id.* In reality, the colluding executives agreed to manipulate the formula by introducing into the calculation a raw material called "Marlim oil," which would skew the formula to yield a price for naphtha that would "consistently be lower" and " more favorable" to Braskem. *Id.* The SAC alleges that, over the ensuing years, including throughout the Class Period, Braskem continued to bribe Petrobras and the companies continued to deploy the manipulated formula to ensure Braskem below-market pricing for naphtha.

The SAC's bribery narrative is well-pled and supported by the testimony in Brazil that it recites. In light of this bribery scheme, each of the two categories of Braskem's recurrent public filings—the Form 20-Fs and the Form 6-Ks—are fairly alleged to be materially misleading.

As to the Form 20-F filings, these spanned 2010 through 2013. The SAC alleges that Braskem there cherry-picked for public consumption benign factors relevant to naphtha pricing. At the same time, it alleges, Braskem deceptively omitted to list—among the "variety of factors" that the Form 20-F depicted as the reasons for the naphtha prices Braskem paid Petrobras—a major factor: the bribery scheme that secretly assured that, whatever result the listed factors might otherwise yield, Braskem would emerge paying a below-market price. Such a selective portrait, if not inescapably misleading, is certainly plausibly alleged to have been so. As pled,

Braskem's omission from its list of this key factor, the bribery-affected side deal with Petrobras, was a classic half-truth. *See In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016) ("Such a statement is a half-truth sufficient to state a claim.").

Braskem's Form 6-K filings, all made in 2010, are also fairly pled as misleading. That is so for two related reasons. First, those filings anchored Braskem's cost of goods sold to the ARA rate, which these filings repeatedly reference. The August 13, 2009, Form 6-K noted, for example, that the average ARA naphtha price in the second quarter had increased by 41%, year over year, but that this increase had been "partially offset by the higher operating efficiency in this period." SAC ¶ 83. Later in the same filing, Braskem referenced "[t]he average price of ARA naphtha in the quarter," and noted that it had acquired "the bulk of its naphtha feedstock from Petrobas." *Id.* Braskem did not reveal, however, that, as to Petrobras, the price it was paying for naphtha pivoted not just on the ARA price but, also, materially, on the two companies' bribery-induced side agreement. Second, in a Form 6-K issued 11 days later, Braskem referenced "[t]he inter-company transactions between [Braskem] and related companies." *Id.* ¶ 85. It stated that these transactions "are made on terms equivalent to the averages practiced with third parties," subject to certain qualifications, including that, as to Petrobras, the price of naphtha turned on "a clause related to the quality of parafinicity and contaminants in the naphtha delivered." *Id.* Again, as pled, this formulation elided a central reality: The naphtha pricing was a function of more than corporate "relatedness"—it derived from a long-running criminal scheme. Put in journalistic terms, the SAC alleges that Braskem deliberately "buried the lead." There were indeed terms unique to Braskem's relationship with Petrobras that influenced the price Braskem paid for naphtha, but they involved not just "the

quality of parafinicity and contaminants in the naphtha delivered," or the companies' "inter-company transactions." They also involved a rigged pricing scheme.

Under these circumstances, disclosure of the bribery scheme was necessary to make Braskem's incomplete statements about the bases for naphtha pricing non-misleading. And Braskem's omission of that fact was material. "A statement is materially misleading if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available." *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000) (internal quotation marks omitted). The SAC fairly alleges that disclosure of the bribery scheme would have significantly altered the total mix of information available to the market. Such a disclosure would have called into question whether Braskem's ability to secure favorable pricing in the future was durable and due to a legitimate competitive advantage, or whether—like all illegal arrangements—it was legally unenforceable and subject to abrupt termination. The market, too, might have questioned whether Braskem's business practice of securing better pricing through bribery left Braskem open to the risk of exposure, scandal, and instability.

The Court's holding that these statements were actionable accords with that in *In re Par Pharmaceutical Inc. Securities Litigation*, 733 F. Supp. 668 (S.D.N.Y. 1990). The district court there found that Par Pharmaceutical Inc. ("Par") had made false and misleading statements "touting Par's . . . competitive advantage in obtaining speedy FDA approvals and Par's earnings performance." *Id.* at 675. Plaintiffs alleged that these statements were false and misleading by virtue of Par's failure to disclose "(1) that such advantage was obtained through an illegal scheme of bribes rather than through defendants' expertise and business acumen, and (2) that the public disclosure and/or termination of the bribery scheme would have a profound harmful effect

on Par's sales, profit margins and earnings." *Id.* As here, the plaintiffs in *Par Pharmaceutical* conceded "that some of the statements they claim[ed] were 'false and misleading' were literally true," but argued that "these statements were essentially 'half-truths,' and thus misleading and actionable under Rule 10b-5." *Id.* at 677. Agreeing with plaintiffs, the *Par* district court noted that "a statement is misleading if a reasonable investor, in the exercise of due care, would have received a false impression from the statement." *Id.* (internal quotation marks and citations omitted). "[T]his determination requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts." *Id.* (internal quotation marks and citations omitted). On the facts pled, the court held "[a] reasonable jury could find these statements . . . to have been misleading to a reasonable investor, in light of the circumstances under which they were made." *Id.* Such a jury

> could find that, by extolling Par's ability to obtain FDA approvals, by comparing Par's success in this regard to other companies in the industry and to its own previous performance, and by projecting continued success in obtaining rapid approvals, the statements conveyed to a reasonable investor the false impression that Par had a particular expertise in obtaining FDA approvals constituting a legitimate competitive advantage over other companies and that this advantageous expertise was responsible for its success in obtaining FDA approvals.

*Id.* at 677–78.

Also in accord is *In re Van der Moolen Holding N.V. Securities Litigation*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005). There, the district court held that plaintiffs had satisfactorily alleged false and misleading statements by Van der Moolen which touted the company's profitability "[i]n exceedingly turbulent market circumstances" without disclosing that such profitability was attributable, "at least in part, [to] trading practices that violated NYSE rules." *Id.* at 400–02. "Statements such as these," the court held, "put the sources of . . . revenue at issue" and, "[u]nder

the circumstances, the alleged failure to disclose the true sources of such revenue could give rise to liability under Section 10(b)." *Id.* at 401.

As in *In re Par Pharmaceutical, Inc. Securities Litigation* and *In re Van der Moolen Holding N.V. Securities Litigation*, the context in which Braskem's statements regarding the price of naphtha were made would permit a reasonable jury to find those statements misleading. Braskem was certainly not obliged to publicly address the components and determinants of the prices it paid Petrobas for naphtha. It was entitled to stay mum on that point. But, having opened up that subject for discussion, it was not at liberty to selectively omit what the SAC fairly alleges as a central determinant of that price: the corrupt arrangement Braskem had struck with the Petrobras officials it bribed.

Accordingly, the Court denies the motion to dismiss, to the extent that the SAC's theory of § 10(b) liability is based on the statements in Braskem's Form 20-F and Form 6-K filings regarding the pricing of naphtha. Those statements are fairly pled to be materially misleading.

### 4.   Implications for the Individual Defendants

The Court's holding that only certain statements on which the SAC's claims are based— those regarding naphtha pricing in the Form 20-Fs and Form 6-Ks—are actionable under § 10(b) has implications for the claims against Gradin and Fadigas.

### i.   Gradin

Gradin left his position as Braskem's CEO in December 2010. SAC ¶ 25. He was thus no longer CEO at the time the earliest Form 20-F at issue was filed in June 2011 *See id.* ¶ 92. Accordingly, Gradin cannot be held to have violated § 10(b) based on the Form 20-Fs.

Gradin was still CEO when the four Form 6-Ks identified in the SAC were filed, between August 13, 2010 and November 26, 2010. *See id.* ¶¶ 83, 85, 87, 89, 167. Unlike other Braskem-

issued documents on which the SAC relied but which the Court has held non-actionable, however, Gradin is not alleged to have signed any of the Form 6-Ks.  Nor does the SAC allege concretely that Gradin played any role in bringing about any statements in the Forms 6-K, including the statements the Court has found actionable.

Under these circumstances, to hold Gradin liable under § 10(b) based on the Form 6-K filings would require the Court to rely on the "group pleading doctrine."  In courts that have held the doctrine viable under § 10(b), the group-pleading doctrine has been used to "permit plaintiffs, for pleading purposes only, to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company."  *In re BISYS Sec. Litig.*, 397 F.Supp.2d 430, 438 (S.D.N.Y. 2005).  The doctrine has been held "limited to group-published documents, such as SEC filings and press releases." *Elliott Assocs., L.P. v. Covance, Inc.*, No. 00 Civ. 4115 (SAS), 2000 WL 1752848, at *12 (S.D.N.Y. Nov. 28, 2000).[9]

For three independent reasons, the Court declines to sustain the SAC's allegations against Gradin on the basis of the group-pleading doctrine.

First, although the SAC alleges that the individual defendants (including Gradin) had responsibilities for Braskem's public filings, these allegations are global and general.  They are not particularized at all as to Gradin.[10]  The SAC lacks any specific factual allegation regarding

---

[9] To invoke the group pleading doctrine, "the complaint must allege facts indicating that the defendant was a corporate insider, with direct involvement in day-to-day affairs."  *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 477 (S.D.N.Y. 2013) (internal quotation marks and alteration omitted); *see In re Alstom SA*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005).
[10] The SAC alleges that "[e]ach of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were

Gradin's role in the creation, formulation, or dissemination of Braskem's public filings, whether in general, as to Forms 6-K as a body, or as to the particular Forms 6-K that the Court has found actionable.

Second, plaintiffs have not invoked the group-pleading doctrine here, either in the SAC or their brief opposing Gradin's motion to dismiss. The Court declines to sustain a complaint based on a theory of liability that plaintiffs have not invoked or defended. *See Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 352 (S.D.N.Y. 2013) (plaintiff waived theory of liability by failing to raise it until opposition brief on motion for summary judgment); *S.E.C. v. Lyon*, 605 F.Supp.2d 531, 550 (S.D.N.Y. 2009) (new theory of fraud liability waived because not pleaded in complaint with particularity as required by Rule 9(b)).

Third, although there is no need to resolve the doctrinal issue here, the Court has doubt whether the group-pleading doctrine remains good law, at least where, as here, a complaint has done no more than attempt, on an *ex officio* basis, to hold each defendant executive liable for an issuer's public statements. In its 2007 *Tellabs* decision, the Supreme Court noted a split among the circuit courts of appeals as to whether the group-pleading doctrine survived the PSLRA. *See* 551 U.S. at 326 n.6. The Third, Fifth and Seventh Circuits have squarely held that it does not. *See, e.g., Winer Family Trust v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007) ("[T]he group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA."); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) ("The 'group pleading' doctrine conflicts with the scienter requirement of the PSLRA."); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("[T]he [group pleading] doctrine is

---

issued and had the ability to prevent the making of material omissions or cause affected statements to be corrected." *Id.* ¶ 167. The SAC further alleges that "each of the Individual Defendants had direct involvement in the day-to-day operations of the Company." *Id.* ¶ 168.

inconsistent with the "strong inference" requirement [of the PSLRA]."). The Supreme Court's

ensuing decision in *Janus Capital Group v. First Derivative Traders*, 564 U.S. 135 (2011), cast

further doubt on the viability of that doctrine. The Supreme Court held in *Janus* that only

makers of misleading statements can be liable under § 10(b) and Rule 10(b), and that there is no

aiding and abetting liability under those provisions. Various courts and commentators have

viewed *Janus* as potentially interring the group pleading doctrine. *See, e.g.*, *In re ShengdaTech,

Inc. Sec. Litig.*, No. 11 Civ. 1918, 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) ("[T]here

is some question whether the group pleading doctrine has been abrogated by *Janus*."); *Rolin v.

Spartan Mullen Et Cie, S.A.*, No. 10 Civ. 1586 (CM) (FM), 2011 WL 5920931, at *5 (S.D.N.Y.

Nov. 23, 2011) ("Whether the Supreme Court's decision in *Janus Capital* abrogated [the group

pleading doctrine . . . ] is an open question.").[11] With plaintiffs having not invoked or briefed

that doctrine here and with the SAC's having pled Gradin's association with Braskem's public

filings in only the most conclusory terms, the Court has no occasion, *sua sponte*, to assess here

the doctrine's continued vitality.

   The Court, therefore, dismisses the SAC's § 10(b) claim against Gradin. With the

statements giving rise to potential liability narrowed to the Forms 20-F and 6-K, the SAC does

not allege sufficient facts on which Gradin can be held primarily liable for those statements.[12]

---

[11] The Second Circuit adopted the group pleading doctrine in *DiVittorio v. Equidyne Extractive
Indus. Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). The Circuit does not appear to have expressly
reconsidered the doctrine after enactment of the PSLRA and the decision in *Janus*. In *Loreley
Financing v. Wells Fargo Securities, LLC*, the Circuit permitted claims to proceed where
plaintiffs brought claims against "plural authors," but *Loreley* involved claims under state law,
not federal securities law. 797 F.3d 173 (2d Cir. 2015).

[12] Plaintiffs disclaim an alternative theory of liability for Gradin under § 10(b)—scheme
liability—that conceivably could have pursued alongside the SAC's theory of liability for false
and misleading statements and omissions. Gradin argues that the SAC does not state a claim

### ii.  Fadigas

Fadigas became Braskem's CEO in December 2010.  *Id.* ¶ 26.  He held this position at the time each Form 20-Fs was filed, and Fadigas personally signed these filings.  *Id.* ¶¶ 92, 104, 113, 124.  Unlike in the case of Gradin, the SAC thus can state a primary § 10(b) violation against Fadigas as to actionable statements in the Form 20-Fs.

As to the Forms 6-K, Fadigas was not yet CEO at the time of the Form 6-Ks were filed. He was CFO at the time.  *Id.* ¶ 26.  The SAC, however, does not allege that Fadigas played any concrete role in connection with the creation or dissemination of these forms.  For the reasons discussed in connection with Gradin, the Court declines to hold Fadigas liable for corporate statements based on the group-pleading doctrine.

The § 10(b) claims against Fadigas, therefore, may go forward, but limited to claims based on the Form 20-Fs.

### B.    Scienter

To state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must plead the defendant's scienter.  *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157.  This requires an adequate pleading that the defendant acted with intent "to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313 (citation omitted).  A plaintiff can clear this threshold by pleading facts showing either "(1) that defendant[] had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 198.

To show motive and opportunity, plaintiffs must allege that defendants "benefitted in some concrete and personal way from the purported fraud."  *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir.2000)).  "Motives that are common to most corporate officers, such as

---

against him for scheme liability, *see* Gradin Def. Br. at 22-23; SAC ¶ 156, and plaintiffs do not challenge that assertion, *see* Pl. First Opp. Br. at 40 n.18.

the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.*; *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (prolonging time in position of authority or desire for increased incentive compensation inadequate motives). The motives of increased compensation and to assure that the company completes announced initiatives are common to corporate officers. *See Saltz v. First Frontier, L.P.*, 485 F. Appx. 461, 464 (2d Cir. 2012).

Alternatively, scienter can be based on a pleading of recklessness, "a sufficiently culpable mental state for securities fraud in this circuit." *ECA*, 553 F.3d at 198. Recklessness is defined as "'at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Novak*, 216 F.3d at 308). Recklessness may be pled based on strong circumstantial evidence, *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001), and a plaintiff may rely on allegations that defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311).

Here, the SAC alleges facts supporting a strong inference that the defendants as to whom § 10(b) claims otherwise remain viable—Braskem, Odebrecht, and Fadigas—were directly involved in the bribery scheme and therefore had actual knowledge that the naphtha pricing statements in Braskem's SEC filings were false or misleading.[13] The SAC alleges in detail that

---

[13] Plaintiffs and Gradin disputed, and briefed extensively, whether the SAC adequately alleges Gradin's scienter. The SAC draws upon the testimony in Brazil of Costa and Youssef in its attempt to establish Gradin's scienter. In light of the Court's ruling that the SAC does not plead viable § 10(b) claims against Gradin, the Court has no occasion to resolve that dispute.

executives from Braskem and its affiliate Odebrecht coordinated payments to Petrobas and political officials so as to obtain favorable naphtha pricing for Braskem. *See, e.g.*, SAC ¶¶ 4, 35–36. Those allegations adequately plead Braskem's and Odebrecht's scienter on either available theory.[14] As to Fadigas, in Brazilian court, Costa testified that, as to the bribe payments, Fadigas "knew what was going on." *Id.* ¶ 39. And Youssef testified that Fadigas, with Gradin, "set" "the bribe amounts." *Id.* ¶ 36. Such "[a]llegations that defendants had actual knowledge that their statements were false or misleading are sufficient to plead scienter." *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *8. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (internal quotation marks omitted).

Accordingly, the Court holds that the SAC adequately pleads scienter as to the remaining § 10(b) defendants—Braskem, Odebrecht, and Fadigas.

### C.    Loss Causation

To state a claim for securities fraud under § 10(b) and Rule 10b-5, plaintiffs must also adequately plead loss causation. *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157.

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 304 (S.D.N.Y. 2011) (internal quotation marks omitted). "To make out loss causation, 'a

---

[14] As to the Form 6-Ks, the SAC does not allege that Drehmer, the CFO who signed them, acted with scienter. That, however, does not prevent a finding of scienter on the part of Braskem, because, as to a corporate defendant, courts have declined to require, at the pleading stage, "'that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter.'" *In re Marsh & Mclennan Cos.*, 501 F. Supp. 2d at 481 (quoting *In re JP Morgan*, 363 F. Supp. 2d at 627). As one court explained, "[c]onfining the pool of employees from which a corporation's scienter may be inferred to those that made an underlying misstatement, . . . is unduly limiting" in that it "forecloses liability in situations where institutional fraud is readily perceivable but plaintiffs have yet to match a culpable employee with a public misstatement." *In re Marsh & Mclennan Cos.*, 501 F. Supp. 2d at 481.

plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Id.* (quoting *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir.2010)). A plaintiff may establish loss causation by demonstrating either "(1) a corrective disclosure or (2) a materialization of a concealed risk." *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d at 304.[15]

"[P]laintiffs need not allege that their entire loss was caused by the misstatements and omissions complained of." *Id.* at 305. "To plead loss causation, the complaint must allege facts that support an inference that [the defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of the that loss absent the fraud." *Id.* (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)). "Nor are plaintiffs required to allege that the particular misstatements and omissions directly caused the alleged losses. . . . [M]isstatements or omissions that conceal a risk, the materialization of which causes all or part of the plaintiffs' loss, . . . suffice." *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d at 305.

Here, in an argument made by Gradin but which the Court understands to have been embraced—at least implicitly—by his co-defendants, defendants argue that the SAC fails to establish loss causation, because it does not plead that Braskem concealed the relevant risk. Gradin Def. Br. at 26–27. They note that Braskem had notified investors that the naphtha pricing agreement with Petrobas could expire or be terminated. *Id.* at 27. Therefore, defendants argue, the market was aware that Braskem might not be able to indefinitely secure favorable naphtha pricing. *Id.*

---

[15] To demonstrate a materialization of a concealed risk, a plaintiff "must allege that the loss was (1) foreseeable and (2) caused by the materialization of the concealed risk." *Id.* "A loss is foreseeable if it is within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor." *Id.* at 305 (internal quotation marks omitted).

This argument mischaracterizes the nature of the SAC's allegations. It alleges that Braskem concealed far more than that its favorable pricing for naphtha was not guaranteed to continue in perpetuity. The SAC alleges that Braskem concealed a fact that made cessation of such pricing more likely—the fact that the pricing was the product of an unlawful, and hence inherently unstable, illegal bribery scheme. The SAC further alleges that the bribery scheme, if exposed, as it eventually was, had the potential to imperil Braskem's naphtha business and indeed to pose a substantial (if not existential) threat to the company. Indeed, the SAC alleges, the disclosure of that scheme caused Braskem's shares to drop more than 20% on the day, March 11, 2015, when the scheme was revealed. SAC ¶ 66. These allegations adequately plead loss causation, *i.e.*, that revelation of the undisclosed bribery scheme caused Braskem's stock to drop.

The Court, therefore, rejects defendants' claim that the SAC fails to plead loss causation.

### D.      Personal Jurisdiction

The Court turns next to foreign defendant Odebrecht's motion to dismiss the claims against it for lack of personal jurisdiction.

In determining whether it has personal jurisdiction over a defendant, the Court employs a two-step inquiry. First, the Court must determine whether there is a "statutory basis for exercising personal jurisdiction." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 129 (2d Cir. 2013) (citation omitted). A federal court applies the forum state's personal jurisdiction rules unless a federal statute "specifically provide[s] for national service of process." *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (citation omitted). Second, the Court must consider whether exercise of personal jurisdiction over the defendant is consistent with due process under the Constitution. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167-68 (2d Cir. 2013).

1.    **Statutory Basis for Exercising Personal Jurisdiction**

Plaintiffs identify a valid statutory basis to exercise personal jurisdiction over Odebrecht:

Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  *See S.E.C. v. Straub*, 921 F. Supp. 2d 244,

252 (S.D.N.Y. 2013) ("In securities cases like this one involving securities listed on domestic

exchanges, Section 27 . . . establishes the exclusive basis for personal jurisdiction.").  Section

78aa states in relevant part:  "The district courts of the United States . . . shall have exclusive

jurisdiction of violations of [the Exchange Act] or the rules and regulations thereunder, and of all

suits in equity and actions at law brought to enforce any liability or duty created by [the

Exchange Act] or the rules and regulations thereunder."  Section 27 provides for worldwide

service of process.  *See* 15 U.S.C. §§ 77v.

Under Section 27, there are three recognized bases for exercising jurisdiction over a

foreign defendant: where the defendant "does business in the forum," "does an act in the forum,"

or "causes an effect in the forum by an act done elsewhere."  *In re CINAR Corp. Sec. Litig.*, 186

F. Supp. 2d 279, 304–05 (E.D.N.Y. 2002) (quoting Restatement of Conflict of Laws §§ 35–37).

Plaintiffs here invoke the third basis.  They allege, based on the alleged impact of the securities

fraud on the domestic ADS market, that Odebrecht's conduct caused an effect in the United

States.

The Court therefore turns to the second inquiry: whether exercise of personal jurisdiction

over Odebrecht would accord with constitutional due process.  *See S.E.C. v. Unifund SAL*, 910

F.2d 1028, 1033 (2d Cir. 1990) (citations omitted)); *In re Alstom SA*, 406 F. Supp. 2d 346, 398

(S.D.N.Y. 2005).

2.    **Due Process**

The due process inquiry has two steps. The Court first inquires whether the defendant has sufficient minimum contacts with the forum (the "minimum contacts") inquiry. If so, the Court inquires whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice" (the "reasonableness" inquiry). *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-68 (2d Cir. 1996) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

As to the first inquiry, a court evaluates the "quality and nature" of the defendant's contacts with the forum. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The Court considers these contacts in totality, with the crucial question being whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" "such that [the defendant] should reasonably anticipate being haled into court there." *Id.* (quoting *Burger King*, 471 U.S. at 474–75). The minimum contacts inquiry "focuses on 'the relationship among the defendant, the forum, and the litigation,'" *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)), such that the defendant's conduct in the lawsuit must create a "substantial connection" with the forum. *Id.* The Court considers the contacts the "defendant himself creates with the forum," not the plaintiff's connections to the forum. *Id.* at 1122 (emphasis in original) (citing *Burger King*, 471 U.S. at 475). Given the focus on the defendant's contacts with the forum, not merely with persons who reside there, "the plaintiff cannot be the only link between the defendant and the forum." *Id.* These personal jurisdiction requirements "principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties." *Id.* (citing *Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92

(1980)).  They assure "that a defendant be haled into a court in a forum . . . based on his own affiliation with the [forum], not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the [forum]."  *Id.* at 1123 (quoting *Burger King*, 471 U.S. at 475).  Where the required minimum contacts are found, the Court then assesses the reasonableness of exercising personal jurisdiction over the defendant, *Metro. Life Ins. Co.*, 84 F.3d at 568; *see also Burger King*, 471 U.S. at 476; where they are not, the due process inquiry is at end, *see, e.g., Walden*, 134 S. Ct. at 1126 (holding personal jurisdiction lacking based on lack of minimum contacts without undertaking reasonableness inquiry).

As to the second inquiry, a court determines reasonableness by applying the five-factor test of *Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano Cty.*, 480 U.S. 102, 113 (1987).  *Id.*  The factors are "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."  *Id.* (citing *Asahi*, 480 U.S. at 113–14).  A court that reaches this inquiry evaluates reasonableness in tandem with the defendant's minimum contacts, such that a lesser showing as to one inquiry may be tolerated if the other strongly favors an exercise of jurisdiction, and vice-versa.  *Id.* (citing *Burger King*, 471 U.S. at 477) (although exercise of personal jurisdiction is favored when plaintiff has made a threshold showing of minimum contacts, jurisdiction may be defeated if defendant makes "a compelling case that the presence of some other considerations would render jurisdiction unreasonable.").

The parties here dispute whether Odebrecht has sufficient minimum contacts to support exercise of personal jurisdiction.

Plaintiffs rely on the principle that a foreign defendant's attempt to "obstruct [a forum's] laws" may bring it within its authority. *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 255 (S.D.N.Y. 2013) (quoting *J. McIntyre Machinery., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011)). As plaintiffs note, where "a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, . . . the sovereign has the power to subject the defendant to judgment concerning that conduct." *J. McIntyre Mach., Ltd.*, 564 U.S. at 884. Plaintiffs point to three securities fraud cases in which foreign defendants were held, based on their alleged violations of U.S. law, to have sufficient minimum contacts to justify personal jurisdiction.

In *S.E.C. v. Straub*, the defendants were executives of a Hungarian telecommunications company that was publicly traded through ADRs listed on the NYSE. 921 F. Supp.2d at 250. As alleged, the defendants had engaged in multiple schemes involving the bribery of public officials in Macedonia and Montenegro, and, to cover up this scheme, made false statements in SEC filings. *Id.* The district court held that, inasmuch as defendants had "allegedly engaged in conduct that was designed to violate United States securities regulations," their conduct was "necessarily directed toward the United States, even if not principally directed there." 921 F. Supp. 2d at 248. Finding sufficient minimum contacts, the court noted that, "[b]ecause these companies made regular quarterly and annual consolidated filing," they "knew or had reason to know that any false or misleading financial reports would be given to prospective American purchasers of those securities." *Id.* at 255. The court further held that, "even if Defendants' alleged primary intent was not to cause a tangible injury in the United States, it was nonetheless their intent, which is sufficient to confer jurisdiction." *Id.* at 256.

In *S.E.C .v. Stanard*, the district court found minimum contacts based on a similar theory. No. 06 Civ. 7736 (GEL) (S.D.N.Y. May 16, 2007) (unpublished transcript of ruling, Tr. 3:2–18). As alleged, Stanard had "conceived and implemented a strategy for entering a sham transaction and specifically intended that his work would result in false statements by [his company] in its publicly-filed financial statements in the United States." *Id.* The court reasoned that, "[w]here an executive of a foreign securities issuer, wherever located, participates in a fraud directed to deceiving United States shareholders in violation of federal regulations requiring disclosure of accurate information to holders of securities traded in the United States, . . . direct consequences have occurred"; otherwise, "SEC regulations would be meaningless as applied to foreign issuers of U.S.-traded securities if the United States courts lacked jurisdiction over executives abroad who violate those regulations." *Id.* The court added: "[T]o the extent that [the SEC's] allegation states a claim for violation of the United States securities laws, this Court has jurisdiction over the persons alleged to have committed that violation." *Id.*

Finally, in *In re CINAR Corp. Securities Litigation*, the district court upheld the exercise of personal jurisdiction over a Canadian general counsel who had allegedly signed a fraudulent registration statement. The court reasoned that the general counsel "must have known that the Statement was made to comply with the laws governing securities offerings in American markets and, as such, it would be used and relied upon by American investors." 186 F. Supp. 2d at 306; *see also U.S. S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 547 (S.D.N.Y. 2013) ("It is by now well-established that signing or directly manipulating financial statements to cover up illegal foreign action, with knowledge that those statements will be relied upon by United States investors satisfies [the jurisdictional] test.").

Plaintiffs argue that, like the three defendants above, Odebrecht "engaged in conduct that was designed to violate United States securities regulations," so as to support finding minimum contacts. *Straub*, 921 F. Supp. 2d at 248. The Court therefore examines the SAC's particular allegations regarding Odebrecht.

The SAC's theory of liability is that Odebrecht exercised control over Braskem. To this end, the SAC alleges that Odebrecht (1) held 50.1% of Braskem's voting share capital; (2) had, with Petrobas, veto power over Braskem's corporate actions; (3) appointed, with Petrobas, 10 of Braskem's 11 board members; (4) had power to appoint Braskem's CEO and CFO; and (5) had "sole power to approve Braskem's business plan." SAC ¶ 14. The SAC also cites Braskem's Annual Report for 2014, which reports that Odebrecht had, with Petrobras, the ability to control Braskem's business plan and to decide most corporate actions requiring shareholder approval:

> Under a shareholders' agreement to which Odebrecht and Petrobas are parties, Braskem has agreed to undertake certain actions only after Odebrecht and Petrobas have reached a consensus with respect to those actions and Odebrecht will have the sole power to approve the business plan of our company. . . . As a result, Odebrecht will have the ability to determine the outcome of most corporate actions or decisions requiring the approval of our shareholders or our board of directors—in certain instances, with the consent of Petrobas.

*Id.* ¶ 28 (citing Braskem 2014, Form 20-F, at 8 (filed April 2015)). The SAC also notes that Odebrecht's CEO, Marcelo Odebrecht, was Braskem's board chair until his arrest for bribery, *id.* ¶ 71; that Odebrecht listed Braskem as a subsidiary in its annual reports, *id.* ¶ 73; and that, during the Class Period, Odebrecht regularly published, on its website, press releases related to Braskem, *id.* ¶ 29. As noted, the SAC also alleges that Odebrecht participated in the bribery scheme aimed at influencing the prices Braskem paid for naphtha. *See, e.g, id.* ¶ 4.

Critical, however, is what the SAC does not allege. It does not allege, concretely, that Odebrecht played *any* role in making, proposing, editing or approving Braskem's public filings

in the United States, including the two categories of filings (on Braskem's Forms 20-F and 6-K) regarding naphtha pricing that the Court has held, on the pleadings, to be only the potential bases for defendants' liability to the plaintiffs, domestic purchasers of Braskem ADS shares.  In attempting to tie Odebrecht to these U.S. filings, the SAC makes only the most sweeping and conclusory allegations.  *See, e.g., id.* ¶ 172 ("Odebrecht had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the dissemination of the various statements and omissions which Lead Plaintiff contends are false and misleading.").

Such conclusory labels and allegations "will not do." *Twombly*, 550 U.S. at 555.  They are a far cry from the concrete factual pleadings in *Straub*, *Stanard, In re CINAR Corp.*, each of which pled specific facts making the foreign defendant accountable for an issuer's allegedly actionable corporate statements.  As various courts have held, a conclusory statement that a foreign defendant caused an issuer to making false and misleading filings is not enough to support personal jurisdiction.  *See, e.g, In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008), *aff'd sub nom. State Universities Ret. Sys. of Illinois v. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009) (complaint's allegations that defendants "caused the distribution of false and misleading reports and statements to AstraZeneca investors in the U.S." or "had actual knowledge that each of the representations alleged herein were materially false or misleading" were "merely conclusory statements" incapable of supporting the exercise of personal jurisdiction); *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 489 (S.D.N.Y. 2011), *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012) (conclusory allegations insufficient to establish jurisdiction).  Notably, the SAC alleges no other contacts

between Odebrecht and the United States that could justify the exercise of personal jurisdiction over Odebrecht.

The Court, accordingly dismisses the claims against Odebrecht for lack of personal jurisdiction.[16]

### E.    Control Person Liability

The Court turns last to Gradin's and Fadigas's challenges to the claims against them under § 20(a) for control person liability, to the extent that the SAC has adequately pled claims of primary violations against Braskem under § 10(b).  *See* SAC ¶¶165–174.[17]  Section 20(a) provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (1999).

To state a claim under § 20(a), "'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI*, 493 F.3d at 108); *see Kalnit v. Eichler*, 85 F. Supp.2d 232, 246 (S.D.N.Y. 1999);

---

[16] In light of the finding that Odebrecht lacked sufficient contacts with the United States, the Court has no occasion to consider the due process reasonableness factors.

[17] In light of the dismissal of the claims against Odebrecht for lack of personal jurisdiction, the Court has no occasion to evaluate Odebrecht's challenge to the § 20(a) claim against it.  Were the Court to have reached this issue, however, it would have granted the motion to dismiss to § 20(a), on the grounds that the SAC fails to allege Odebrecht's culpable participation in the relevant Braskem public filings.

*see also In re Lihua Int'l, Inc. Sec. Litig.*, No. 14 Civ. 5037 (RA), 2016 WL 1312104, at *18 (S.D.N.Y. Mar. 31, 2016). As to the second element, control over a primary violator, "a plaintiff must allege 'that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 451 (S.D.N.Y. 2005) (quoting *S.E.C. v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996)).[18] As to the third element, culpable participation, it "means "actual involvement in the making of the fraudulent statements by the putatively controlled entity." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 663 (S.D.N.Y. 2007) (quoting *Ross v. Bolton*, No. 83 Civ. 8244, 1989 WL 80428 (S.D.N.Y. Apr. 4, 1989) (internal citation and quotation marks omitted)).

As to Gradin, the sole issue is presented by the Form 6-Ks filed by Braskem in 2010, because the company's Form 20-Fs were filed after Gradin stepped down as CEO. *See Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 61 (E.D.N.Y. 2011) (corporate officers "cannot be liable as control persons for the period after they left the Company"). Except for conclusory and general allegations to the effect that the company's executive board members were all responsible for all necessary corporate functions, including public filings, *see* SAC ¶ 27, however, the SAC is silent with respect to Gradin's actual control of, or any role he played with respect to, the Form 6-F filings. There are, in fact, no concrete allegations as to Gradin's activities in connection with, or responsibility for, such filings. The SAC therefore fails to adequately plead Gradin's control over this distinct function. And "to satisfy a Section 20(b) claim, the defendant must not only have actual control over the primary violator, but have actual

---

[18] However, "[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity under Rule 9(b) or the PSLRA. They need satisfy only the less stringent requirements of Fed. R. Civ. P. 8." *In re BISYS Sec. Litig.*, 397 F.Supp.2d at 451.

control over the *transaction* in question." *Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 486 (S.D.N.Y. 2014) (internal quotation marks omitted) (finding no control person liability where complaint "alleged no particularized facts suggesting that the [defendant] had control over the alleged misrepresentations at issue").

As to Fadigas, the Court has already sustained the SAC's claims against him of primary liability under § 10(b) with respect to the Form 20-F filings, based on Fadigas's having signed those forms on behalf of Braskem. It follows that Fadigas may also be secondarily liable, under § 20(a), as a person with actual control over those corporate filings. With respect, however, to Braskem's earlier Form 6-K filings, which were filed when Fadigas was Braskem's CFO, the SAC, as with Gradin, is devoid of concrete allegations as to Fadigas's responsibility for, or actions with respect to, such filings. The SAC therefore fails to plead a § 20(a) claim against him with respect to the Form 6-K filings.

## CONCLUSION

For the foregoing reasons, the Court (1) grants in part, and denies in part, the motion to dismiss filed by Braskem and Fadigas; (2) grants the motion to dismiss filed by Gradin; and (3) grants the motion to dismiss filed by Odebrecht. The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 70, 73, and 96. An order as to next steps in this case will follow shortly.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: March 30, 2017
       New York, New York